**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| I.B.I.D. ASSOCIATES LIMITED PARTNERSHIP d/b/a I.B.I.D. ASSOCIATES, L.P., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. _____ |
| | : | |
| COUNCILMEMBER JAMIE GAUTHIER and THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendants. | : | |

**<u>APPENDIX TO VERIFIED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

EXHIBIT 1 - Zoning Map ................................................................................................... 1

EXHIBIT 2 - 1982 HUD Contract ..................................................................................... 3

EXHIBIT 3 - 2021 HUD Contract ...................................................................................... 10

EXHIBIT 4 - Bill No. 210778, introduced Sept. 30, 2021 ........................................... 24

EXHIBIT 5 - Oct. 21, 2021 City Planning Meeting Transcript Excerpt ..................... 29

EXHIBIT 6 - Oct. 26, 2021 Philadelphia City County Rules Committee Meeting
    Transcript ......................................................................................................... 41

EXHIBIT 7 - Bill No. 210778, as amended Oct. 26, 2021 ........................................... 251

EXHIBIT 8 - Bill No. 210778-A, as amended Nov. 4, 2021 ...................................... 261

EXHIBIT 9 - Bill No. 210778-A, as amended Jan. 20, 2022 ..................................... 272

# EXHIBIT 1

# Zoning Map



# EXHIBIT 2

# 1982 HUD Contract

U.S. DEP^ ^MENT OF HOUSING AND URBAN DEVELOPME^
^EDERAL HOUSING ADMINISTRATION

# REGULATORY AGREEMENT FOR INSURED MULTI-FAMILY HOUSING PROJECTS

### *(With Section 8 Housing Assistance Payments Contracts)*

Project No.:   034-32037-LD                                    HAP CONTRACT NO.: *PA26-0037-008*

Mortgagee   **Central Mortgage Company**

Amount of Mortgage Note   $3,807,400                          Date   June 29, 1982

Mortgage: Recorded: June 29, 1982 State Pennsylvania County Philadelphia   Date   June 29, 1982

Book                                                          Page

Originally endorsed for insurance under Section   220   of the National Housing Act.

This Agreement entered into this   29th   day of   June   , 19 82 , between
**I.B.I.D. Associates, a Pennsylvania limited partnership,**
whose address is   **115 New Street,**
**Glenside, Pennsylvania   19038**
their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*.

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 1,228.75               per month unless a different date or amount is approved in writing by the Secretary.  Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee.  Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary.  In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, within 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized.  Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. Except as provided in Paragraph 5 hereof:

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary.  Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years.  Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary.  Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide.  Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or

services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services include in the approval rental schedule.

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

    (i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

    (ii) Deny the increase stating the reasons therefor.

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

  (b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

  (c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

  (b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

    (1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

    (2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

    (3) Notwishstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

  (c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

  (d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

  (a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

  (b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

  (c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

  (d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

  (e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

    (1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

    (2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

—2—

(3) Any distribution of any funds of the project which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 8(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

HUD—92465 (8-77)

(h)   If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13.   Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national orgin, including Title VI of the Civil Rights Act of 1964 *(Public Law 88-352, 78 Stat. 241)*, Title VIII of the Civil Rights Act of 1968 *(Public Law 90-284,82 Stat. 73)*  Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities *(including 24 CFR Parts I, 100, and 110, and Subparts I and M of Part 200)*.

14.   Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address.  If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a)   (i)    If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

     (ii)   If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b)   Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c)   Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d)   Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15.   As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein.  Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16.   As used in this Agreement the term:

(a)   "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary:

(b)   "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c)   "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d)   "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e)   "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f)   "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

     (1)   the payment of:

          (i)    All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

          (ii)   All amounts required to be deposited in the reserve fund for replacements;

          (iii)  All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

HUD--92465 (6-77)

    (i)    An amount equal to the aggregate of all special funds required to be maintained by the project;

    (ii)    All tenant security deposits held:

(g)    "Residual Receipts" *(limited distribution mortgagor)*means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h)    "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i)    "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(j)    "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k)    "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l)    "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m)    "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17.    This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representativ executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18.    Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19.    The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20.    The following Owners:   I.B.I.D. Associates and all partners thereof, general and limited, do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a)    for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain: and

(b)    for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

                I.B.I.D. ASSOCIATES
                       *(Owners)*

Seal

WITNESS

By   /s/ Berel Altman, General Partner

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL HOUSING COMMISSIONER

By                                 
        *(Authorized Agent)* W. Oliver Leggett

*(Add proper acknowledgements)*

                              AREA MANAGER

    GPO 921-983               HUD—92465 (6-77)

COMMONWEALTH OF PENNSYLVANIA:

COUNTY OF *Phila* .                              SS
                                                :

On this, the 29th day of June, 1982, before me, the undersigned officer, personally appeared BEREL ATLMAN, who acknowledged himself to be the General Partner of I.B.I.D. Associates, a Pennsylvania limited partnership, and that he as such General Partner executed the foregoing instrument for the purposes therein contained by signing the name of the partnership by himself as General Partner.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Lucy A. Salmon*
Notary Public

LUCY A. SALMON
Notary Public, Phila., Phila. Co.
My Commission Expires May 20, 1985

COMMONWEALTH OF PENNSYLVANIA:

COUNTY OF *Phila*                               SS
                                                :

On this, the 29th day of June, 1982, before me, the undersigned officer, personally appeared *W. Oliver Leggett* known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Anne M. Forsman*
Notary Public  ANNE M. FORSMEN, Commissioned officer
For Commonwealth of Penna. From out of State
Woodbury, Gloucester Co., N. J.
My Commission Expires 9/1/82

# EXHIBIT 3

# 2021 HUD Contract

Attachment 11-1

**U.S. Department of Housing and Urban Development**

**Office of Housing**

---

**Project-based Section 8**

**HOUSING ASSISTANCE PAYMENTS**

**BASIC RENEWAL CONTRACT**

**ONE-YEAR TERM**

---

OMB Control #2502-0587

"Public reporting burden for this collection of information is estimated to average 1 hour. This includes the time for collecting, reviewing, and reporting the data. The information is being collected for obtaining a signature on legally binding documents and will be used to enforce contractual obligations. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it has a currently valid OMB control number. No confidentiality is assured."

## PREPARATION OF CONTRACT

Reference numbers in this form refer to notes at the end of the contract text. These endnotes are instructions for preparation of the Basic Renewal Contract. The instructions are not part of the Renewal Contract

---

# TABLE OF SECTIONS

**1 CONTRACT INFORMATION** — **1**

**PROJECT** — **1**

**TYPE OF RENEWAL** — **1**

**2 TERM AND FUNDING OF RENEWAL CONTRACT** — **2**

**3 DEFINITIONS** — **3**

**4 RENEWAL CONTRACT** — **4**

**a Parties** — **4**

**b Statutory authority** — **4**

**c Expiring Contract** — **4**

**d Purpose of Renewal Contract** — **4**

**e Contract units** — **5**

**5 EXPIRING CONTRACT - PROVISIONS RENEWED** — **5**

**6 CONTRACT RENT** — **6**

**a Contract rents** — **6**

**b No rent adjustments** — **6**

**7 OWNER WARRANTIES** — **6**

**8 OWNER TERMINATION NOTICE** — **6**

**9 HUD REQUIREMENTS** — **6**

**10 STATUTORY CHANGES DURING TERM** — **7**

**11 PHA DEFAULT** — **7**

Attachment 11-1

**12 EXCLUSION OF THIRD-PARTY RIGHTS**    **7**

**13 WRITTEN NOTICES**    **8**

**SIGNATURES**    **9**

Attachment 11-1

U.S. Department of Housing and Urban Development
Office of Housing

**Project-based Section 8**

# HOUSING ASSISTANCE PAYMENTS

# BASIC RENEWAL CONTRACT 1

# ONE-YEAR TERM

## 1  CONTRACT INFORMATION 2

<u>PROJECT</u>

**Section 8 Project Number**      PA260037008

**Section 8 Project Number of Expiring Contract**   PA260037008

**FHA Project Number** (if applicable)     N/A

**Project Name**   University City Townhouses

**Project Description** 3

3990 Market Street

Philadelphia

PA        19104

<u>TYPE OF RENEWAL</u>

☒   Check this box for a project renewed under Section 524(a) of MAHRA (not including a Mark-Up-To-Market renewal).

☐   Check this box  for a project renewed at exception rents under Section 524(b)(1) of MAHRA.

---

HUD-9636                                      1                          Basic Renewal Contract
                                                                        One Year Term
                                                                        REV 11-05-2007

## PARTIES TO RENEWAL CONTRACT

**Name of Contract Administrator** 4

Pennsylvania Housing Finance Agency

**Address of Contract Administrator**

211 North Front Street, P.O Box 8029

Harrisburg, PA -17105

**Name of Owner** 5

I.B.I.D. Associates L.P.

**Address of Owner**

240 New York Drive, Suite 1

Fort Washington

PA   19034

## 2    TERM AND FUNDING OF RENEWAL CONTRACT

a    The Renewal Contract begins on __07/09/2021__ 6 and shall run for a period of one year.

b    Execution of the Renewal Contract by the Contract Administrator is an obligation by HUD of $ __552470__ ,7 an amount sufficient to provide housing assistance payments for approximately __5__ 8 months of the Renewal Contract term.

c    HUD will provide additional funding for the remainder of the Renewal Contract term subject to the availability of sufficient appropriations.  When such appropriations are available, HUD will obligate additional funding and provide the Owner written

notification of (i) the amount of such additional funding, and (ii) the approximate period of time within the Renewal Contract term to which it will be applied.

**3      DEFINITIONS.**

**ACC.**  Annual contributions contract.

**Contract rent.**  The total monthly rent to owner for a contract unit, including the tenant rent (the portion of rent to owner paid by the assisted family).

**Contract units.**  The units in the Project which are identified in Exhibit A by size and applicable contract rents.

**HAP contract.**  A housing assistance payments contract between the Contract Administrator and the Owner.

**HUD.**  The United States Department of Housing and Urban Development.

**HUD requirements.**  HUD regulations and other requirements, including changes in HUD regulations and other requirements during the term of the Renewal Contract.

**MAHRA.**  The Multifamily Assisted Housing Reform and Affordability Act of 1997 (Title V of Public Law No.105-65, October 27, 1997, 111 Stat.1384), as amended.

**PHA.**  Public housing agency (as defined and qualified in accordance with the United States Housing Act of 1937. 42 U.S.C. 1437 et seq.).

**Project.**  The housing described in section 1 of the Renewal Contract.

**Renewal Contract.**  This contract, including applicable provisions of the Expiring Contract (as determined in accordance with section 5 of the Renewal Contract).

**Section 8.**  Section 8 of the United States Housing Act of 1937 (42 U.S.C.1437f)

**4      RENEWAL CONTRACT**

    **a      Parties**

        **(1)**    The Renewal Contract is a housing assistance payments contract ("HAP Contract") between the Contract Administrator and the Owner of the Project (see section 1).

        **(2)**    If HUD is the Contract Administrator, HUD may assign the Renewal Contract to a public housing agency ("PHA") for the purpose of PHA administration of the Renewal Contract, as Contract Administrator, in accordance with the Renewal Contract (during the term of the annual contributions contract ("ACC") between HUD and the PHA). Notwithstanding such assignment, HUD shall remain a party to the provisions of the Renewal Contract that specify HUD's role pursuant to the Renewal Contract, including such provisions of section 9 (HUD requirements), section 10 (statutory changes during term) and section 11 (PHA default), of the Renewal Contract.

    **b      Statutory authority**

        The Renewal Contract is entered pursuant to section 8 of the United States Housing Act of 1937 (42 U.S.C. 1437f), and section 524 of MAHRA.

    **c      Expiring Contract**

        Previously, the Contract Administrator and the Owner had entered into a HAP Contract ("expiring contract") to make Section 8 housing assistance payments to the Owner for eligible families living in the Project.  The term of the expiring contract will end prior to the beginning of the term of the Renewal Contract.

    **d      Purpose of Renewal Contract**

        **(1)**    The purpose of the Renewal Contract is to renew the expiring contract for a one-year term.  During the term of the Renewal Contract, the Contract Administrator shall make housing assistance payments to the Owner in accordance with the provisions of the Renewal Contract.

        **(2)**    Housing assistance payments shall only be paid to the Owner for contract units occupied by eligible families leasing decent, safe and sanitary units from the Owner in

accordance with statutory requirements, and with all HUD regulations and other requirements.  If the Contract Administrator determines that the Owner has failed to maintain one or more contract units in decent, safe and sanitary condition, and has abated housing assistance payments to the Owner for such units, the Contract Administrator may use amounts otherwise payable to the Owner pursuant to the Renewal Contract for the purpose of relocating or rehousing assisted residents in other housing.

**e**     **Contract units**

The Renewal Contract applies to the Contract units.

**5**   **EXPIRING CONTRACT - PROVISIONS RENEWED**

**a**     Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term).

**b**     All provisions of the Expiring Contract concerning any of the following subjects are not renewed, and shall not be applicable during the renewal term:

**(1)**     Identification of contract units by size and applicable contract rents;

**(2)**     The amount of the monthly contract rents;

**(3)**     Contract rent adjustments; and

**(4)**     Project account (sometimes called "HAP reserve" or "project reserve") as previously established and maintained by HUD pursuant to former Section 8(c)(6) of the United States Housing Act of 1937 (currently Section 8(c)(5) of the Act, 42 U.S.C. 1437f(c)(5)). Section 8(c)(5) does not apply to the Renewal Contract, or to payment of housing assistance payments during the Renewal Contract term.

**c**     The Renewal Contract includes those provisions of the ExpiringContract that are renewed in accordance with this section 5.

**6      CONTRACT RENT**

   **a      Contract rents**

   Throughout the Renewal Contract term, the contract rent for each bedroom size (number of bedrooms) shall be the contract rent amount listed in Exhibit A of the Renewal Contract.

   **b      No rent adjustments**

   There shall be no adjustment of the contract rents during the term of the Renewal Contract.  Special adjustments shall not be granted.

**7      OWNER WARRANTIES**

   **a**      The Owner warrants that it has the legal right to execute the Renewal Contract and to lease dwelling units covered by the contract.

   **b**      The Owner warrants that the rental units to be leased by the Owner under the Renewal Contract are in decent, safe and sanitary condition (as defined and determined in accordance with HUD regulations and procedures), and shall be maintained in such condition during the term of the Renewal Contract.

**8      OWNER TERMINATION NOTICE**

   **a**      Before termination of the Renewal Contract, the Owner shall provide written notice to the Contract Administrator and each assisted family in accordance with HUD requirements.

   **b**      If the Owner fails to provide such notice in accordance with the law and HUD requirements, the Owner may not increase the tenant rent payment for any assisted family until such time as the Owner has provided such notice for the required period.

**9      HUD REQUIREMENTS**

The Renewal Contract shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements, including changes in HUD regulations and other requirements during the term of the Renewal Contract.  However, any changes in HUD requirements that are inconsistent with the provisions of the Renewal Contract, including the provisions of section 6 (contract rent), shall not be applicable.

**10   STATUTORY CHANGES DURING TERM**

If any statutory change during the term of the Renewal Contract is inconsistent with section 6 of the Renewal Contract, and if HUD determines, and so notifies the Contract Administrator and the Owner, that the Contract Administrator is unable to carry out the provisions of section 6 because of such statutory change, then the Contract Administrator or the Owner may terminate the Renewal Contract upon notice to the other party.

**11   PHA DEFAULT**

a      This section 11 of the Renewal Contract applies if the Contract Administrator is a PHA acting as Contract Administrator pursuant to an annual contributions contract ("ACC") between the PHA and HUD.  This includes a case where HUD has assigned the Renewal Contract to a PHA Contract Administrator, for the purpose of PHA administration of the Renewal Contract.

b      If HUD determines that the PHA has committed a material and substantial breach of the PHA's obligation, as Contract Administrator, to make housing assistance payments to the Owner in accordance with the provisions of the Renewal Contract, and that the Owner is not in default of its obligations under the Renewal Contract, HUD shall take any action HUD determines necessary for the continuation of housing assistance payments to the Owner in accordance with the Renewal Contract.

**12   EXCLUSION OF THIRD-PARTY RIGHTS**

a      The Contract Administrator does not assume any responsibility for injury to, or any liability to, any person injured as a result of the Owner's action or failure to act in connection with the Contract Administrator's implementation of the Renewal Contract, or as a result of any other action or failure to act by the Owner.

b      The Owner is not the agent of the Contract Administrator or HUD, and the Renewal Contract does not create or affect any relationship between the Contract Administrator or HUD and any lender to the Owner or any suppliers, employees, contractors or subcontractors used by the Owner in connection with implementation of the Renewal Contract.

c      If the Contract Administrator is a PHA acting as Contract Administrator pursuant to an annual contributions contract ("ACC")

between the PHA and HUD, the Contract Administrator is not the agent of HUD, and the Renewal Contract does not create any relationship between HUD and any suppliers, employees, contractors or subcontractors used by the Contract Administrator to carry out functions or responsibilities in connection with contract administration under the ACC.

## 13   WRITTEN NOTICES

a   Any notice by the Contract Administrator or the Owner to the other party pursuant to the Renewal Contract shall be given  in writing.

b   A party shall give notice at the other party's address specified in section 1 of the Renewal Contract, or at such other address as the other party has designated by a contract notice. A party gives notice to the other party by taking steps reasonably required to deliver the notice in ordinary course of business. A party receives notice when the notice is duly delivered at the party's designated address.

Attachment 11-1

## SIGNATURES

**Contract administrator (HUD or PHA)**

Name of Contract Administrator (Print)

<u>Pennsylvania Housing Finance Agency</u>

By: *Carl R Dudeck Jr*

Signature of authorized representative

Carl Dudeck Jr,
Director of Housing Management

Name and official title (Print)

Date          04/092021

## U. S. Department of Housing and Urban Development

By:

Signature of authorized representative

Digitally signed by: Sharon
Rowe Downs
DN: CN = Sharon Rowe Downs
email = Sharon.Downs@hud.
gov C = US O = U.S.
Department of Housing and
Urban Development OU =
Multifamily
Date: 2021.04.12 06:32:50 -
04'00'

Name and Official title

Date:

## Owner

Name of Owner (Print)

<u>I.B.I.D. Associates L.P.</u>

By

Signature of authorized representative

*Brett Altman, Sole Member, IBID General Partner, LLC*

Name and title (Print)

Date   *4/8/2021*

Attachment 11-1

## EXHIBIT A

### IDENTIFICATION OF UNITS ("CONTRACT UNITS")
### BY SIZE AND APPLICABLE CONTRACT RENTS

**Section 8 Contract Number:  PA260037008**

**FHA Project Number (if applicable):  N/A**

**Effective Date of Rent Increase (if applicable):  07/09/2021**

| Number of Contract Units | Number of Bedrooms | Contract Rent | Utility Allowance | Gross Rents |
|---|---|---|---|---|
| 19 | 2BR | 1,706 | 121 | 1,827 |
| 41 | 3BR | 1,881 | 140 | 2,021 |
| 10 | 4BR | 2,294 | 137 | 2,431 |

Comments :_____

# EXHIBIT 4

# Bill No. 210778, introduced Sept. 30, 2021

To amend Title 14 of The Philadelphia Code by adding Section 14-532, entitled the "/AHP, Affordable Housing Preservation Overlay District" and making other related changes; to amend the Philadelphia Zoning Maps by changing the zoning designations of certain areas of land located within an area bounded by 39th Street, Ludlow Street, 40th Street, and Market Street; and to establish a temporary demolition moratorium with respect to properties within the aforementioned area; all under certain terms and conditions.

THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:

SECTION 1.  Title 14 of The Philadelphia Code is hereby amended to read as follows:

TITLE 14.  ZONING AND PLANNING.

\*   \*   \*

CHAPTER 14-500.  OVERLAY ZONING DISTRICTS

\*   \*   \*

§ 14-532.  /AHP, Affordable Housing Preservation Overlay District.

(1)  Applicability.  The Affordable Housing Preservation Overlay District shall apply to lots located in the area bounded by Market Street, 39th Street, Ludlow Street and 40th Street.

(2)  Use Regulations.  The following standards shall apply in addition to those of the applicable base zoning district:

(a)                At least 40% of all dwelling units (rounded up, if fractional), or seventy-seven units, whichever is greater, shall be provided and maintained as affordable on the same site as all other dwelling units.

(b)                Any development that has received or will receive government financial assistance conditioned upon the provision of 51% or more units meeting affordability standards of a government program shall not be required to meet the requirements of subsections (a) above.

(c)                All uses other than residential uses or required off-street parking must be located on the ground floor of a building.

(3)  Development Standards

The maximum floor area ratio for lots zoned RMX-3 within the Affordable Housing Preservation Overlay shall be 750% of the lot area.

(4)  Motor Vehicle Parking Ratios

The minimum required parking spaces for household living is as indicated in Table 14-532-1.  All other parking and loading standards are as indicated elsewhere in the Zoning Code.

Table 14-532-1: Minimum Required Parking Spaces in the /MIN

|  | RSD-1/2/3 RSA-1/2/3/4/5 RTA-1 RM-1 CMX-1/2/2.5 | RM-2/3/4 RMX-2/3 CMX-3/4/5 IRMX | RMX-1 |
|---|---|---|---|
| Household Living | 0 | 2/10 units | 2/3 units |

(5) Affordability

Affordable dwelling and sleeping units required shall be provided under the following standards.  For the purposes of this section, a household shall consist of every person who lives or intends to live in the unit, regardless of age, dependency status, or relationship. The imputed household size for determining unit affordability and occupancy requirements of this section shall be equal to 1.5 people per each bedroom in the unit, except for studios, efficiencies, and sleeping units for which the imputed household size is 1 person.

(a)          Affordable rental units shall:

(.1)  Have total monthly costs (including rent and utility costs) that do not exceed thirty percent (30%) of gross monthly income for households earning up to twenty percent (20%) of the Area Median Income (AMI), adjusted for household size, as reported by the U.S. Department of Housing and Urban Development (HUD) for the Philadelphia Metropolitan Statistical Area;

(.2)  Be occupied by households earning up to twenty percent (20%) of the Area Median Income (AMI), adjusted by household size, as reported by HUD for the Philadelphia Metropolitan Statistical Area at the time of the household's initial occupancy of the unit; and

(.3)  At no time be occupied by households earning greater than forty percent (40%) of the Area Median Income (AMI), adjusted by household size, as reported by HUD for the Philadelphia Metropolitan Statistical Area; provided that, in the event the income of a tenant is found by the Department of Planning and Development to exceed the maximum income provided for by this subsection (iii), a tenant shall nonetheless be deemed in compliance with this subsection (iii) until the first expiration of a lease occurring after the tenant's income first exceeded the maximum permitted by this subsection (iii). The Department of Planning and Development may waive this requirement upon a showing of exceptional circumstances

2

(b) The standards of §14-702(7)(b)(.2) through (.5) shall apply.

(c)         Applicants shall be encouraged to partner with community development corporations and other community-based organizations in developing and executing plans for marketing units and evaluating the qualifications of potential occupants.

(d)         Compliance check, remedies, and regulations of § 14-702(7)(d) through (g) shall apply.


(6) Marketing and Equal Opportunity

Any development shall be subject to the requirement that no zoning permit shall be issued unless an applicant has met with Registered Community Organizations ("RCOs") whose boundaries include the applicant's property to present a Marketing and Occupancy Plan and an Economic Opportunity Plan, in accordance with subsections (a) through (c), below; has subsequently filed the Plans with either a division of the Department of Commerce responsible for monitoring participation by minority, women, and disabled-owned businesses or any other City agency designated by the Mayor; and has subsequently made available a copy of the Plans to the RCOs.

(a)         A Marketing and Occupancy Plan shall describe how the permit applicant will market and occupy affordable and market-rate units within the development.

(b)         An Economic Opportunity Plan shall include a description of all efforts to be taken to foster meaningful and representative opportunities for participation by M/W/DSBEs and an appropriately diverse workforce in connection with the project. Such description shall include certification and documentation of any and all actions taken with respect to solicitation and other activities as set forth in subparagraphs (1)(d)(.3)(.a)-(.c) of Section 17-1603 of the Code ("Economic Opportunity Plan: Contents");a statement of past practices to develop diversity at any and all levels of the organization, as described in subsection (1)(f) of 17-1603; and a statement of equity ownership, as described in subsection 17-1603(1)(g)(.2); provided that the requirements of § 17-1600 shall not otherwise apply to this § 14-531.

(c)         The applicant must meet the applicable requirements of § 14-303(12) (Neighborhood Notice and Meetings), regardless of whether those provisions would otherwise apply. The applicant may fulfill the requirement of meeting with RCOs in this subsection (c) by presenting such Plans at the Neighborhood Meeting required under § 14-303(12).

(d)         L&I and the Commission are authorized to promulgate such regulations as are necessary and appropriate to implement the provisions of this section.

3

\*   \*   \*

SECTION 2. Pursuant to Section 14-106 of The Philadelphia Code, the Philadelphia Zoning Maps are hereby amended by changing the zoning designations of certain areas of land within an area bounded by Market Street, 39th Street, Ludlow Street, and 40th Street from the existing zoning designations indicated on Map "A" set forth below to the zoning designations indicated on Map "B" set forth below.

SECTION 3.                 Intentionally left blank.

SECTION 4.  This Ordinance shall take effect immediately following its enactment.

MAP "A"

[SEE ATTACHED]

MAP "B"

[SEE ATTACHED]

End

4

# EXHIBIT 5

# Oct. 21, 2021
# City Planning Meeting Transcript Excerpt

**City Planning Meeting – Trego**
**2:39:30 to 3:07:54**

| Anne Fadullon | Okay that now takes us to Item No. 14, which is Zoning Bill 210778. |
|---|---|
| Nicole Osdemir | Good afternoon, commissioners and everyone. My name is Nicole Osdemir with PCP Commissions Staff. Today I am presenting Zoning Bill 210778, which is an ordinance which amends um Title 14 of the Zoning Code by adding in um the slash AHP or Affordable Housing Preservation Overlay District. It also amends the zoning maps by changing the zoning – up on the end – uh boundaried by 39th Street, Ludlow Street, 40th Street, Market Street and also establishes a temporary demolition moratorium. This Bill was introduced by council member Gauthier on September 30th of this year.

Next slide please. Here we have an aerial contacts map with the site in question highlighted in red, which scan is bounded by 39th and Ludlow, 40th and Market Street in West Philadelphia.

Next slide please. And then here's just a more zoomed in aerial look at the site, which is currently um an affordable housing development that includes service parking and some open space.

This Bill was, um, came out of councilmember Gauthier's office. It has a number of components in an attempt to preserve the Affordable Housing that is currently at this site and to potentially delay um eviction of current residents. The site's current owners have notified the U.S. Department of Housing and Urban Development that they will not be renewing their expiring Affordable Housing Contracts and plan on selling the site. They also have notified the current tenants that they must leave their homes by July of 2022.

Next slide please. Here are just a couple of street view images of the site. This one is looking at the site at 39th and Market.

Next slide please. And then this one is just at 40th and Market with the entrance to the 40th uh Street El station just to the right of the view.

Next slide please. So the first component of this Bill is a base zone remapping. The site is currently zoned DMX4, which is the second most dense commercial mixed-use zoning designation.

Next slide please. And the Bill proposes to change the base zoning of the site to RMX3 or Residential Mixed Use Space.

Next slide please. The next part of this bill um creates the AHP overlay or Affordable Housing Preservation overlay with a number of regulations. So at least 40% of all dwelling units, or 77 units, uh whichever number is |

greater, must be affordable units located on the same site as any potential other market rate unit. All other uses besides residential, and any required accessory parking, must be located on the ground floor of a building. Um, and it would event any development that has or will receive government funding for providing at least uh 51% or greater units of affordable housing.

Next slide please. Um it sets out the maximum FAR for RMX3 uh at 750, and it requires two parking spaces per 10 dwelling units.

Next slide please. Regarding affordable rental units, um it requires that they are occupied by up to 20% AMI or Area Median Income households. It requires that the total monthly costs don't exceed 30% gross monthly income or up to 20% AMI household. It states that it can't, uh these units cannot be occupied by households that earn greater than 40% AMI. It also encourages any applicants to work with CDCs or other community organizations to develop plans for marketing as well as evaluating the qualifications of potential tenants of these units.

Next slide please. It also uses the same criteria from the mixed income bonus for terms of affordability, timing of construction, marketing, design of the buildings and material quality, as well as compliance and regulations uh for enforcement.

Next slide please. Now regarding marketing any full opportunity, it states that the applicants must meet with uh affected RCOs to present a marketing and occupancy plan as well as an economic opportunity plan in order to get a zoning permit. Um it states that the marketing plan will describe how the applicant will market and fill both the affordable and market-rate units, and it authorizes L&I and PCPC to create any regulations needed to implement and regulate this overlay.

Next slide please. Um and then the third key part of this Bill is that it establishes a temporary demolition moratorium, um stating that no zoning permit shall be issued for a total demolition unless L&I determines that this – any building is imminently dangerous or there's unsafe conditions impacting right of way or the adjacent properties, and the length of time of this moratorium is 12 months um since the date of enactment, excuse me, of this Bill.

Next slide please. So PCPC commission staff support not only increasing the City's supply of affordable housing, but particularly understands the importance of having affordable housing available in this specific neighborhood and at this location. However, it is difficult for staff to support these efforts via the Bill. The rezoning Bill could be considered a taking of the owners' property rights. Secondly, while the staff supports the goal of keeping residents in their homes, the demolition moratorium

| | will expire shortly after the HUD agreement expires, and so will not be helpful in meeting that goal. The residents could still potentially be evicted, and the developer could just sit and wait out the moratorium with a vacant site.

Furthermore, the level of affordability required in the Bill will be difficult for a new developer to achieve, certainly without government subsidy. Additionally, the Bill requires other uses outside of residential or accessory parking to be limited to the ground floor. While this is a large site that could have multiple structures, it limits the possibility of having comprehensive mixed-use buildings, which is what the current base zoning calls for and what is recommended in the comprehensive plan.

With the utmost respect for the councilmember, the staff recommendation is not for approval. |
|---|---|
| Anne Fadullon | Thank you Nicole. Um do we have any questions and comments on on this Bill from the, from the Commission? |
| Garlen Capita | Thanks Nicole, I have a question. Uh, we reviewed earlier the Fifth District overlay. Is that a tool that could be used to do some of the things that this zoning Bill is trying to do? Just in terms of like what are – what are – what, what tools are available to help support some of the goals of this zoning Bill? |
| Nicole Osdemir | Um, |
| Eleanor Sharpe | Let me help. Garlen, are you talking about [some over talking] – which – which old school – there's so many overlays today, not my favorite words |
| Garlen Capita | It was the Fifth District one that we talked about that they wanted to start at Spring Garden and whether Spring Garden made sense? |
| Eleanor Sharpe | Oh, the mixed-income housing bill [over talking] |
| Garlen Capita | The mixed-income housing? If you can |
| Eleanor Sharpe | I don't think so, but Ann can weigh in on this, because this was um, designated for affordable housing through a HUD program that the, uh owners |
| Anne Fadullon | I think it's um – yeah there's some complicating factors with this. |
| Eleanor Sharpe | Yeah |
| Anne Fadullon | I mean, one it's it's family housing that's very, very difficult for us to, to replicate, particularly given the location of this, right. And so, um, and what complicates it further is that um the City or the federal government |

| | |
|---|---|
| | really has no – there's no uh dollars that we have in this project that remain. So we don't have a mortgage or anything like that, so there – there's none – no financing to leverage, um, for us on this project. Uh obviously, given that it's zoned CMX4 in this location, it's a very valuable piece of property. Uh there's just a lot of difficult issues raised on on this, on this site, so I believe this is, you know, a very uh valiant attempt by the councilwoman to try to preserve the affordability on this site in this community.<br><br>I think what makes this Bill a little bit difficult is, for example, even if um there was a proposal to do a tax credits site on the – a project on this site – at the income levels that they're talking about, the the the tax credit project would not pencil and be feasible. The cash flow would not work even on a tax code credit project, so it would be difficult for the project to even, um, to get, to get tax credits, uh. You know it's just this is a very complicated issue, right. And I think uh the councilwoman I know is here, I think we should let her speak for herself, because she is very capable and able to do that, but you know I just, I just think this really is one of those sites that brings to the foreground, uh, you know, a lot of the the issues that as the City grows we we are going to be, be grappling with, and unfortunately there – there's just not real easy answers here.<br><br>Um, so with that I'm going to go a little bit out of turn, because we normally allow the commissioners to uh provide whatever comment they want, but given that the councilwoman is here and this is her Bill, I think it's most appropriate to hear from her now. So can we unmute the councilwoman please? |
| Jamie Gauthier | Hello? |
| Anne Fadullon | Hi, we can hear you. Go ahead. |
| Jamie Gauthier | Okay. Wonderful. Um thank you so much to the Planning Commission for allowing me to testify regarding Bill Number 210778, and thank you to Nicole and her colleagues for their thoughtful consideration of this Bill.<br><br>Um I am here today because 70 families who reside in extremely affordable townhomes in the heart of amenity-rich University City are at risk of displacement as soon as July 2022. The owner of the property opted out of their affordability contract with HUD and is actively seeking to maximize the profit for this mega site estimated to be worth 75 to 100 million dollars.<br><br>Without immediate government intervention, we will lose these very affordable townhomes forever; and for the second time in 50 years, government will have allowed wealthy private interests to profit at the expense of working class black Philadelphians. Some residents who were |

displaced once before as a result of urban renewal will be displaced again. These families will lose access to – easy access – to transit and healthcare and jobs and schools, um and their community will be torn apart.

All of the consequences that residents stand to suffer due to government inaction run counter to APA policy goals, the 2035 comprehensive plan, and basic morality; which is why I'm here today to ask that the planning commission recommend the passage of Bill Number 210778.

Before the commission votes today, I think it's important to recount how we got here, the role that this body played in urban renewal in Philadelphia, and why this ordinance is aligned with the foundational mission of urban planning. In the late 1960s and early 1970s, during what was known as urban renewal, the City of Philadelphia raised the black bottom neighborhood to make way for a science and technology research campus, which today we know as the University City Science Center.

Thousands of Philadelphians, roughly 80% of whom were black, were displaced as a result. Not just from their homes, but from a very stable community. This block was initially slated to be a part of that research campus, but neighbors and University of Pennsylvania students banded together to fight. They demanded that site be set aside for affordable housing, so that people displaced by urban renewal had options to return, and so that they would have access to housing in the neighborhood for generations to come. And eventually a commitment was made to West Philly residents that this site would be dedicated to low income housing.

Now let's fast forward to today. Forty years after the University City townhomes first opened, our City and the 3rd District has changed dramatically. Housing prices have tripled in this immediate area since then. In the last two decades alone, the black population east of 52nd Street has been cut in half, and um the end of this demand is nowhere within sight. An estimated five billion dollars have been spent on construction in University City in the last decade alone.

And so all of this helps to explain why the University City townhomes are simply irreplaceable. Dozens of three-bedroom apartments with rents that are 90% cheaper than what you can get on the open market, sitting on a piece of land that is valued today at 75 to 100 million dollars. As a black woman and an urban planner, I'm well aware of how the institution of planning has exacerbated racial inequities in our cities, including Philadelphia.

These wounds of planners past are eloquently acknowledged and addressed by director Eleanor Sharpe, along with planning directors from across the country, in their Commitment to Change Statement, which notes

| | |
|---|---|
| | that planners played an integral role in the displacement of communities of color over the course of modern American history.<br><br>That history is clearly reflected in the 3rd District. The Philadelphia City Planning Commission helped facilitate urban renewal, leading to the displacement of thousands of black bottom residents. And today this body has an opportunity to make amends to community for past wrongs, and commit to change moving forward.<br><br>Recommending this legislation also aligns with the American Planning Association's Housing Policy Guide Statement 2B, which supports the preservation of existing affordable housing in gentrifying amenity-rich areas. Philadelphia's 2035 Comprehensive Plan likewise notes "the location of new housing, particularly housing supported by government funding, to be prioritized based on adjacency to existing community assets and strengths, commercial corridors, transit stations and stable residential blocks." In this instance we are talking about existing housing, but the same logic to preserve this community should apply.<br><br>The University Southwest District Plan calls for mixed-use development on this site. I would argue that our proposed remapping and overlay still achieve the district's planned uh intent, and does so in a way that creates space for equity, community co community cohesion and cultural and housing preservation.<br><br>First, the mapping change to RMX3 ensures that mixed-use development can still take place on the site at the scale of what is envisioned in the District plan. Making residential mandatory and adding the affordability requirements provides a check against the perverse market forces at play that encourage maximizing profit over the creation of inclusive neighborhoods where people with very low incomes can have housing their amenities.<br><br>I think it's also important to note that this particular District plan was adopted in mid-2013, when real estate conditions were very different than they are now in 2021, with the marker - market hotter than any of us have ever seen it before. Without more restrictive zoning, the private market will not produce or preserve affordable units in this area.<br><br>And so today the Planning Commission has an opportunity to change that, and to align its official actions with the values that I think we all hold. I urge the Planning Commission to recommend the adoption of Bill Number 210778. Thank you. |
| Anne Fadullon | Thank you very much, councilwoman. And we we really appreciate those comments. Um I'm gonna go back to seeing if anybody else from the |

| | |
|---|---|
| | Commission has any questions or comments on this item, and then we'll hear the rest of the public comments. |
| Michael Johns | Yeah, yeah I do. Um and this is, this is one of those sites that I know **very** well, um, and it, it pains me to even think that the, that these, it - it will no longer be affordable housing. I've watched the neighborhood change. I see that site – across the street from that site it is an affordable senior building. I see right next to that it's another affordable senior building, and as these, um sort of pillars, right, of affordability in a neighborhood that has **all** of the amenities – education, transportation, you know, job opportunities, walkability -- um be potentially lost, there needs to be some intervention, right. <br><br> And, you know, maybe this is not the greatest Bill, but you've gotta do something, and, and you've gotta make a stand somewhere or else you're going to lose any affordability in that neighborhood altogether. I mean, you just kind of look, you know, it's just that the movement is there, and the, you know, there'll be absolutely no affordability at some point in that neighborhood if this – like I like I said – if this site goes, the senor buiilding is goin next. Right next to that, the next thing you're building is gone, you know. 3801 – it's probably gone. You know what I mean? So, you know it may not be the best, but some, some place, somewhere you gotta put a you gotta put your foot in it – in you know in the ground, and say let's, let's do something, you know. And maybe that causes some additional interaction, um or intervention, um and my battery is going low, I'm gonna plug this in. So that's my comment. |
| Anne Fadullon | Thanks. Thank you commissioner Johns. |
| Michael Johns | Yep |
| Anne Fadullon | Uh, any other commissioners that would like to provide comment or have a question on this matter? |
| Garlen Capita | I would just like to show support for what the Bill is trying to do, and to really appreciate um council um woman Jamie Gauthier's really um passionate and emotional plea for preserving affordable housing. Recognizing that the cost of building the affordable housing and our opportunity to do so is so limited I completely agree with um commissioner Johns in that, even if this runs into issues, can we take a stand in saying that as a planning commission, if we really do believe in equity and sustainability in building this community where all of these people can continue to be, that we have to be empowered to be able to do so, and this Bill starts to talk about what that power looks like. |
| Anne Fadullon | Thank you commissioner Capita. Uh, any other commissioners? |

| | |
|---|---|
| Patrick Eiding | I have a question. |
| Anne Fadullon | Go ahead commissioner Eiding. |
| Patrick Eiding | If this is voted down, this recommendation, does the Bill go through or do we have to have a separate motion? |
| Anne Fadullon | Uh, well, if – if the motion was made and approved by the commission to uh accept staff recommendation, which is not for approval, or the reverse, um again the role of the planning commission is advisory only. So yeah it is – you know the the the councilwoman – it is in her uh purview to continue to move this Bill forward. It is scheduled for a Rules Committee hearing on the 26th. I would uh assume, based on the councilwoman's very passionate comments, that she intends to have the Bill heard at the Rules Committee on the 26th so I would assume that regardless of of how this commission recommends that the Bill will continue to move forward. |
| Maria Gonzalez | Hi. I, I I think that, you know, I commend the councilwoman um for really thinking outside the box, and for really, um you know, uh preserving, trying to preserve affordable housing in many parts of a neighborhood that have been gentrified and there's really no affordable housing being built, and preserving that for the families. Um, and another comment that I have is that, you know, if this Bill moves forward or is being heard at the Rules Committee, I think that there should be some talk about some of the restrictions, um especially about um you know, having or making recommendations for economically viable uh housing activity. I think that some of the recommendations are not economically viable, um so maybe it is deserving of, you know, taking a looksee and making some other adjustments. Um and also, um you know, desperate times you know, you need desperate measures, and you know need to make a stand, especially with all the, uh the gentrification and also the displacement that has happened in many of our communities, so really kudos to you for um, you know, thinking differently and um you know, coming up with this Bill. |
| Anne Fadullon | Any other commissioners? Alright, I do believe we have some additional hands up, so Greg lets go to public comment. |
| Greg Waldman | Um yes, uh this is Greg Waldman from planning commission staff. Um I see three hands that are raised, uh the first one that I'm seeing after councilmember uh Gauthier is uh Lewis uh Baum. And you can unmute yourself. |
| Louis Baum [totally guessing at spelling] | Hello, uh yes. Uh I don't believe my hand was raised, but um, I'll be happy to speak a little bit. |

| Greg Waldman | It's up to you |
|---|---|
| Louis Baum | The uh, the first thing I would say is the, the objection to this Bill being a taking of the of owners' property rights. Um if that were case, it would seem to me that any overlay is a taking, and certainly other overlays have been approved before. Um this Bill, um it primarily is a subset of the mixed income neighborhoods Bill, which the commission uh did approve with, with uh uh, amendments earlier. Um, the, it - obviously it also includes a change in zoning and something to do with uh, uh demolition, which are different - but the rest of it's kind of a, a subset. That's all I'll say for right now. I, I, thank you. |
| Anne Fadullon | Thank you Mr. Baum, and Greg I think we have another one. |
| Greg Waldman | We have a couple others. Um we have a Mark Harris, uh who I believe is being unmuted momentarily, at the moment. |
| Mark Harris | Thank you sir. |
| Anne Fadullon | Go ahead Mr. Harris. |
| Mark Harris | I understand the concerns of the planning commission as expressed, but I'm disappointed that all their comments seem to be negative. They haven't made any useful or positive suggestions for how this uh proposal might be amended to make it more practical. So we're all in agreement I think that we'd like to preserve this affordable housing, uh but the planning commission is not doing anything to assist us to that objective. |
| Greg Waldman | Um, next we have a Ms. Wigham, and I apologize if I'm pronouncing that incorrectly. Um, I believe you still have to unmute. There is um, Ms. Wigham there is a mute button, which is on the bottom left-hand side of your screen. |
| Ms. Wigham | Sorry. I apologize that I hit it by mistake [laughs]. I'm pretty new at this but I will chime in for just a second and, um, you know affordable housing in our community has become a rarity, and so with this situation that's goin on and all the developments that are going on in particular neighborhoods um that are high density, um, the area in which they wanna destroy – I'm gonna use that word – **destroy** um actually should be reconsidered. Um like I said, affordable housing in this community, in this City, is difficult. So to um, you know displace people over money, greed over lives, I think should be considered. So thank you. |
| Anne Fadullon | Thank you Ms. Wigham. Uh Greg do you have any other hands up from the public? |

| Greg Waldman | There are no more hands at this time, Chair. |
| Anne Fadullon | Thank you. Uh thank you for, commissioners for your comments on this Bill, uh and and thank you for all of the public participants that spoke and particularly the councilwoman, uh and I'm gonna call for a motion on this item. |
| Patrick Eiding | I make a motion that we do not approve the recommendation of the uh staff. |
| Michael Johns | I second. |
| Anne Fadullon | A motion has been made by commissioner Eiding and um seconded by commissioner Johns to, uh once again, double negative, which is to *not* accept the staff recommendation which is for *not* approval, which means essentially that the commission would recommend approval on this Bill. Uh, commissioner Gonzalez? |
| Maria Gonzalez | Yes. |
| Anne Fadullon | All right. Commissioner Eiding? |
| Patrick Eiding | Yes |
| Anne Fadullon | Commissioner Gaston? |
| Cheryl Gaston | Gonna abstain. |
| Anne Fadullon | Commissioner Capita? |
| Garlen Capita | Yes |
| Anne Fadullon | Commissioner Syrnick? |
| Joseph Syrnick | Yes |
| Anne Fadullon | Commissioner Rashid? |
| Michael Rashid | Yes |
| Anne Fadullon | Commissioner Valle? |
| Ximena Valle | Yes |
| Anne Fadullon | Commissioner Johns? |
| Michael Johns | Yes |

| Anne Fadullon | Commissioner Lamb? |
| Cat Lamb | No |
| Anne Fadullon | Commissioner Castle? |
| Charlotte Castle | Abstain |
| Anne Fadullon | Okay. Uh we had a couple of abstentions and one no, but we had the ayes carry, so uh just to be clear, for the record, the uh recommendation on this item is for approval for Zoning Bill 210778. Thank you all. |

# EXHIBIT 6

# Oct. 26, 2021 Philadelphia City County Rules Committee Meeting Transcript

Committee on Rules 10-26-21 Meeting
October 26, 2021

COUNCIL OF THE CITY OF PHILADELPHIA

COMMITTEE ON RULES

Remote location using Microsoft® Teams
Tuesday, October 26, 2021
10:00 a.m.

PRESENT:

COUNCILMAN KENYATTA JOHNSON, CHAIR
COUNCILMAN MARK SQUILLA, VICE-CHAIR
COUNCILWOMAN CINDY BASS
COUNCILWOMAN KATHERINE GILMORE RICHARDSON
COUNCILMAN DAVID OH
COUNCILMAN BRIAN J. O'NEILL
COUNCILWOMAN MARIA D. QUINONES-SANCHEZ

ALSO PRESENT:

COUNCILMAN ALLAN DOMB
COUNCILWOMAN JAMIE GAUTHIER

BILLS:  210549, 210634, 210637, 210638, 210667,
        210668, 210686, 210687, 210741, 210742,
        210778, 210808

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 2

Page 2

- - -

COUNCILMAN JOHNSON:  Good
morning, everyone.

I understand that state law
currently requires that the following
announcement be made at the beginning of
every remote public hearing as follows:
Due to the current public health
emergency, City Council Committees are
currently meeting remotely.  We are
using Microsoft Teams to make these
remote hearings possible.

Instructions for how the public
may view and offer public testimony at
public hearings at Council Committees
are included in the notices that are
published at the Daily News, Inquirer
and Legal Intelligencer prior to the
hearings and can also be found on
PHLCouncil.com.

Will the Clerk please call the
roll to take attendance.  Members that
are in attendance will please indicate
that they are present when their names
are called.  Also, please say a few

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 3

Page 3

brief words when responding so that your

image will be displayed on screen when

you speak.

THE CLERK:  Councilmember Mark

Squilla.

COUNCILMAN SQUILLA:  Good

morning, Mr. Chair.  Present.

THE CLERK:  Councilmember Maria

Quinones-Sanchez.

COUNCILWOMAN QUINONES-SANCHEZ:

Good morning, Council Chair and members.

THE CLERK:  Councilmember Cindy

Bass.

COUNCILWOMAN BASS:  Good

morning, Mr. Chairman, colleagues and

all in attendance for today's hearing.

Good morning.

THE CLERK:  Councilmember David

Oh.

COUNCILMAN OH:  Good morning,

Chair.  Good morning, colleagues.

THE CLERK:  Councilmember

Katherine Gilmore Richardson.

COUNCILWOMAN GILMORE

RICHARDSON:  Good morning, Mr. Chair.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 4

Page 4

Good morning, colleagues.  Thank you
very, very much.

THE CLERK:  Councilmember Brian
O'Neill.

COUNCILMAN O'NEILL:  Good
morning, everyone.

THE CLERK:  And also present,
Councilmember Jamie Gauthier.

COUNCILWOMAN GAUTHIER:  Good
morning, Mr. Chair, members of the
Committee and to the public.  Present.

COUNCILMAN JOHNSON:  Thank you
very much, Brett.

A quorum of the Committee is
present and this hearing is now called
to order.  This is the public hearing of
the Committee on Rules regarding Bill
Nos. 210549, 210634, 210637, 210638,
210667, 210668, 210686, 210687, 210741,
210742, 210778, and 210808.  Very full
schedule today.

Will the Clerk please read the
titles of the bills.

THE CLERK:  Bill No. 210638, a
bill to amend the Philadelphia Zoning

Page 5

Page 5

Maps by changing the zoning designations
of certain areas of land located within
an area bounded by 11th Street, Reed
Street, 12th Street and Wharton Street
to amend Title 14, by adding the South
Philadelphia Municipal Hub Overlay
District, and making other related
changes, and approving the Residential
Mixed-Use-2 District Master Plan for the
site generally bounded by 11th Street,
Reed Street, 12th Street and Wharton
Street, all under certain terms and
conditions.

     Bill No. 210637, amending Title
14 of The Philadelphia Code, entitled
"Zoning and Planning," by amending
certain provisions of Chapter 14-800,
entitled "Parking and Loading,"
pertaining to parking requirements for
uses in historically designated
properties, all under certain terms and
conditions.

     Bill No. 210686, to amend the
Philadelphia Zoning Maps by changing the
zoning designations of certain areas of

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 6

Page 6

land located within an area bounded by
Walnut Street, 9th Street, Locust Street
and 10th Street.

     Bill No. 210687, to amend the
Philadelphia Zoning Maps by changing the
zoning designation of certain areas of
land located within an area bounded by
Trenton Avenue, Cambria Street, Tulip
Street and William Street.

     Bill No. 210549, approving an
amendment to the Articles of
Incorporation of the City Avenue Special
Services District of Philadelphia and
Lower Merion to extend the term of
existence of the District to December
31, 2042.

     Bill No. 210667, amending Title
14-529 of The Philadelphia Code,
entitled "Fifth District Overlay
District," to prohibit certain bonuses,
all under certain terms and conditions.

     Bill No. 210668, amending
Section 14-504 of The Philadelphia Code,
entitled "Neighborhood Conservation
Overlay Districts," by expanding the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 7

Page 7

existing Strawberry Mansion/NCO area to

include the area bounded by Lehigh

Avenue, 29th Street and Sedgley Avenue,

under certain terms and conditions.

        Bill No. 210741, to amend the

Philadelphia Zoning Maps by changing the

zoning designations of certain areas of

land located within an area bounded by

20th Street, Arch Street, Cuthbert

Street and 21st Street, all under

certain terms and conditions.

        Bill No. 210742, amending

Section 14-502 of The Philadelphia Code,

entitled "Center City Overlay District,"

by amending certain height regulations

and creating bulk and massing controls

with the Benjamin Franklin Parkway Area,

all under certain terms and conditions.

        Bill No. 210808, to amend the

Philadelphia Zoning Maps by changing the

zoning designations of certain areas of

land located within an area bounded by

all Oxford Avenue, Shelmire Avenue,

Rising Sun Avenue, Solly Avenue, the

County Line, Borbeck Avenue, Hasbrook

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 8

Page 8

Avenue and Hartel Avenue.

Bill No. 210634, to amend the
Master Plan for the University of
Pennsylvania by areas of land located
within an area bounded by Guardian
Drive, East Service Drive, Civic Center
Boulevard, 34th Street, 33rd Street and
Walnut Street and the Schuylkill River,
34th Street and University Avenue.

And Bill 210778, to amend Title
14 of The Philadelphia Code by adding
Section 14-532, entitled "Affordable
Housing Preservation Overlay District"
and making other related changes --

(Background interruption.)

THE CLERK:  Will someone please
mute your microphone.

(Background interruption.)

COUNCILMAN JOHNSON:  Everyone,
if you're not speaking, please put your
camera on mute.  Thank you.

THE CLERK:  -- to amend the
Philadelphia Zoning Maps by changing the
zoning designation of certain areas of
land located within an area bounded by

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 9

Page 9

39th Street, Ludlow Street, 40th Street
and Market Street, and to establish a
temporary demolition moratorium with
respect to properties within the
aforementioned area, all under certain
terms and conditions.

COUNCILMAN JOHNSON:  Thank you
very much, Brett.

Before we begin to hear
testimony from the witnesses we have for
today, everyone who has been invited to
the meeting to testify should be aware
that this public hearing is being
recorded.  Because the hearing is
public, participants and viewers have no
reasonable expectation of privacy.  By
continuing to be in the meeting, you are
consenting to being recorded.

Additionally, prior to
recognizing Members for the questions or
comments they have for witnesses, I will
note for the record at this time that we
will use the chat feature available in
Microsoft Teams to allow Members to
signify that they wish to be recognized.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 10

Page 10

In order to comply with the Sunshine
Act, the chat feature must only be used
for this purpose.

Before we begin, please let the
record reflect that Bill No. 210741 is
being held at the request of the sponsor
and will be heard at a later date.

Will the Clerk please call for
the -- one second.  Hey, Brett, is there
another bill that we want to hold as
well?

THE CLERK:  There will be
another bill that is held, but we are
hearing it today.

COUNCILMAN JOHNSON:  Okay.
Thank you.  So we're going to move
forward with what we have right now.

Will the Clerk please call the
panel for Bill No. 210638.

THE CLERK:  We have Paula
Brumbelow Burns and Thomas Dalfo.

COUNCILMAN JOHNSON:  Will you
please state your name for the record
and please begin your testimony.

MS. BRUMBELOW BURNS:  Good

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 11

Page 11

morning, members of the Rules Committee.

I am Paul Brumbelow Burns, Director of

Legislation for the Philadelphia City

Planning Commission.  I'm here to

testify on Bill No. 210638, which was

introduced into City Council on June 24,

2021 by Councilmember Squilla.

        Bill No. 210638 amends Title 14

of The Philadelphia Zoning Code,

entitled "Zoning and Planning," to

revise certain provisions of Chapter

14-500, entitled "Overlay Zoning

Districts," by adding the Section

14-531, entitled "SMH South Philadelphia

Municipal Hub Overlay District," and

approving the Residential Mixed-Use-2

District, RMX-2, Master Plan for the

site.

        The proposed bill will remap

the site to RMX-2 which is a Master Plan

District, along with the attached Master

Plan.  The SMH overlay requires

affordable dwelling units and green

roofs for any new residential

development on the site, changes open

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 12

air requirements and curb-cut size

restrictions as well as allowances for

commercial square footage in the RMX-2

District.

            The development team and the

development plan for the municipal

complex site was selected through an RFP

process led by PIDC, with significant

community engagement and the general

features of the proposed Master Plan are

consistent with the recommendations of

the South District Plan.  The

Philadelphia City Planning Commission

considered Bill No. 210638 at its

meeting of October 26, 2021 and

recommended for approval.  I will be

happy to answer any questions at this

time.

            COUNCILMAN JOHNSON:  Will the

Clerk please call the next panelist.

            THE CLERK:  Is Thomas Dalfo in

the (inaudible)?

            MR. DALFO:  I am.  Good

morning.  Can everyone hear me?

            COUNCILMAN JOHNSON:  Yes, we

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 13

Page 13

can hear you, Thomas.

MR. DALFO:  Hello.  My name is
Thomas Dalfo.  I'm Senior Vice-president
for Real Estate Services at the
Philadelphia Industry and Development
Corporation or PIDC.  PIDC managed the
developers selection process for the
property in question related to this
bill, and I'm testifying in support of
the ordinance that's been introduced.

Real briefly let me just give
background on the timeline for the
process because it was quite extensive
for this site.  PIDC at the City's
request drafted and then issued a
Request for Proposals for developers on
October 17, 2018.  And November 6, 2018
I presented to the Passyunk Square Civic
Association at the general meeting
regarding the RFP process.

November 14, 2018, PIDC managed
a tour of the Fleet Management facility,
the largest facility in this asset.  And
then January 18th, we had proposed a
deadline for the development responses,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 14

and that deadline was extended somewhat

in response to community concerns and

requests for incorporation of affordable

housing into the project, so we afforded

the development community additional

time to provide a response based on

that.

On April 10, 2019, PIDC hosted

a series of interviews with short-listed

developers on their proposals for the

project.  I would note that the Passyunk

Square Civic Association had one member

on the Selection Committee, and had

three members of their planning team in

attendance in those developer interviews

and presentations.

On October 4, 2019, the

Selection Committee made a

recommendation to select Alterra

Property Group as the developer for the

site.  December 16, 2019 there was a

community meeting with the City, PIDC

and Alterra Property Group coordinated

by the Passyunk Square Civic

Association.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 15

Page 15

We hit a bit of a hiatus with
the pandemic, and earlier this year on
July 20, 2021 there was another Passyunk
Square Civic Association meeting
focusing on the redevelopment process
for the site and the planning, and PIDC
participated in that.  In August of this
year, there was an RCO meeting that was
required under the zoning code was held.
And just a week or so ago, there was
another meeting with the Passyunk Square
Civic Association addressing some
community questions regarding the fire
station.  That ends my testimony.  I'm
happy to answer any questions.

COUNCILMAN JOHNSON:  Thank you
very much.

The Chair will now recognize
Councilman Mark Squilla to make any
remarks regarding this particular bill.

COUNCILMAN SQUILLA:  Thank you.
Thank you, Mr. Chair.

And thank you, Paula and Tom,
for your testimony.  Tom, real quick and
I know this has been a long process from

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 16

Page 16

the fall of '18, but this is something
new that we had done, at least in my
District, where we have engaged the
community to be part of the selection
process.  Normally, the Councilperson
gets a seat at that table when the
selection process was done.

          Real quick, Passyunk Square was
at this selection process and also
inputted into the RFP, especially with
the concern with the affordability
process.  Has it been done before where
the community group has been a part of
the selection process as far as one of
the RFPs that PIDC has done previously?

          MR. DALFO:  Councilman, not to
this extent.  The level of coordination
and involvement that we've had with the
Passyunk Square Civic Association really
represents the most intensive amount of
community coordination, and I think to
good effect.  I think the project here
has been before the community a number
of times, and we were able to adjust the
requirements of the RFP with input from

Committee on Rules 10-26-21 Meeting
October 26, 2021

the community.  So to answer your

question, no, this is the most extensive

we've had.

COUNCILMAN SQUILLA:  And I just

wanted to reiterate that point too

because sometimes things take longer

when we have a lot of concerns and

questions from the community during the

process.  But what I think came out of

this was changes in the development that

we saw through that process, the process

of selecting a developer depending on

what proposals were given forth.  And

the RFP sort of changed also because of

the concerns from the community.

We also looked at this as far

as remapping and planning suggesting for

what zoning to make this process work,

and there's been questions all along and

community concerns and they're still

are.  We still have time to work with

the developer on this project for

concerns from the community.

But I just want to thank PIDC

and the Planning Commission because it's

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 18

Page 18

a lot more work.  It took a lot more

time.  We did this during challenging

times also.  But even the process of the

RCO flyer in the community to do

inperson meetings, but then doing

virtual meetings, you have many people

on to discuss their concerns.

          And we have people on both

sides of this, right.  We have people

who said it was too dense of a project.

We have people who said it wasn't enough

density.  We have people who said it

wasn't enough parking, and the project

kept evolving until we got to a point

where we are now at where we're

introducing an ordinance for a remapping

of this whole entire area, but there's

still more processes to go.

          There's a Master Plan process.

And maybe, Paula, can you explain how

the Master Plan process works as we

attach it to this ordinance?

          MS. BRUMBELOW BURNS:  Yes.

Once the plan is attached to the

ordinance, that is the approved plan.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 19

Page 19

So if they ever want to amend it by
building a building larger, they will
have to come back through City Council
to have that plan amended.  So there
will always be -- if they want to
basically deviate from what they've
proposed, they will always have to come
back through the public process to
create any amendments to the plan.  So
it gives more security to the
neighborhood.

          COUNCILMAN SQUILLA:  Right.
And I want to say that because we've
actually did a remapping of an area on a
previous project in Passyunk Square and
we were sort of burned on that project
where a developer came back and because
we remapped something, they were able to
come back and build a more dense, more
height of a building.

          This allows us to know exactly
what we supported as a community and
then knowing that the developer can't
come back later and say, oh, well, the
zoning allows us to do this, therefore

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 20

Page 20

we have it already and we're going to

continue that.  So I think this

protection is very important for the

community, adding the Master Plan to the

ordinance.  And then the Master Plan

also has to be approved by the Planning

Commission, correct?  You guys are now

going to go through that process to

approve the Master Plan?

          MS. BRUMBELOW BURNS:  We have

approved our portion of it, so it is now

up to City Council to finalize the

approval of the Master Plan.

          COUNCILMAN SQUILLA:  So that

will be done with this process?

          MS. BRUMBELOW BURNS:  Yes,

they're done at the same time.

          COUNCILMAN SQUILLA:  Now, after

this process is done and we remap the

area, there will be then another process

for the City to sell the property.  Does

Planning work with Public Property on

the sale?  Because during the RFP

process, a point of the RFP was that any

project here would have to have an EOP

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 21

Page 21

attached to the sale of this property.

          So as the sale is being done,
Public Property works with Planning and
then we will be introducing an ordinance
to sell that property; is that correct?

          MS. BRUMBELOW BURNS:  Yes.  And
so, the Planning Commission will then
vote on it and it will go to the Public
Property Committee.

          COUNCILMAN SQUILLA:  So that
will come to the Public Property
Committee.  And at that Committee, there
will be another public hearing where the
community can weigh in.  And all during
this process, we will be able to work
with the developer on concerns, still
concerns that people may have and how we
can address those concerns as this whole
plan is finalized.

          So I just want to again thank
both Planning and PIDC.  I know it's
been a long grueling process and I know
it's still a lot more work to do, but I
think that by doing this and having the
involvement in the community ahead of

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 22

Page 22

time will allow us to move forward and

continue to address concerns as we hear

them from our neighbors and folks close

by.  So thank you for that and looking

forward to continue working with you on

this project.

        COUNCILMAN JOHNSON:  Thank you

very much, Councilman Squilla.

        Any other questions or comments

from members of the Committee on this

particular bill?

            (No response.)

        COUNCILMAN JOHNSON:  Hearing

none, Councilman Squilla, I have one

small question.  I think it's a great

project.  I'm in that area quite

frequently.  Where is the fire station

going to go?

        COUNCILMAN SQUILLA:  The fire

station that is currently at 12th and

Reed will be rebuilt on the 11th Street

side of the project to the north of the

fleet building.  There's a current fleet

building there.  I forgot to mention

during that process when we were doing

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 23

Page 23

the RFP for this, the neighbors really

wanted to keep that fleet building as

part of the development.  And so, the

firehouse will be north of that right

next to the police station and the L&I

building.  And then the exit points of

that will be on 11th Street and Reed

Street.

       COUNCILMAN JOHNSON:  Cool.

Good job.  We used to go get water.

It's a water fountain in --

       COUNCILMAN SQUILLA:  From the

firehouse.

       COUNCILMAN JOHNSON:  The

firehouse when we came from --

       COUNCILMAN SQUILLA:  And you'll

hear some testimony.  Also, there's

going to be some public comment from

some neighbors there that still have

some concerns about the project.  So we

still will continue to work through this

as we move on.  It's a lot more work to

do and a lot more engagement, so thank

you.

       COUNCILMAN JOHNSON:  Okay.

Page 24

Page 24

Good job.

If there are no other questions
from members of the Committee, I want to
thank the panelists and I will ask the
Clerk to please call the next panel.

THE CLERK:  Paula Brumbelow
Burns and Patrick Grossi testifying for
Bill No. 210637.

COUNCILMAN JOHNSON:  Please
identify yourself for the record and
please begin your testimony.

MS. BRUMBELOW BURNS:  Good
morning, members of the Rules Committee.
I'm Paula Brumbelow Burns, Director of
Legislation of the Philadelphia City
Planning Commission.  I'm here to
testify on Bill No. 210637, which was
introduced into City Council on June 24,
2021 by Councilmember Squilla.

Bill No. 210637 amends Title 14
of The Philadelphia Code, entitled
"Zoning and Planning," by amending
certain provisions of Chapter 14-800,
entitled "Parking and Loading," which
addresses parking requirements for uses

Page 25

Page 25

on properties that are locally

historically designated.  This bill

amends Zoning Bill No. 190611, which

lowered the minimum parking requirement

for properties that are locally

designated historic or that contribute

to a local historic district.

          The proposed text of this bill

removes the word addition from the

regulations.  This change clarifies that

any new floor area located within the

existing historic building will not

trigger a minimum parking requirement.

Any expansion outside of the historic

building will continue to have a minimum

parking requirement of 50 percent of the

base zoning layer.

          Additionally, a provision to

allow that parking to be provided

off-site has also been proposed in the

bill.  The Philadelphia City Planning

Commission considered Bill No. 210637 at

its meeting of July 15, 2021 and

recommended for approval.  I will be

happy to answer any questions at this

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page  26

Page  26

time.

         COUNCILMAN JOHNSON:  Thank you

very much.

         Will the Clerk call the next

panel -- not panel, the next testifier.

         THE CLERK:  Patrick Grossi.

         COUNCILMAN JOHNSON:  Go ahead,

Patrick.  State your name for the record

and you can begin.

         MR. GROSSI:  (Muted).

         COUNCILMAN JOHNSON:  You're

still on mute, Patrick.

         MR. GROSSI:  My apologies.

         COUNCILMAN JOHNSON:  Okay.

         MR. GROSSI:  My name is Patrick

Grossi.  I'm here today representing the

Preservation Alliance for Greater

Philadelphia.  Good morning, Committee

Chair Johnson, Vice-Chair Squilla and

members of the Committee.  The

Preservation Alliance wishes to express

its support for Bill No. 210637.  The

original provision, which this bill

amends, was one of the handful zoning

changes to emerge from the historic

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 27

Page 27

Preservation Task Force.

It's a commonsense provision
which relieves or reduces parking
requirements with the adaptive reuse of
historic properties.  The bill is
exclusive to properties listed on the
Philadelphia Register of Historic
Places, so this only applies to a small
universe of buildings and potential
projects city-wide.  The bill encourages
investment in historic properties and
incentivizes listing on the Philadelphia
Register to goals the Alliance has
readily pursued over its 25 years.

So the current amendment before
you simply brings the original bill
closer to the spirit in which it was
asked.  And churches are particularly
illustrated, if a historic church was
for example being proposed for
residential or commercial, the
introduction of a new (inaudible) plan
as you just heard would probably trigger
parking requirements, and that was not
the intention.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 28

Page 28

          The parking relief envisioned
by the Task Force intended that projects
like that would have no parking
requirement unless the building was
being substantially added upon, in which
case parking requirements do remain in
place but will reduce by roughly half.
So Bill No. 210637 is a sensible tweak
to an already popular bill, and we fully
support it.  It better incentivizes and
promote the adaptive reuse of the
properties, and ease the path toward
continued and renewed productive use.
And I thank you for your consideration.

          COUNCILMAN JOHNSON:  Thank you
very much.

          The Chair recognizes Councilman
Mark Squilla before we ask for questions
or comments from the Committee.
Councilman Squilla.

          COUNCILMAN SQUILLA:  Thank you,
Councilmember Johnson.

          I want to thank the
Preservation Alliance, Paul Steinke,
Patrick Grossi for their assistance in

Committee on Rules 10-26-21 Meeting
October 26, 2021

this, realizing that any time we

introduce legislation sometimes there's

unintended consequences or sometimes

people look at what we're doing and have

their own take on what it means, so I

think this clarifies it.

      And, Patrick, maybe knowing

that doing this also incentivizes a

person to keep the historic structure

instead of demoing it because the

requirements if they demo it, they would

have to then include the restrictive

parking requirements; is that correct?

      MR. GROSSI:  I mean, certainly

this only applies to properties that are

standing, that are existing, that are on

the local Register, and if there's a

permit that would otherwise trigger

parking requirements, right, some sort

of zoning change, some sort of use

change.  So, yeah, if you were to

demolish a property, somehow get

permission through the Historic

Commission to do that, then, yes, you're

not going to receive any benefit for

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 30

Page 30

doing so.  You're not going to get any

parking relief by doing so.

        COUNCILMAN SQUILLA:  And I

think that's also important as we see to

try to preserve some of our historic

structures.  It's important to have

legislation in place.  And the Historic

Task Force came up with a bunch of

options, still a lot more that we need

to work on and introduce.

        But again, if we continue to go

in this direction, we will start to see

preservation, how important it is to

keep the historic fabric of our city

alive while continuing to build and

develop, but allow us to be proud of our

history and also to retain it.

        So, Patrick, thank you again

for your advocacy.  And hopefully as we

move forward, we will have more and more

legislation to help us reach that goal.

Thank you.

        MR. GROSSI:  Thank you.

        COUNCILMAN JOHNSON:  Thank you,

Councilman Squilla.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 31

Page 31

Any questions or comments from
members of the Committee?

(No response.)

COUNCILMAN JOHNSON:  Hearing
none, I want to thank our panelists.

Will the Clerk please call the
next panel.

THE CLERK:  For Bill No.
210686, we have Paula Brumbelow Burns.

MS. BRUMBELOW BURNS:  Hi.  I'm
Paula Brumbelow Burns, Director of
Legislation for the Philadelphia City
Planning Commission.  I am here to
testify on Bill No. 210686, which was
introduced into City Council on
September 17, 2021 by Councilmember
Squilla.

The purpose of this bill is to
allow for the construction of a new
biomedical research building at Thomas
Jefferson University to replace an
existing above-ground parking structure.
Bill No. 210686 remaps a parcel of land
among 9th Street between Walnut and
Locust Streets from RMX-3 Residential

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 32

Page 32

Mixed-Use to CMX-4, Commercial Mixed-
Use.  This bill aligns with the
Philadelphia 2035 city-wide vision
recommendation to encourage
institutional development and expansion
through policy and careful consideration
of land resources.

     The Philadelphia City Planning
Commission considered Bill No. 210686 at
its meeting of October 21, 2021 and
recommended approval.  I will be happy
to answer any questions at this time.

     COUNCILMAN JOHNSON:  Will the
Clerk call the next testifier.

     THE CLERK:  That is the only
individual for this panel.  If there are
questions, there are additional
representatives available for the
project that will be able to answer
anything.

     COUNCILMAN JOHNSON:  Will the
Clerk please recognize Councilman Mark
Squilla.

     COUNCILMAN SQUILLA:  Thank you,
Mr. Chairman.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 33

Page 33

And I appreciate it.  We have
worked with the community group here,
Washington Square West on this proposal.
Ron Patterson representing Jefferson has
been in conversations.  Since we have
support from the community group, we
wanted to hear this today, but we're
still waiting for the map to be attached
and amended to this legislation.

Jefferson has also agreed to
hold off.  They did receive their EOP
today, which is important.  We want to
make sure we attach that to this
legislation.  And Jefferson has agreed
to hold this in Committee until we have
the signed EOP in place, and that will
probably be at the next Rules Hearing.

Mr. Patterson, do you have
anything else to add as we move forward?

MR. PATTERSON:  Good morning.
Ronald Patterson, Klehr Harrison law
firm, 1835 Market Street on behalf of
Thomas Jefferson University.  No,
Councilman Squilla, that accurately
reflects what has occurred.  As you

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 34

Page 34

mentioned, we had a series of three

meetings over the summer with Wash West

Civic Association, and we agreed and

will have a side agreement with them

concerning certain provisos about the

building is to be constructed such as it

will be commensurate with the adjacent

building in terms of height, 11 stories.

       We won't be seeking any bonuses

under the bump up of the change of the

zoning map.  And of course, the EOP plan

which we're serious about, you can

imagine Jefferson being a large entity,

we received it this morning and we have

to digest it and put it through the

concurrent chain.  So we're happy to

proceed with the vote being held, and we

will have it addressed by the next Rules

Hearing.

       COUNCILMAN SQUILLA:  And --

       MR. PATTERSON:  I'm sorry.  I

just wanted to let you know we also have

Anthony Bracali with Jefferson and

Michael Hinchcliffe with Payette

Architects if there are any questions

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 35

Page 35

about the projects or if you wanted to

see renderence.

   COUNCILMAN SQUILLA:  Thank you,

Mr. Patterson, and I appreciate your

continued work and effort.  And I

appreciate also your ability to agree to

hold this until we have the final

mapping and EOP.

   And we would like to hold this

in Committee, Mr. Chairman, and then be

able to amend it at the next Rules

Hearing in November.

   COUNCILMAN JOHNSON:  Thank you

very much.  And I just want to give a

shout-out to Ron Patterson from South

Philadelphia and the Jefferson team,

give a shout-out to you leading the

whole Jefferson team.  I know y'all

going through a little bit of

post-traumatic stress as it relates to

the recent gun violence that took place

on Jefferson campus, so all of City

Council stand with the staff and

employees at Jefferson Hospital.

   Will the Clerk please call the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 36

Page 36

next panel.

        THE CLERK:  For Bill No.

210687, we have Paula Brumbelow Burns.

        MS. BRUMBELOW BURNS:  I'm Paula

Brumbelow Burns, Director of Legislation

for the Philadelphia City Planning

Commission.  I'm here to testify on Bill

No. 210687, which was introduced into

City Council on September 17, 2021 by

Councilmember Squilla.

        Bill No. 210687 amends the

Philadelphia Zoning Maps by changing the

zoning designations of certain areas of

land located within an area bounded by

Trenton Avenue, Cambria Street, Tulip

Street and William Street.  This is a

proposed zoning map amendment from

Residential Single-Family Attached

District RSA-5 to RSA-6, and will be the

first zoning map designation of an

RSA-6, which allows for smaller lots

with the intent of preserving the

two-story block.

        The purpose of the proposed

changes is to facilitate redevelopment

Page 37

Page 37

of vacant lots with 13 single family

homes on individual lots.  The

development will be carried out pursuant

to a redevelopment agreement with the

Redevelopment Authority.  The units are

being developed and marketed as

workforce housing.

           The Philadelphia City Planning

Commission considered Bill No. 210687 at

its meeting of October 21, 2021 and

recommended approval.  I'll be happy to

answer any questions at this time.

           COUNCILMAN JOHNSON:  Thank you.

Brett, is there another testifier for

this panel?

           THE CLERK:  Not for this panel.

           COUNCILMAN JOHNSON:  The Chair

would like to recognize Councilman Mark

Squilla.

           COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.  And it seems like I'm taking

up all the bills here, but this is an

important project that was also done

through the Land Bank, so this is the

one the Land Bank proposed, the 5149

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 38

Page 38

affordable market rate projects.

The remapping here enables to
keep the block as a low-dense two-story
block to try to make it consistent and
allow affordable development to be sold
in the community that desperately needs
it, so we are also amending this bill to
attach an EOP to that plan.  This is
something that we're going to watch real
closely to see if we can do this again
in other areas of the District.  We
think it's really important to have
affordability and also workforce housing
where people who are now working and
living in the City maybe working
$40,000, $50,000 are able to buy a home
in the City, so it's so important.

And so, we want to make sure
that our intent is being followed here
and that this is something that we could
do with private developers also.  And I
want to thank the Land Bank for working
through this process and guiding us as
this takes place, so I want to thank
them.  I know they're not here today,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 39

Page 39

but they did do a lot of work with this

particular development and working with

us, so thanks.

COUNCILMAN JOHNSON:  Thank you,

Councilman Squilla.

Any other questions or comments

from members of the Committee?

(No response.)

COUNCILMAN JOHNSON:  Hearing

none, will the Clerk please call the

next bill and the next panel.

THE CLERK:  For Bill No.

210549, we have Denis Murphy and

Terrence Foley.

MR. MURPHY:  Good morning,

Chairman Johnson and members of the

Rules Committee.  My name is Denis

Murphy.  I'm the Senior Director of

Corridor Improvements for the Commerce

Department.  I'm here to testify in

support of Bill No. 210549, amending the

Articles of Incorporation of the City

Avenue Special Services District of

Philadelphia and Lower Merion to extend

the District's term of existence until

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 40

Page 40

December 31st of 2042.

     Since 1999, the City Avenue
District has carried out capital
improvements, public safety services,
marketing and develop partnerships and
engage stakeholders to bring vibrancy to
this important area.  The City Avenue
District is critical in fostering
cooperation along this important
business corridor situated on the
boundary between Philadelphia and
Montgomery County.

     The proposed legislation will
extend City Avenue's term as a municipal
authority for an additional 20 years.
As a second step in the
re-authorization, City Avenue will
return to City Council for approval for
an updated plan and budget.  This will
occur after City Avenue has shared that
plan with all property owners and
conducted a public hearing in accordance
with the Pennsylvania law regarding
municipal authorities.

     Business Improvement Districts

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 41

Page 41

are one of the best examples of

collaboration between the City and our

commercial areas.  This worthwhile

effort deserves our support.  Thank you

for your consideration and I'm happy to

answer any questions.

      COUNCILMAN JOHNSON:  Thank you

very much.

      Will the next panelist please

state your name for the record and begin

your testimony.

      MR. FOLEY:  Good morning,

Chairman Johnson.  I'm Terrence Foley,

the President of the City Avenue Special

Services District of Philadelphia and

Lower Merion, better known as the City

Avenue District.  Before starting, I

would like to thank Councilman Jones for

his support of the District over the

years.  It's been much appreciated.

      The City Ave District is a

unique partnership between the City of

Philadelphia and the Township of Lower

Merion.  It stretches from I-76 to 63rd

Street along City Avenue.  The

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 42

Page 42

District's objectives are to improve
public safety, enhance the area's image
and attract and shape development.  The
District is a Pennsylvania Municipal
Authority and is fully funded by
assessments to commercial property
owners within the District, which then
funds the services provided.

        The City Ave District works
with businesses, property owners,
developers and residents to shape the
future of this important corridor.  This
work includes new zoning on both the
Philadelphia and Lower Merion sides,
allowing for much opportunity for new
development.  The District has secured
over $14 million in funding for capital
improvement projects with over $13
million in streetscape and safety
improvements having been completed over
the last 10 years alone.

        There is an additional $3
million improvements that are fully
funded and will be constructed next
year.  The economic impact of the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 43

Page 43

District's activities is substantial.

Hopefully you received a copy of our

economic analysis that was completed by

Econsult, but I will summarize here.

The capital improvements alone have

generated almost $9 million of tax

revenue for the City of Philadelphia.

The resulting private sector investment

on the corridor on the Philadelphia side

has created an additional 400 new jobs.

These jobs create additional direct and

indirect annual expenditures of 54.6

million and employee compensation of

18.4 million each year.  This increase

of activities generates approximately

800,000 in additional tax revenue for

the City.

         The capital improvements and

resulting private sector investments

also generate increased property tax

revenue for the City and the School

District.  The new construction

renovations within the District

increased the assessed value of those

properties by $100.5 million, generating

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 44

Page 44

an additional 1.41 million a year in
property taxes.

      The District is also immensely
proud of its contribution to public
safety.  The District employs an eight-
person bike patrol which has served to
reduce crime by 55 percent over the last
20 years.  The District also engages in
community and networking opportunities
for local businesses and restaurants.
Over two decades of growth and
achievements can be viewed in the
timeline brochure that again I hope you
received electronically.  So I look
forward to seeing the continued growth
of the development of the District in
the next 20 years and beyond.

      The District is seeking an
extension of its Articles of
Incorporation for another 20 years,
approval for which is required from the
Township of Lower Merion and the City of
Philadelphia.  Lower Merion has
previously granted its approval.  The
District will be finalizing its 20-year

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 45

Page 45

plan for services and a budget, and in

keeping with the state Municipal

Authorities Act, will present this plan

to the property owners and conduct a

public hearing.  Once that is

accomplished, we will return to Council

for Council's approval.  Thank you very

much and I'm available for any

questions.

      COUNCILMAN JOHNSON:  Thank you

very much for your testimony.

      The Chair recognizes Councilman

Curtis Jones for remarks on his bill.

        (No response.)

      COUNCILMAN JOHNSON:  Okay.  We

will move on.

      The Chair recognizes

Councilwoman Katherine Gilmore

Richardson.

      COUNCILWOMAN GILMORE

RICHARDSON:  Thank you.  Thank you so

much, Mr. Chair.

      First, I wanted to thank our

colleague and my District Councilmember,

Councilmember Jones, for introducing

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 46

Page 46

this legislation to extend the City

Avenue Special Services District.  I was

around when the Special Services

District first began here in Wynnefield

and actually at that time lived right

off of City Avenue, so have worked

closely with the bike patrol and with a

lot of you over the years.

         And, Terrence Foley, I just

want to thank for your steadfast

dedication to our community and for

ensuring that we always have key

initiatives in our area that continue to

improve not only our capital

improvements, but public safety in our

area.  And the marketing I think has

just been stellar, particularly starting

down at Presidential Boulevard by 76 all

the way up to 63rd Street.

         But you know I would get in

trouble, Terrence, particularly for my

folks in Wynnefield, and that would

include Wynnefield Heights and

Wynnefield, Overbrook and Overbrook

Farms, so I had to get this on the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 47

Page 47

record on how you all are monitoring the

types of businesses that are setting up

along City Avenue, particularly I would

say the Wynnefield Heights area from the

Bala Cynwyd shopping center on down to

63rd Street, and how we are ensuring

that the businesses that settle on that

corridor, particularly on the City of

Philadelphia side, that it's fair and

it's equitable.  I just wanted to put

that on the record.

          MR. FOLEY:  Thank you very

much.  We regularly monitor what's

happening in terms of new businesses.

We want to support them and make sure

they're successful.  Our bike patrol

actually is one of my first lines of

telling me there's activity in a

building when it's vacant.  We

immediately investigate and find out

what's coming in there.

          We have not always been

successful.  As you know, we have two

medical marijuana dispensers which we're

not happy about, but that's life.  And

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 48

Page 48

we're working to make sure that they are

safe.

     COUNCILWOMAN GILMORE

RICHARDSON:  Yes.  So we work with the

bike patrol folks, and they have been

very, very helpful to us on the

corridor, particularly in certain areas

of the corridor where we may have vacant

facilities.  And I know that was the

case between 52nd and I believe

Bryn Mawr for a very short time at the

old furniture store, but they have been

very, very helpful.

     I just want to ensure that I

put on the record because I will be

supporting this bill, for the members in

the community that I have broached this

topic to ensure that the businesses that

are setting up on the City side of the

City Avenue Special Services District,

that it's fair and it's equitable.

Because I know there is a thing in the

community where there's a belief that on

the Lower Merion side, they're getting

the newer buildings, i.e., the old KFC,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 49

Page 49

the residential developments and some of

the other zoning changes that have been

made on the Lower Merion side and that

is not the same on the City side.

So I just wanted to put that on

the record that we are for ensuring that

any businesses that set up on the City

Avenue Special Services District on the

City side is both fair and equitable and

that we are thinking about that for the

overall vision for City Avenue from 63rd

Street down to 76 West.

And then finally, Terrence, I

just wanted to thank you again for your

steadfast support and for all you have

done with us over the last 20 years, and

that was even back to the St. Joe's

expansion of the dormitories at the old

supermarket site and everything in

between. So I just want to thank you

very, very much for your work. And I

look forward to continuing to work with

you.

And, Mr. Chair, for that reason

I will be supporting this legislation,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 50

Page 50

and I thank my colleague Councilmember

Jones for introducing this.  Thank you

very much.

        COUNCILMAN JOHNSON:  Thank you

very much, Councilwoman.

        Any other questions or comments

from members of the Committee?

                (No response.)

        COUNCILMAN JOHNSON:  Thank you

for your testimony.

        Hearing none, will the Clerk

please call the next bill and next

panel.

        THE CLERK:  For Bill No.

210667, we have Paula Brumbelow Burns.

        MS. BRUMBELOW BURNS:  Hi.  I'm

Paula Brumbelow Burns, Director of

Legislation for the Philadelphia City

Planning Commission.  I'm here to

testify on Bill No. 210667, which was

introduced into City Council on

September 27, 2021 by Councilmember

Parker for Council President Clarke.

        Bill No. 210667 will amend the

VDO, 5th District Overlay by removing

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 51

Page 51

the option for applicants to earn height

and density bonuses using the Mixed-

Income Housing Bonus within the 5th

Council District.  The purpose of the

Mixed-Income Housing Bonus is to promote

the production of deed-restricted

affordable housing in new construction

and increase contributions to the

Housing Trust Fund in addition for

greater height and density.

        This bill will apply to all

properties within the overlay.  The City

Planning Commission at its meeting of

October 21, 2021 recommended Bill No.

210667 for approval with amendments.

The Commission recommends keeping the

bonus in Center City, an adjacent

neighborhood south of Spring Garden

Street, but removing the option to pay a

fee to the Housing Trust Fund.  Any

bonus earned would require affordable

units to be built onsite.  This is part

of the 5th District in most need of

affordable units and where we believe

developers have the greatest amount of

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 52

Page 52

room in their pro-formas to accommodate

onsite affordable units.  I'll be happy

to answer any questions at this time.

COUNCILMAN JOHNSON:  Any

questions or comments from members of

the Committee?

(No response.)

COUNCILMAN JOHNSON:  Hearing

none, will the Clerk please call the

next bill and panel.

THE CLERK:  For Bill No.

210668, we have Paul Brumbelow Burns.

We have Odessa Tate, Linda Tate and

Tonetta Graham.  And you can speak in

the order in which your name was called.

MS. BRUMBELOW BURNS:  I'm Paula

Brumbelow Burns, Director of Legislation

for the Philadelphia City Planning

Commission.  I am here to testify on

Bill No. 210668, which was introduced

into City Council on September 27, 2021

by Councilmember Parker for Council

President Clarke.

This bill expands the

Strawberry Mansion Neighborhood

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 53

Page 53

Conservation Overlay to cover the

remaining two-thirds of the

neighborhood.  The overlay applies

design and zoning standards to all

residential and residentially-zoned

properties.

         The NCO expansion has positive

goals, but it's deficient in many of the

requirements that the Commission's

regulations set out for creating or

expanding an NCO.  These requirements

ensure that staff has the correct

materials to be able to apply the design

standards of the NCO applications for

building permit.  The lack of materials

will hinder staff's ability to review

and approve applications and may result

in noticeable delays.

         PCPC staff has begun

conversations with the lead civic

organizations and Council staff in this

part of the neighborhood, a process that

is collaborative, deliberative and

unique to each neighborhood.  The

Commission supports the intention of the

Page 54

Page 54

overlay and would like staff to continue

working with Council and the Civics to

refine the overlay in this section of

the neighborhood.

        The City Planning Commission at

its meeting of October 21, 2021

recommended Bill No. 210668 for approval

with suggested amendments that will

address creating more specific design

language, revised boundaries to exclude

blocks that are primarily nonresidential

or vacant and have further

considerations on height limits.  I will

be happy to answer any questions at this

time.

        COUNCILMAN JOHNSON:  Thank you

very much.

        Will the next panelist please

state your name for the record and

begin.

        MS. TATE:  Hello to the

Chairman and the Committee.  My name is

Odessa Tate and I represent the Village

Community of Strawberry Mansion and All

In The Family CDC.  I am in favor of the

Page 55

Page 55

Strawberry Mansion Overlay to be

included into our boundaries within

Strawberry Mansion.  The identity of the

community is rooted in the history and

unique culture of that community.

        Community culture creates a

sense of pride for a community and

outliers of the community should not

hold precedence or responsibility for

community planning and not consider the

community.  Philadelphia itself is

distinct and each neighborhood has

distinct characteristics that define the

area.  The overlay creates opportunities

for smart development and enhancement

tactics that preserve neighborhoods and

not just dismantle neighborhood culture

with hodgepodge developments.

        The overlay allows for good

practice in the following:  One,

collaboration.  This joins community

stakeholders and development.  Two, more

predictability and the community members

have better protection that supports a

neighborhood's best interest.  Three,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 56

Page 56

appropriating and appreciating

distinctive communities.  Developments

according to the overlay are attractive

to communities because they intensify

strong sense of place.  Communities are

to maintain development in accordance to

recognized ability in terms of quality

after infrastructure.

        Communities do not deserve to

lose their identities with developments

when there is already an established

look and feel.  This overlay forces new

developments to adhere to a written

standard and criteria that is consistent

with the comprehensive plan.  Layouts of

properties often have serious impacts on

neighboring and nearby properties.

Importantly, fundamental fairness is

upheld and that details of the overlay

are clearly stated for regulatory

standards and are not unconstitutionally

vague.

        With this overlay, the

expectation is to achieve higher

standards and proficiency so that

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 57

Page 57

community culture and integrity are not

compromised with new developments.

Thank you.

          COUNCILMAN JOHNSON:  You're

welcome.

          Will the next panelist please

state your name for the record and

begin.

          MS. TATE:  Good morning,

Chairman and Committee.  My name is

Glenda Tate and I'm the President of All

In The Family Group Associates CDC and

RCO in the Strawberry Mansion section of

North Philadelphia, and I am in favor of

the overlay in my community because it

gives community organizations and

residents a chance to communicate with

the Planning Commission, City Council

and developers regarding our feelings as

community residents about new

developments added to the current

housing stock.

          As community members, we have

the right to say what we feel and what

we would like to see within our

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 58

Page 58

communities because the decisions impact
us greatly.  The relations between
developers and residents are important
because it affects individuals and
families residing in said community.
The overlay provides regulations,
boundaries and standards that would
provide more protection for
neighborhoods who feel that they are
under siege from new development to have
more impact on what development should
be or look like in their neighborhoods.

         To be clear, we do want to
establish cohesive relationships with
developers.  It's not that our community
does not want new development.  It is
the offensiveness of how the
developments are propelled into
communities without our input from
inception.  Through lack of thought for
affordability and truly understanding
the needs of the area, developments
impact parking, the flow of traffic and
overcrowding and most importantly, the
cultural structure of the communities

Page 59

Page 59

with overemphasized department living.

     The foundation of many
communities have been built on family
living and with this, does the
development allow with the needs of the
community or unethically go against
them.  With the overlay in place,
developments are more likely to reflect
neighborhood and the culture,
affordability and the characteristics of
that area.  Thank you.

     COUNCILMAN JOHNSON:  Thank you
very much.  Thank you.

     Will the next panelist state
your name for the record and begin.

     THE CLERK:  The next panelist
is Tonetta Graham.  If you are on, you
may unmute yourself and begin your
testimony.

     (No response.)

     COUNCILMAN JOHNSON:  Tonetta,
are you there?

     (No response.)

     COUNCILMAN JOHNSON:  Okay.  Any
questions or comments from members of

Committee on Rules 10-26-21 Meeting
October 26, 2021

                                                    Page 60

                                    Page 60

the Committee?

                    (No response.)

          COUNCILMAN JOHNSON:  Hearing

none, will the Clerk please call the

next bill and the next panel.

          THE CLERK:  For Bill No.

210742, we have Paula Brumbelow Burns

and Dennis Boylan.

          MS. BRUMBELOW BURNS:  I'm Paula

Brumbelow Burns, Director of Legislation

at the City Planning Commission.  I'm

here to testify on Bill No. 210742,

which was introduced into City Council

on September 23, 2021 by Councilmember

Parker for Council President Clarke.

The purpose of this bill and the

accompanying bill 210741, which is being

held, is to allow for the redevelopment

of the existing surface parking lot with

a multiple-story office building.

          Bill No. 210742 adjusts the

maximum allowable height from 240 to 245

feet and places caveats on the

applicability of CMX-5, Commercial

Mixed-Use zoning provisions.  These

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 61

Page 61

caveats would apply despite the status

of zoning maps.   The provisions of Bill

No. 210742 would make it so that CMX-5

zoning applies only to an office

building with retailer commercial

services, onsite parking, no residential

uses and a payment of $2,515,350 is made

to the Housing Trust Fund regardless of

whether a Mixed-Income Housing Bonus is

used.

         Planning Commission staff has

no problem with the adjustment to the

height limit for this parcel, but the

other provisions of this bill as written

apply very specific standards to only

one parcel and require a payment for

approval condition.   Planning

Commission's staff feels that the

proposed building does a good job of

transitioning the scale of the JFK

Boulevard to the lower scale of the

Logan Square neighborhood to the north.

         A building of this scale can be

developed in CMX-4 using zoning bonuses.

Alternatively, a clean remapping to

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 62

Page 62

CMX-5 would make this bill unnecessary.

The Philadelphia City Planning

Commission considered Bill No. 210742 at

its meeting of October 26,2021 and

recommended not for approval.  I will be

happy to answer any questions at this

time.

          COUNCILMAN JOHNSON:  Any

questions or comments from members of

the Committee?

               (No response.)

          COUNCILMAN JOHNSON:  I have a

question.  I just wanted to ask the

reason why Planning Commission was not

recommending the bill?

          MS. BRUMBELOW BURNS:  We felt

that they could do either a straight

CMX-5 or CMX-4 with bonuses and meet the

basic requirements of it and they did

not need an additional amendment to the

Ben Franklin Parkway Overlay, that they

could have just achieved most of this

other than the 5 feet of height without

a zoning overlay.

          COUNCILMAN JOHNSON:  Okay.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 63

Page 63

Thank you very much.

Any questions or comments from members of the Committee?

(No response.)

COUNCILMAN JOHNSON:  Will the Clerk please call the next bill and the next panel.

THE CLERK:  We actually have one more individual to testify for this bill.  It is Mr. Dennis Boylan for 210742.

COUNCILMAN JOHNSON:  Okay. Mr. Dennis, please state your name for the record and begin your testimony.

MR. BOYLAN:  Good morning, Chairman Johnson.  Dennis Boylan for the Logan Square Neighborhood Association. I'm the President of LSNA.  And this project that's subject to the amendment falls within our neighborhood association boundaries.  We were the coordinating RCO for this project, and we're a large neighborhood footprint. We go from Broad to Schuylkill, Market to Spring Garden.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 64

Page 64

            The significant feature of our
neighborhood is that it's bisected by
the Benjamin Franklin Parkway.  Our
neighborhood takes very seriously the
implied obligation to safeguard
development in and around the Parkway,
specifically the height restrictions.

            The Parkway District is home to
some of the City's --

            COUNCILMAN JOHNSON:  Hey,
Dennis.

            MR. BOYLAN:  Yes?

            COUNCILMAN JOHNSON:  Hey,
Dennis, I just want to say you're not
coming through clear.

            Brett, do you hear full
testimony from him because I'm hearing
glitches?

            THE CLERK:  I was having no
issue hearing him, but it might be --

            COUNCILMAN JOHNSON:  It may be
where I'm located at.  But go ahead,
Dennis.  You can continue your
testimony.

            MR. BOYLAN:  And I have written

Page 65

Page 65

testimony which I will submit to the
Clerk afterwards.

The Parkway District is home to
some of the City's most important
cultural, educational and civic
institutions and maintaining that unique
quality is a civic duty of the
government, the citizenry and our
neighborhood.  LSNA does not believe
that this development will adversely
affect the Parkway District, and it is
for that reason that LSNA supports the
proposed amendment to the City Code for
this specific location.

Our process in evaluating the
project was informed by a number of
factors.  One, the development is just
several -- it's over two-and-a-half
blocks away from the Ben Franklin
Parkway.  The Parkway Cooperation worked
in very good faith with LSNA and most
importantly, with the nearest neighbors,
this was the Walden Walk Condominiums,
to resolve any issues that were of
contention.

Page 66

Page 66

          The development will take what
has been for decades a surface parking
lot, put it into a more meaningful
purpose.  But last but not least, the
proposed occupant of the building is to
be a single corporate entity bringing
prestige, jobs and vitality to the City.
These are some, but not all of the
reasons that LSNA supports this proposed
amendment.  And thank you very much,
Mr. Chairman.

          COUNCILMAN JOHNSON:  Thank you
very much for your testimony.

          Any other questions or comments
from members of the Committee?

               (No response.)

          COUNCILMAN JOHNSON:  Hearing
none, will the Clerk please call the
next bill and the next panel.

          THE CLERK:  For Bill No.
210808, we have Paula Brumbelow Burns.

          MS. BRUMBELOW BURNS:  I am
Paula Brumbelow Burns, Director of
Legislation for the Philadelphia City
Planning Commission.  I am here to

Page 67

Page 67

testify on Bill No. 210808, which was

introduced into City Council on October

7, 2021 by Councilmember O'Neill.  Bill

No. 210808 amends the Philadelphia

Zoning Maps by changing the zoning

designations of certain areas of land

located within an area bounded by

Oxford, Shelmire, Rising Sun, Solly

Avenue, the County Line, Borbeck,

Hasbrook and Hartel Avenues.

          The bill amends all CMX-2,

Commercial Mixed-Use properties to

CMX-1, Commercial Mixed-Use.  The zoning

change will prevent the redevelopment of

these lots for mixed-use development

projects that the community has deemed

to be incompatible with the character of

the Fox Chase neighborhood.

          The Central Northeast District

plan recommended keeping CMX-2 zoning in

this area to encourage mixed-use

redevelopment of underutilized

properties to strengthen the Fox Chase

Business District and to encourage a

strong, walkable commercial corridor.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 68

Page 68

          The new CMX-1 zoning prohibits
restaurants and ground floor commercial
spaces greater than 2,000 square feet.
The Philadelphia City Planning
Commission considered Bill No. 210808 at
its meeting of October 26, 2021 and
recommended not for approval.  I will be
happy to answer any questions at this
time.

          COUNCILMAN JOHNSON:  Thank you
very much.

          The Chair recognizes Councilman
O'Neill for remarks on sponsorship of
his bill.

          COUNCILMAN O'NEILL:  Yes,
Mr. Chair.  Thank you.

          I understand the Planning
Commission's opposition.  I also
understand when the Planning Commission
says the community feels that the
current zoning is not in compatible with
the character of the neighborhood.
That's my responsibility, not the
Planning Commission's, to make sure that
the community is involved, community has

Page 69

Page 69

input and in this particular case been

working with the Planning Commission

trying to find a solution, because in

the 2035 meetings there were walks in

this particular neighborhood in Fox

Chase with the Planning Commission and

the Board members of the Fox Chase

Homeowner's Association, the RCO.

         And what was sold to that

community and it's been sold at

different times in the past is

storefront commercial,

pedestrian-friendly, it's a potential

little downtown for Fox Chase.  It's the

oldest area in my District.  It has a

huge train station right in this area,

the dead-ends at Fox Chase, and there's

an unimaginable parking problem that

spills over.  People come in from the

suburbs because it's a cheaper monthly

ticket.  They park in front of people's

houses.  They park in -- the lot fills

up and it's a large lot, and there's

tremendous parking issues.

         So what the neighbors and the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 70

Page 70

community felt they were getting when

they agreed to the zoning is not what

they got.  There have been three

proposals that have been approved at the

Planning Commission just in the last

month or so, and the storefronts are not

there.

On one property, and it's the

biggest one, the developer is the same

developer that's basically building as

many apartment units as they can, as

high as they can and as dense as they

can.  And you know what got left out of

the equation?  What the community bought

which was storefront commercial.

The side streets which are

commercial, particularly on this major

one, it was just ignored because a

developer wouldn't have gotten four

floors shoved into 35-foot height which

means the units are going to be about

7-and-a-half feet inside the rooms.

They would have had to do three stories

if the side street had been used.  That

was the Planning Commission's discretion

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 71

Page 71

to use the side street.  And it's an

abomination.

          I've had two community meetings

where people are just outraged, and the

interpretation is let's not go in favor

of the community.  It goes in favor of

the developer to get the developer to

get the developer a by-right permit, and

that's actually come out of

conversations with the Planning

Commission.  That's the goal.

          If we put these storefronts on

the side, they wouldn't get their

by-right zoning.  The developer is not

concerned about the storefront, not

about the commercial, which is what CMX

whether it's 1 or 2 is all about.  If

there had been a couple of stories above

these units with residential, I wouldn't

be here asking for CMX-1, which is much

more community-friendly when the people

that are making the approvals, the

Planning Commission, are more worried

about what the developer can squeeze in

than what the community feels is

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 72

Page 72

compatible with their neighborhood and
their understanding of what 2035, the
plan of 2035 was going to include.

         So I just ask my colleagues to
support me on this.  At the last meeting
a week and a half ago, there was at
least 100 people that stayed until about
11 o'clock after another meeting and
gave a standing vote unanimously for
this change.  The three projects I
mentioned, they're already permitted and
that's not going to change unless
somebody appeals later and all that, but
it's been approved and I just ask
there's a lot of other properties like
that, and it's one thing to see mistakes
being made and actually a community was
double-crossed.  But to sit back in my
position representing this community and
not do anything when I know something
wrong happened and something right can
happen in the future, that's all I'm
asking for.

         And I thank you, Mr. Chair.

         COUNCILMAN JOHNSON:  Thank you.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 73

Page 73

I just had a question.  So this is a
four-story apartment building under 35
feet.  Isn't the regular feet by-right
38 feet?

          COUNCILMAN O'NEILL:  In my
District, there is a 35-foot limit.
That's an overlay.

          COUNCILMAN JOHNSON:  But that's
a lot of density under 35 feet.

          COUNCILMAN O'NEILL:  Yes.  If
it would have been a three-story
building with commercial on the bottom,
there's room counting the side street
commercial, which it's a big wide
commercial street with nothing but
commercial on it.  There would probably
be 13 storefronts plus 3 on the other
street.  We're just getting the 3
storefronts on the one.  Everything else
is 86 apartments squeezed in.  They're
500 square feet and they're just packed
in, and it is an abomination.  But the
horse seems to be out of the barn on
this.  It doesn't mean we can continue
to have this happen.  And I just ask

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 74

Page 74

that this is prevented for the future.

It won't correct the past.

          COUNCILMAN JOHNSON:  Thank you.

Thank you very much, Councilman O'Neill.

          COUNCILMAN O'NEILL:  And it is

Commercial Mixed-Use, and people

understand that we have a restaurant in

this that will be CMX-1.  People are not

concerned about a restaurant.  They're

concerned sometimes about a restaurant,

which is good that they have to meet

with the community, tell them what they

are and get the community's support.

          COUNCILMAN JOHNSON:  Thank you.

I just had a quick question for Paula.

          MS. BRUMBELOW BURNS:  Yes.

          COUNCILMAN JOHNSON:  Just for

clarity, Paula, when there's projects

that don't fall through on the original

intent of what the Planning Commission

has proposed, what's the recourse?  Does

the project just move forward and then

you have situations like this where the

Councilman has to come and try to

provide corrective action or circle back

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 75

Page 75

with the developer and say, hey, here's

the policy as opposed to how you're

supposed to develop to hold them

accountable?

          MS. BRUMBELOW BURNS:  I'm going

to say I have not seen the plan that was

brought up as the example in question,

so I'm going to apologize.  But if the

commercial wasn't being met or it didn't

meet the spirit of the code and they

feel that there was an error in the

issuing of the review or the permit, we

can always or the Council office, a

neighbor, another property owner always

has the right to appeal the zoning

permit based on an error of information

not being provided adequately.  So

there's always that route.

          There's always the best if it

was an as-of-right permit.  We can

always look more at the zoning code and

kind of figure out is it the 35 feet, is

it a three-story issue, how do we come

up with bigger answers.  Sometimes when

we're in a rush to stop everything we

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 76

Page 76

don't always get to take as thoughtful

of a look as we'd like.  So we're always

willing at the Planning Commission to go

back and take a more thoughtful look

instead of just the -- I understand the

reaction time.  But we can also after

this reaction time still look

thoughtfully and see if there's other

solutions that need to be made.

       COUNCILMAN JOHNSON:  Okay.

Thank you very --

       COUNCILMAN O'NEILL:  Mr. Chair,

if I can just follow up.

       COUNCILMAN JOHNSON:  Yes.

       COUNCILMAN O'NEILL:  There's

been plenty of time because there were

two projects initially.  The large one I

mentioned with all the side street

commercial possibility that was turned

down, the Planning Commission has

reviewed it.  They're sticking to their

guns.  And then across the street, we

found out that the same developer that

we knew about two projects has a smaller

project identical but smaller.  And we

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 77

Page 77

asked that the side street be included
in that while the review was being done
just in the last couple of weeks.

        We were told no, it would
prevent the developer from getting a
by-right permit if we did that.  And you
know what, that is not consistent with
what the Planning Commission should be
doing, what their mission is.  It should
be balancing the community against the
developer.  And when something is CMX, I
don't care if it's 1 or 2, the community
has already said we'll take some
residential above storefronts.
Storefronts are the key to CMX-1 and 2.
We're getting the fewest storefronts
possible so we can squeeze all these
apartments in and get the four-story in
a very limited height situation.

        So I think this is really out
of line with everything I have learned
about the Planning Commission over the
years.  I think they're taking a totally
different left turn on the community and
saying it's our way, more density or the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 78

Page 78

highway.  And saying we can appeal

this -- do you know how hard it is for a

community to appeal a zoning permit that

was granted at the discretion of the

Planning Commission, because they have

the discretion to use the side street or

not.  And there's no question that the

side street should have been used, but

it continued a week ago to be permitted

the same way on a smaller project, so

the "developer," and I'm quoting, "could

get a by-right project and not need a

variance."

        And again, I just ask my

colleagues for their support because

this is our only way of helping the

community.  Filing a challenge to a

zoning permit to the Zoning Board is

very, very difficult and cumbersome,

puts everything on the party with no

money, the community and then has the

City defending it because that's what

happens.  The City solicitor defends it,

not the developer.  They don't spend any

money.  The community has to spend the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 79

Page 79

money and the odds are very long as to

whether or not they're going to be able

to succeed, and they shouldn't have to

go through that or run the risk of what

is often times a loss.

            COUNCILMAN JOHNSON:  Councilman

O'Neill, are you saying the City

solicitor which is paid by our taxpayers

will be defending a developer against

those very same taxpayers who are

appealing the permit?

            COUNCILMAN O'NEILL:  Yes,

that's in essence what happens.  Because

when you challenge or appeal a permit --

                (Background noise.)

            COUNCILMAN JOHNSON:  Excuse me.

Gerald B., can you put your phone,

camera, whatever on mute please.  Thank

you, sir.

            COUNCILMAN O'NEILL:  When you

challenge a zoning permit that was

handed over to the developer as-of-

right, you are challenging the Planning

Commission, in this case it's the

Planning Commission that recommends to

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 80

Page 80

L&I, that the Planning Commission erred,

they did not properly interpret the

zoning code.  It's the City solicitor's

job to defend the Zoning Board who

relied on L&I and Planning to do the

right thing.

      COUNCILMAN JOHNSON:

Understood.

      COUNCILMAN O'NEILL:  Your

description isn't what's in the code.

It's what actually happens.

      COUNCILMAN JOHNSON:  Okay.  All

right.  Thank you, Councilman O'Neill.

And as always, I know you do your

diligence representing your constituents

which you represent.

      Any other questions or comments

from members of the Committee?

        (No response.)

      COUNCILMAN JOHNSON:  Hearing

none, will the Clerk please call the

next bill and next panel.

      THE CLERK:  Our next bill is

210634 and we have Paula Brumbelow

Burns.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 81

Page 81

MS. BRUMBELOW BURNS:  I'm
sorry.  I was going to say I thought we
were done and I forgot we had one more,
so I apologize.  I'm Paula Brumbelow
Burns, Director of Legislation for the
City Planning Commission.  I am here to
testify on Bill No. 210634, which was
introduced into City Council on June 24,
2021 by Councilmember Gauthier.  Bill
No. 210634 amends the Master Plan for
the University of Pennsylvania bounded
by areas of land located by Guardian
Drive, East Service Drive, Civic Center
Boulevard, 34th Street, 33rd Street,
Walnut Street, the Schuykill River, 34th
Street and University Avenue.

The bill will allow for the
expansion of the Master Plan at 3200
Walnut Street, which is previously
mapped Special Purpose Institutional in
previous legislation.  The expansion
will include a proposed six-story
building known as the Vagelos Laboratory
for Energy Science and Technology known
as VLEST, the inclusion of the existing

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 82

Page 82

Consortium building and square footage

updates of miscellaneous amendments

recently approved administratively by

Planning Commission staff.

        The proposal includes the

addition of 43,150 square feet of total

land area; 122,615 square feet of gross

floor area and 21,306 square feet of

occupied area within the expanded

boundaries of the University

Pennsylvania Master Plan.

        With these changes, the Master

Plan District remains in compliance with

development regulations specified in our

City Code.  The City Planning Commission

considered Bill No. 210634 at its

meeting of July 15, 2021 and recommended

approval.  I will be happy to answer any

questions at this time.

        COUNCILMAN JOHNSON:  Thank you

very much.

        The Chair recognizes

Councilwoman Jamie Gauthier for remarks

on her bill.

        COUNCILWOMAN GAUTHIER:  I don't

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 83

Page 83

have remarks for this bill.  I have

remarks for the next bill, but thank

you, Mr. Chair.

          COUNCILMAN JOHNSON:  You're

welcome.

          Any questions or comments from

members of the Committee on this bill?

               (No response.)

          COUNCILMAN JOHNSON:  Hearing

none, will the Clerk please call the

next bill and the next panel.

          THE CLERK:  For 210778, we have

Paula Brumbelow Burns, Aida Smith, Pam

Andrews and we have a couple more, but I

will call them as we go.

          MS. BRUMBELOW BURNS:  Good

morning, members of the Rules Committee.

I am Paula Brumbelow Burns, Director of

Legislation for the Philadelphia

Planning Commission.  I'm here to

testify on Bill No. 210778, which was

introduced into City Council on

September 30, 2021 by Councilmember

Gauthier.

          Bill No. 210778 amends Title 14

Page 84

Page 84

of The Philadelphia Code by adding

Section 14-532, entitled "The AHP

Affordable Housing Preservation Overlay

District," and making other related

changes to amend the Philadelphia Zoning

Maps by changing the zoning of land

within an area bounded by 39th Street,

Ludlow Street, 40th Street and Market

Street and to establish a temporary

demolition moratorium.

           The bill has several components

in an attempt to preserve affordable

housing at this site.  The development's

current owners have notified the U.S.

Department of Housing and Urban

Development that they will not be

renewing their expiring affordable

housing contract and they plan on

selling the site.

           They have also notified current

tenants that they must leave their homes

by July 2022.  The bill proposes to

change the base zoning from CMX-4

Commercial Mixed-Use, to RMX-3,

Residential Mixed-Use.  It also places

Page 85

Page 85

use regulations that address

affordability, create development

standards to have a maximum FAR of 750%,

implement a parking ratio of two parking

spaces per ten dwelling units, and to

put a one-year demolition moratorium on

any building at this site.

The Philadelphia City Planning

Commission considered Bill No. 210778 at

its meeting of October 21, 2021 and

recommended the bill for approval.  I'll

be happy to answer any questions at this

time.

THE CLERK:  Next we have Aida

Smith.

COUNCILWOMAN GAUTHIER:

Mr. Chair, would I be able to speak on

the bill now?

COUNCILMAN JOHNSON:  (Muted).

THE CLERK:  Mr. Chair, you are

muted.

COUNCILMAN JOHNSON:  Yes.  Do

you want to go now, Jamie, or after your

panelists go?

COUNCILWOMAN GAUTHIER:  I would

Page 86

Page 86

like to go now, if possible.

COUNCILMAN JOHNSON:  Okay.  The
Chair recognizes Councilwoman Jamie
Gauthier.

COUNCILWOMAN GAUTHIER:  Good
morning, everyone.  Thank you, Mr. Chair
and all my colleagues on the Rules
Committee for this opportunity to be
recognized on Bill 210778.

This legislation aims to
protect both the 70 families who
currently reside at the University City
Townhomes as well as the future of
affordability in this increasingly
expensive part of West Philadelphia.
The townhomes are a deeply affordable
housing complex in the heart of
University City, an amenity-rich
neighborhood with easy access to
transportation, high quality schools,
good jobs and world class health care
institutions.

The owner of this property
opted out of their affordability
contract with HUD and they are actively

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 87

Page 87

seeking to maximize their profits for
this mega site.  The current residents
of the townhomes have been notified that
they may be displaced as soon as July
2022.  Without immediate intervention,
we will lose these very affordable homes
forever.  And for the second time in 50
years, it will come at the expense of
working class Black Philadelphians.

        I'm sure that we are all
familiar with the history of urban
renewal and what it did to Black
communities in this City.  In the late
'60s and early '70s, the City of
Philadelphia raised the Black Bottom
neighborhood to make way for a science
and technology research campus, which
today we now know as the University City
Science Center.

        Thousands of Philadelphians,
roughly 80 percent of whom were Black,
were displaced as a result not just from
their homes, but from their community.
The block where the townhomes are
located was originally slated to be a

Page 88

Page 88

part of that research campus, but

neighbors and the University of

Pennsylvania students banded together to

fight.

They demanded that sites be set

aside for affordable housing so that

people displaced from urban renewal had

options to return so that they would

have access to housing in the

neighborhood for generations to come.

And eventually, a commitment was made to

West Philly residents that this site

would be dedicated to low-income

housing.

Now, let's fast-forward to

today.  Forty years after the University

City Townhomes first opened, our City

and the 3rd District have changed

dramatically.  Housing prices have

tripled in this immediate area since

then.  In the last two decades alone,

the Black population east of 52nd Street

has been cut in half.  And the end of

this demand is nowhere in sight.  An

estimated $5 billion has been spent on

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 89

Page 89

construction in University City in just
the last 10 years.

So all of this helps to explain
why the University City Townhomes are
irreplaceable.  Dozens of three-bedroom
apartments with rents that are 90
percent cheaper than what you can get on
the open market sitting on a piece of
land that is valued today at $75 to $100
million.  Eradicating affordable housing
on this site would be a grave injustice,
not just for the families who live there
now, not just for the thousands of Black
Bottom residents who were removed from
this land once before, but for the
future of this place being somewhere
where working-class people can afford to
live in an amenity-rich neighborhood,
one where jobs and transit and health
care and other resources are all easily
accessible to them.

This is something that cannot
be replicated in today's housing market.
The bill being considered today includes
a one-year demolition band on the site.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 90

Page 90

It will also make residential mandatory
and add affordability requirements,
which together provide a check against
the perverse market forces that play in
today's real estate market, that
encourage maximizing profit over the
creation of inclusive neighborhoods.

        Last week we were grateful to
receive the support of the City Planning
Commission for this bill.  We appealed
to the Commission that they recognize
the importance and the context of this
site and they took us up on that
request.  Now, we come to this body with
the same appeal, to not be swayed by the
idea that this site should be sacrificed
for Philadelphia's seemingly never-
ending development boom.  People matter.
Places matter.  Having equity and
diversity in our communities matter.

        Today let's do something
different than what happened half a
century ago in West Philly and let's
make sure there's justice for
working-class residents in our City in

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 91

Page 91

the months and years to come.  Thank you

so much.

            COUNCILMAN JOHNSON:  Thank you

very much, Councilmember.

            Will the Clerk please call the

next panelist.

            THE CLERK:  We have Aida Smith

next.  Aida Smith, if you are on, please

unmute yourself and begin your

testimony.

            MS. SMITH:  Hi.  Aida Smith my

name is.

            COUNCILMAN JOHNSON:  Please

begin your testimony.

            MS. SMITH:  I've been here for

about 40 years since it's been built.

Before the grounds were even finished, I

was here.  Over across the street where

the Ralston House was, that was a vacant

lot and everything.  We've watched this

neighborhood continue to be gentrified.

And I don't understand how is it that

right now we're just finding out, and

I'm quite sure some members of City

Council knew what was going on.  I'm

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 92

Page 92

glad she's taking up this bill.  I'm in

favor of it.

          I don't think that because

we're in an area that's newly developed

or all of the development that's around

it, that people want to be in this

neighborhood because it is so close to

everything.  Everything here is right

here in this area and it tends to be a

safe area.  So I hope you're

reconsidering even letting them get away

with this.  They should not be able to

get away with this, and I agree with

your bill.  Please pass her bill.

That's all I have today.

          COUNCILMAN JOHNSON:  Thank you,

Ms. Smith.

          Will the Clerk call the next

panelist.

          THE CLERK:  Next we have Pam

Andrews.

          COUNCILMAN JOHNSON:  Pam, state

your name for the record and begin.

               (No response.)

          COUNCILMAN JOHNSON:  Pam, are

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 93

Page 93

you there?

           (No response.)

        COUNCILMAN JOHNSON:  Okay.
We'll come back to Pam.

        Will the Clerk call the next
panelist.

        THE CLERK:  Next we have Gerald
Bolling.

        COUNCILMAN JOHNSON:  How you
are doing, Gerald?

        MR. BOLLING:  Good morning,
Chairman.

        COUNCILMAN JOHNSON:  Trying to
get a headset, Gerald.  You trying to
show everybody up?

        MR. BOLLING:  No, sir.  No,
sir.  I just wanted to make sure I could
hear clearly and everybody could hear me
clearly.  How's everyone doing.  Thank
you, Chairman.  Thank you, Rules
Committee.  My name is Gerald Bolling.
I'm a displaced member of the Black
Bottom tribe.  We are a community that
has history over hundreds of years, so
1850 is one of our ports that Dr. Palmer

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 94

Page 94

had brought up where we were recognized.
That's way before Penn, Drexel or any
other entity came into our neighborhood
to destroy it.

        I want to support the
Councilwoman's bill.  And I also want to
talk about White privilege because this
is what it's about.  Our neighborhood
has always been a transfer for every
community in the City and they knew
that, and they were trying to buy our
homes and put us out for many years.
They bulldozed our houses on 38th Street
to get us out of there to build the
University Science Center and also
University City schools.  So they got us
out of there through that tactic.  And
then now they're trying to use these
tactics now not giving us the apartheid
agreement that they agreed to in the
late '70s saying that we weren't
stabilized as a community, which was far
from the truth.

        We're a stabilized community
which everyone else around us as far as

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 95

Page 95

Mantua up the way, 52nd Street.  They're
not dealing with the Black Bottom
immensely.  So I'm here to say the Black
Bottom is actually tired of these folks
thinking that they're going to keep
pushing us around and pushing us over on
our land.  This is our land.  I
understand that the City and the other
big wigs and institutions came and
bought this land, but it's also stolen
land.  So this land was stolen from us,
the people of the Black Bottom, and we
want this land returned.  And this is
part of the land that we want returned
because we should have ownership in our
community.

        We shouldn't have to be begging
for nobody to give us anything.  Like I
heard on this whole situation, please
don't do this to us, please don't come
into our neighborhood and do this to us.
No, we need to have our own ownership
and this is where people fail to realize
what we need to clean up the community.
Everybody is talking about all this

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 96

Page 96

violence going on.  Guess what?  White
privilege is the cause of it, because
they're moving people out displacing
them in neighborhoods that they're
having gang war with.  So what do you
think is going to happen?  What do you
think all of this violence is coming
from?  Nobody knows, right.  So I just
now clued you in to what it is to stop
the violence.

          Stop overbuilding.  Give people
a chance to live.  There's been $5
billion that Councilwoman said went
through the University of Penn.  Not one
contractor was Black.  They didn't even
want to hire Black people on there and I
got testimony to prove that, that they
do not want Black people on their job
sites, you understand.  So this is
bigger than anything that we can ever
imagine.

          We're talking about people
trying to sell land that's not theirs.
People who ostracized the Black Bottom
out of their own neighborhood.  We don't

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 97

Page 97

have an RCO.  We don't even have a voice

in our own community.  What is that?

This is the Black Bottom.  It's not

University City.  It's the Black Bottom,

and that's what it's always going to be.

And I want City Council to recognize

that like y'all did before.

          Y'all recognized us as a

historical community.  So we need to be

recognized also all around the board

with ownership, with loans and grants to

help us out to build our community and

build our people.  We want to stop the

violence just like you do.  Give us a

chance.  If y'all give us a chance to

come sit down and talk to us, we can get

together and we can stop this violence.

We're not going to stop it the way you

going.  You have to talk to us.  You

have to communicate with us and give us

a chance.

          We're in a neighborhood we

don't have no ownership in and we're the

dominant people there.  No ownership at

all.  That doesn't sound right.  So

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 98

Page 98

let's -- I pray that we can all get
together to change this, for real.  I
really do.  And thank y'all for letting
me talk, get this out.  I wanted to say
some more things but I'm not going to
say it, but I hope I can send y'all all
what I'm thinking in my heart on my
PowerPoint.  I can send it all to y'all
so y'all can get adjusted to what I
mean.

        You want to stop this violence.
I do too.  I seen all y'all out there
trying to do it.  The way to stop the
violence is come through us, Family.  We
got to be a family.  You can't exclude
us from the help because we're the
experts with the help.  We the ones who
been to jail.  We the ones who been
floating around in these streets.  Give
us a chance to help y'all understand
where we coming from so we can stop
this.  And remember, White privilege is
the cause of it all.  Thank you.

        COUNCILMAN JOHNSON:  You're
welcome.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 99

Page 99

          MS. SMITH:  May I ask a

question?  Are we going in order?  Is

there other people slated to speak

because I wanted to make a comment?

          COUNCILMAN JOHNSON:  There are

other people slated to speak.  Just give

me one second and I will give you an

opportunity to make your comment.

          Brett, can you call the next

panelist.

          THE CLERK:  Yes.  We have

Timothy Boyle.

          COUNCILMAN JOHNSON:  Go ahead.

          MR. BOYLE:  Good morning,

everybody.  Timothy Boyle, Founding

Principal of Science Leadership Academy

Middle School and also a proud principal

of Ms. Smith's grandkids.  I'm here

today in support of Bill 210778, on to

provide Chairperson and other

Councilmembers some context of the bill.

          University City Townhomes

represents 70 of the 150-floor private

HUD private homes in our cash fund area.

When I say cash fund, I mean the

Committee on Rules 10-26-21 Meeting
October 26, 2021

geographic boundaries of my school and
the Powel School as well.  The vacancy
rate at both of these housing sites is
less than 10 percent, so these are homes
that folks want to live in that are
filled at or near capacity all the time.

As was mentioned earlier, we
will be potentially losing the 70 units
July 8, 2022.  The 84 units at Center
Post Village which is located at 55
North 40th Street, that contract is also
up in 2024.  So the decisions that we
make today could also lead us down a
path one way or the other in the near
future.  SLAM has 22 students that got
an eviction notice.  Powel School has 34
students that got an eviction notice.
The 22 students represent 6 percent of
my school.  It also represents 48
percent of all the students within my
school who live in the neighborhood.
Powel and SLA, we both have robust
populations that come from outside the
neighborhood.

We were talking about most of

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 101

the folks who live near our schools who

attend our schools live at this site.

The 34 students at Powel represent 15

percent of their total population, so a

significant driver of folks who walk to

school and populate our schools, and

these numbers have been borne out of the

last six years that I've been the

principal of SLAM.

        For folks who know the history,

it's been nice to hear folks' testimony

previously, this site that we're talking

about is four blocks away from where

University City High School, the

elementary and the Walnut Center are

located.  It's a 14-acre site that now

hosts 6.5 million square feet of retail,

residential, clinical office and

laboratory space.  There are very few

places in the City where so many

affordable homes are next to so much

economic opportunity, cultural

opportunity and educational opportunity.

        My hope of this bill is in the

near term there could be justice for the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 102

Page 102

families that are located, but also that

we can preserve affordable housing

rights next to some of the greatest

opportunities that this City has to

offer.  That is all of my testimony.  If

there are any comments or questions or

anything I didn't add, I'd like to.

      COUNCILMAN JOHNSON:  Thank you

for your testimony.

      Ms. Smith, do you want to make

a comment or ask a question?

      MS. SMITH:  I want to make a

comment because -- well, yeah, a

comment.  And it was riding on the back

of Mr. Gerald and Mr. Boyle.  As I said,

I've been here for a long time.  And you

notice when people start looking in and

you see outsiders and how they want to

be here, and it's always where Black

people get pushed out.

      And the reason why we get

pushed out is because they raise the

taxes.  The real estate tax is so high

that you can't afford to stay in your

own community anymore.  So what you need

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 103

Page 103

to do is to make sure that if it can't

be saved, at least make sure it's a

mixed income neighborhood.  It's going

to be people that work in the area but

can't afford to live in the area.  That

doesn't make sense to me.

          You know, it's things that's

being done constantly to push Black

people away.  And to me it seems like

it's going to be to the outskirts of the

City of Philadelphia, and that's Upper

Darby, Yeadon and all of that, and Black

people won't be able to afford to come

back into the City.  And I know this is

going on around this City in places

where -- I grew up in North Philly, and

you hearing stuff about what's going on

now, what they're trying to take -- I'm

sorry.  Can you see me?

          COUNCILMAN JOHNSON:  Yes, I see

you.

          MS. SMITH:  That they're trying

to do now in North Philly and around the

City, and I don't think it's fair.  So

her bill, it really needs to take a

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 104

Page 104

serious look at and to stop a lot of

what's happening around this City.  And

if it wasn't for developers, it wouldn't

be homeless people, (inaudible)

speculation in real estate.  If you took

that out of the equation -- I can't get

to go bigger again.  Hello?  Hello?

          COUNCILMAN JOHNSON:  Yeah, we

hear you.

          MS. SMITH:  I'm sorry.  I don't

see where I'm at, so I don't know if you

can see me.

          COUNCILMAN JOHNSON:  I can see

you.

          MS. SMITH:  But real estate

speculation, that's what's literally

driving a bunch of stuff around this

country.  The richest country in the

world and you have homeless people, and

it's because of real estate speculation.

So the thing that needs to be done is to

make sure that Philly and its residents,

especially Black residents, Black and

Brown, need to be a priority, especially

since we do most of the work in this

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 105

Page 105

daggone city and can't find decent

housing, and this is one thing that I

like about my community is that my

grandkids are safe.  Hello?

        COUNCILMAN JOHNSON:  Yes, we

hear you.

        MS. SMITH:  I'm done now.

Thank you for letting me speak.  I'm

trying to get back to where --

        COUNCILMAN JOHNSON:  You're

welcome, Ms. Smith.  Thank you for your

testimony.

        Will the Clerk please call the

next panelist to testify.

        THE CLERK:  Pam Andrews.

        COUNCILMAN JOHNSON:  Pam, just

state your name for the record and

please begin.

        MS. ANDREWS:  Good morning.  My

name is Pam Andrews.  I am the Chair of

West --

        COUNCILMAN JOHNSON:  One

second, Pam.  You're very, very faint.

We can't hear you.

        MS. ANDREWS:  Okay.  Hold on

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 106

Page 106

for a second.  How about now?

   COUNCILMAN JOHNSON:  Just a

little bit.  Can you turn your volume up

a little bit more.

   MS. ANDREWS:  I'm having some

technical issues today.

   COUNCILMAN JOHNSON:

Ms. Andrews, are you still there?

   MS. ANDREWS:  Hello.  Can you

hear me now?

   COUNCILMAN JOHNSON:  You're

faint.  But can other members of the

Committee hear?

   MS. ANDREWS:  All right.

I'm --

   COUNCILMAN JOHNSON:  Go ahead,

Pam.

   MS. ANDREWS:  Okay.  Great.

Good morning.  My name is Pam Andrews.

I am the Chair of West Powelton/Saunders

Park RCO, and I am here to testify in

support of the Mixed Income Neighborhood

Overlay introduced by Councilwoman

Gauthier this morning, which the West

Powelton community feels it's long

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 107

Page 107

overdue.

      I have been a resident of the
area for over 30 years now and I have
seen many families that back in '95 when
my husband and I moved in this area
people could afford to rent a house, a
one-bedroom apartment for $500 a month.
Now, as the Chair of West
Powelton/Saunders Park, the Zoning
Committee, when developers come in
asking variances, the average cost of an
apartment that they want to build
monthly rental is $1400 to $1500 a month
and townhouses are built and sold for
$300,000.

      The West Powelton Community
feels very strongly in terms of
supporting this bill.  We feel it is
overdue and it is probably one of the
first big steps that needs to be done to
protect affordable housing in this area.
Like I said, when my husband and I moved
here, there were families.  Now, there
are very few.

      On my block I would say right

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 108

Page 108

now there's probable only three long-
term residents who have been able to
stay here.  Either the price of real
estate has gone up, taxes have gone up
and we are just overrun with student
housing.  So I'm here -- thank you for
taking the opportunity to hear me this
morning and we are very excited to
support this bill to assure that
affordable housing is maintained in this
area.  Thank you.

        COUNCILMAN JOHNSON:  Thank you
very much.

        I'm going to ask Councilwoman
Jamie Gauthier if there are any
additional remarks before I start
acknowledging other members of the
Committee?

        COUNCILWOMAN GAUTHIER:  No.
Thank you, Mr. Chair.

        COUNCILMAN JOHNSON:  All right.
You're welcome.

        Chair recognizes Councilman
David Oh.

        COUNCILMAN OH:  Thank you very

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 109

Page 109

much, Mr. Chair.  I just wanted to

respond to is it Ms. Ida Smith?  I think

so.  One of the --

            MS. SMITH:  Aida.

            COUNCILMAN OH:  Aida, I'm

sorry.  I just wanted to completely

agree with what you're saying in terms

of the taxes.  And one of the things

that I just want people to understand is

you have to watch your assessment, the

assessed value.

            So for example, we have cases

in Philadelphia where it's the OPA,

Office of Property Assessment, if you

pretty much understand that your house

is worth about $100,000, it's not good

news when OPA comes out and says your

house is worth $350,000 because it

isn't, but you're going to have to pay

the taxes.  And that should be one of

the first things because it happens in

your neighborhood, it doesn't happen all

over the City.

            It happens in these gentrifying

neighborhoods.  And a lot of it is

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 110

Page 110

illegal.  It is generated by a 10-year

tax abatement that occurred somewhere in

the neighborhood.  And by law they

cannot increase your value, but they do.

And Council did an audit of the

assessment methodology.  That means the

way they do these assessments, and it

was found to be below industry standard.

That means it is below an acceptable

standard of assessment.

So please be aware that --

unfortunately, some people they get this

assessment and they don't understand

you're going to pay the taxes and it's

the first sign that there is something

wrong.  I did a bill and I've

reintroduced a bill to freeze these

taxes based on these illegal -- in my

opinion and I say so, if it is below

industry standard, it's an illegal

assessment and it's an illegal tax and

people should not pay these taxes.  So

please be alert, and thank you very much

for your testimony.

Thank you, Chairman.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 111

      COUNCILMAN JOHNSON:  You're welcome.  Thank you, Councilman Oh.

      Gerald, I want to acknowledge you for a brief remark.

      MR. BOLLING:  Yes.  I just wanted to ask Councilman Oh, are you in support of Councilwoman Gauthier's bill?

      COUNCILMAN OH:  I don't know the -- I'm supporting it.  I'm not voting against it.  I don't know at the end of the day the legality of it.  That's something for the Administration, the Planning Commission.  So I'm voting for the bill.  That's your bottom-line question.

      However, I do think that elsewhere in the City and in other parts of Philadelphia to me the most direct thing that's happening is people are being targeted for improper illegal overly high assessment that is leading to overly high taxes that lead to sheriff's sales and other things where they're not even getting the money that it's assessed on.  So, yeah, I do

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 112

Page 112

support the bill.

        But I will say that ultimately
I think we have to straighten out these
assessments and the corresponding taxes
that are driving people out of this city
depending in what neighborhood they live
in under the threat of sheriff's sale.

        MR. BOLLING:  My other question
was do you think that we need to make a
committee for affordable housing and
have the community members in the
housing where there's gentrification at
be on that and have power, not just
being on there as a sitting stone, but
actually have power to stop the
developers that's coming in and doing
things of that nature?  I think that
will be a better way to solve some of
these things that's going on, especially
the violence that's happening in the
communities.  Because actually, when you
actually take somebody and displace
them, you're putting them in another
place.

        They took the whole Passyunk

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 113

Page 113

out and put it somewhere else.  And then

they took another place and put it

somewhere else.  They took Bloomberg and

put it somewhere else.  And now

everybody's running around talking about

well, why all this violence happening,

why people shooting 900 bullets.  This

is the reason why because they're not

going to lay down to everybody else.

          When they're going into a

neighborhood where they not liked or

they're not wanted, and guess what, the

people there are fighting back and they

got to fight back too.  So my question

is should we have a committee that's

city-wide that has all of the committees

and concern with all these developers

and it's a board that these developers

have to come to in order for them to be

able to develop in the ways that they

want to develop, also keeping affordable

housing alive because we need that, you

know what I mean.

          We gave the developers a

10-year abatement, so why don't we go

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 114

Page 114

ahead and give the people that's on

affordable housing the 10-year abatement

and put them in some housing, you know

what I mean.  There's mix as you say, so

let's put them in that new building that

they building on 38th and Powelton

that's going up now, the high-rise that

Drexel just built for pennies on a

dollar.  That's another place in the

Black Bottom.  So let's put people in

there too because they have to share,

right.  Let's share.

          COUNCILMAN OH:  Yeah.  So I'll

take your statement as a suggestion and

recommendation.  What I don't want to do

is start having a private conversation

with you because we're in the middle of

a hearing.  I'm happy to talk with you

and I've done things publicly as well.

You can contact me any time, come visit.

I'm right in 319.  Stop by today.  I'm

here.  But let me respect the Chair and

this hearing.  Thank you very much.

Thank you for your comments and

suggestions.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 115

Page 115

Thank you, Chairman.

COUNCILMAN JOHNSON:  Thank you

very much.

Any other questions or comments

from members of the Committee?

(No response.)

COUNCILMAN JOHNSON:  Hearing

none, we will take a brief pause so that

our technical crew can set up for those

who registered for public comment.

(Brief recess.)

COUNCILMAN JOHNSON:  Thank you

very much.  We will now hear the

testimony of those who have signed up

for public comment.  The Clerk will call

your name and once called, please state

your name for the record and proceed

with your testimony.

Will the Clerk please call the

first witness.

THE CLERK:  Commenting on Bill

210778, we have Andre Del Valle.

MR. DEL VALLE:  Good afternoon,

Chairperson --

COUNCILMAN JOHNSON:  Please

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 116

Page 116

state your name for the record.  We all

know you, but please state your name for

the record and begin.  How are you

doing, Andre?

        MR. DEL VALLE:  I'm doing good,

Councilmember.  Appreciate it.  Good

afternoon, Chairperson Johnson and

members on the Committee on Rules.  My

name is Andre Del Valle.  I'm the

Director of Government Affairs for the

Pennsylvania Apartment Association.  I'd

like to thank you for the opportunity to

testify today on Bill No. 210778

introduced by Councilmember Gauthier.

        The Pennsylvania Apartment

Association is a statewide association

representing property managers and

landlords across Pennsylvania.  Here in

Philadelphia we represent 98 property

management companies and over 156,000

units.  Now, the Pennsylvania Apartment

Association truly believes in the spirit

of cross-collaboration, especially when

it comes to legislation impacting the

housing industry.

Page 117

Page 117

Locally, we have worked closely
with PHDC, assisted in the emergency
rental assistance fund roll-outs, hosted
briefings for both landlords and tenants
and navigated the program who also had
troubleshooting challenges with the
program.  We have cross-collaborated
with the Office of Emergency Management
and relocation efforts for flood victims
following Hurricane Ida, and have worked
closely with Councilmember Brooks and
Community Legal Services on the newly
implemented renters access app.
Currently, we're working with Office of
Immigrant Affairs, Department of Human
Resources and Department on Homeland
Security on resettling efforts for our
Afghan brothers and sisters who are
coming to seek refuge here in
Philadelphia.

I highlight this cross-
collaboration because legislation like
the one before us today desperately
needs to have an open dialogue among all
stakeholders and its elected officials.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 118

Page 118

I can assure you that no landlord or
property owner wants to add to
Philadelphia's continuously rising
homelessness rate or displacement rate.
And on the contrary, landlords across
the City have been working to avoid
housing instability as we all continue
to navigate the challenges brought on by
the COVID-19 pandemic.

        I know BIA will be testifying
today and I don't want to speak for them
or their membership, but I know
firsthand how they practically work with
District members on the front end of the
legislative process on variances,
rezoning, et cetera, for their projects.
What raises concerns about this
particular piece of legislation is that
it would rezone and would establish a
demolition ban for one parcel known as
the University City Townhomes.

        The total number of units we're
discussing today at University City
Townhomes is 70.  That's less than the
number of units that were scrapped in a

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 119

Page 119

proposal a few weeks ago and just a few

blocks away where residents demanded

parking over units, reducing the project

from 174 affordable units down to 100.

          Unfortunately, this will not be

the first or last landlord that will

sell their property here.  This is

actually the first of many within our

membership here in the City of

Philadelphia due to the rising costs of

maintaining buildings, rising costs

associated with every new regulation

passes as well as dealing with the

continued ramifications from the

COVID-19 pandemic.

          The question before this

Committee today is not whether this

legislation should pass or not, but

rather will this Committee set the

precedent and support future rezoning of

a single parcel of land, which is

privately owned without the support of

property owners.  The Pennsylvania

Apartment Association has and will

continue to stress the need for private-

Page 120

Page 120

public partnerships and cross-

collaborating to address the challenges

our City faces.

We welcome an opportunity to

bring all stakeholders together,

residents as well as elected officials

to discuss viable options for this

parcel, which addresses residents and

community needs while not punishing an

owner for wanting to sell their personal

property.  Thank you for the opportunity

to testify today.  I'm happy to answer

any questions you may have.

COUNCILMAN JOHNSON:  Will the

Clerk please call the next panelists.

THE CLERK:  Commenting for Bill

210778, we have Mo Rushdy.

MR. RUSHDY:  Good afternoon,

everyone.  My name is Mo Rushdy and I

serve as Treasurer of the Building

Industry Association of Philadelphia as

well as Co-Chair of Affordable Housing

and Diversity, Equity and Inclusion

Committees and member of the Real Estate

Alliance.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 121

Page 121

        I want to thank Chairman
Johnson and the rest of the Committee
for allowing me to provide testimony
today on Bill No. 210778.  We recognize
that there's an urgent need in
Philadelphia for affordable housing
options for a great many people and have
been seeking to collaboratively craft
policies with Council to help all
residents in this City share in its
prosperity.

        Bill No. 210778 moves the City
in the wrong direction.  However, the
BIA has historically respected District
Councilmembers' efforts to rezone parts
of their Districts, but this bill's
reach is unlike anything we have seen
before.  It's a rezoning to target a
single privately-owned parcel without
the owner's support and proposes a
demolition moratorium on this site as
well.

        The legislation will create a
dangerous precedent and have a chilling
effect on the real estate development

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 122

Page 122

community.  Although we sometimes don't

want to acknowledge it, City Hall needs

private developers to build what

government cannot, producing the housing

that current and new residents want and

generate the jobs and tax revenue that

are so badly needed.  To build housing

in a strong economy, developers need

just one thing from City Hall, and that

is certainty.  We can figure out what

type of project to build and where and

when to build it as long as we can

control a sufficient number of variables

to make projections work.

        But Bill No. 210778 would make

it possible for Council to rezone any

parcel whenever it wants and halt

demolition before a new project is

announced.  Suddenly Philadelphia has a

whole lot more uncertainty than anywhere

else in the country because this would

not happen anywhere else.  Why then

build here?

        Even more frustrating is that

this dramatic legislation is apparently

Page 123

proposed in the name of affordable

housing, but the City continues to

squander its best opportunities to

generate significant quantities of

affordable housing for its residents.

In the 3rd Councilmanic District, there

are 647 publicly-owned parcels that

could be used to house those in need.  I

repeat 647 properties.

        In the BIA's Affordable

Blueprint, we argue that the City's

housing crisis can be resolved if City

Hall simply increases its capacity to

dispose public land quickly to qualified

applicants.  You have the land.  The

development community knows how to build

what you want, and we supported the

Neighborhood Preservation Initiative to

reach lower AMIs and to keep

affordability that Councilwoman Gauthier

just spoke about.

        What are we waiting for?

Didn't we know about this project over a

year ago.  So to Ms. Aida Smith and

Mr. Gerald Bolling, please listen to me,

Page 124

Page 124

I hear you and I feel you.  We can build

for sale affordable single-family homes

for you at very low pricing made

possible by City land with the

Neighborhood Preservation Initiative

that we supported.

          I am going on record, talk to

Councilman Gauthier and see all of the

public land that's available and talk to

her about the 51 percent of these homes

being affordable making mixed-income

neighborhoods possible as Ms. Smith

mentioned.  Further, Council decided to

decrease the amount of money that

developers will pay into the Housing

Trust Fund by lowering the bonuses

available.

          And now, Bill 210667 seeks to

eliminate the bonuses all together in

one Councilmanic District.  These

bonuses were a key component of

overcoming Philadelphia's high

construction costs in neighborhoods that

would not otherwise see investment.

          Eliminating these bonuses in 10

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 125

Page 125

percent of the City and potentially

imposing inclusionary zoning mandates is

sending a clear signal to the real

estate to look elsewhere.  No one has to

build in Philadelphia and soon maybe no

one will.  The BIA is sincere in its

desire to be part of the solution.  We

believe in solutions that work for all.

Unfortunately, Bill No. 210778

is a dramatic example of City Hall's

actions that punish the development

community for longstanding shortfalls in

housing policy that we have demonstrated

support for, for affordable housing,

providing effective alternatives and are

willing partners.  Please let us take a

step back and work together.  Please.

Thank you for your consideration.

COUNCILMAN JOHNSON:  (Muted).

THE CLERK:  Mr. Chair, you are

muted.

COUNCILMAN JOHNSON:  Thank you.

Will the Clerk please call the next

panelist.

THE CLERK:  For Bill No.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 126

Page 126

210778, we have Joe Ritchie.

          MR. RITCHIE:  Good afternoon.
My name is Joe Ritchie and I'm here
today on behalf of the Greater
Philadelphia Chapter of NAIOP where I
serve as the President.  NAIOP is a
501(c)(6) organization that represents
the commercial real estate development
community in Philadelphia and is also a
member of the Philadelphia Real Estate
Alliance.

          Thank you to Chairman Johnson
and the rest of the Committee for
permitting us to provide testimony on
Bill No. 210778.  A membership of NAIOP
understands that affordable housing is
an important issue in the City that
collectively the public and business
community need to address with
comprehensive and holistic solutions.

          However if approved, Bill No.
210778 would set a dangerous precedent
with the unintended consequence.  The
legislation effectively spot zones the
block, the 3900 block of Market Street

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 127

Page 127

without the owner's consent, prohibiting

any alterations to the site and

rendering it unsalable.

        The University City Townhomes

were developed under an agreement that

calls for the development of the

affordable housing residences and

obligating the owner to maintain the

Section 8 housing and affordability for

four years.  The owner agreed to and met

this obligation.  And now at the end of

the term faces legislation which changes

the nature of the agreement.  This

precedent would put up for consideration

whether private landowners have the

right to manage and sell their property

within the confines of the rule of law.

        We urge the Committee to

consider the fine balance between

economic growth and affordable housing

and to think deeply about the

far-reaching implications of spot zoning

without approval of the land owner.  As

an industry, the real estate community

relies on the particularability of land

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 128

Page 128

use and cannot support targeted

legislation that undermines the

confidence in the system.

This use of spot zoning as a

tool to preserve affordable housing is

only necessary because Philadelphia

currently lacks an efficient and

functioning mechanism to holistically

address affordable housing development.

The City is being forced to choose

between supporting affordable housing

and supporting a once-in-a-generation

growth industry that could be one of the

cornerstones in Philadelphia's future

economy.  We should be able to choose

both.

We support fully BIA's proposed

land to use Philadelphia Land Bank for

affordable housing and I will refer to

the previous speakers' comments on the

number of parcels available in this

District alone through that mechanism.

Instead of introducing legislation that

pits the interest of one group against

the other, we would all be better served

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 129

Page 129

with new legislation to solve the larger

problem.

        Zoning is not a tool for micro-

issue resolution of which affordable

housing is just one example.  Zoning is

meant to guide the path of development

and growth in a thoughtful and balanced

way.  It is meant to have certainty and

should only be altered or modified with

a thorough, deliberate and robust

process involving all properties,

including the current owner of the land.

        The questions that we in the

City are faced with today deserve

legislation that materially attempts to

construct working mechanisms to

holistically address the issues of

affordable housing.  NAIOP sincerely

wants to be part of the solution.  We

hope to work together.  Thank you very

much for your consideration.

        COUNCILMAN JOHNSON:  Thank you

for your testimony.

        Will the Clerk please call the

next panelist.

Page 130

THE CLERK:  Isa Shahid.

MR. SHAHID:  Good afternoon,
panel.  My name is Isa Shahid
representing the Laborers' District
Council.  Thank you for the opportunity
to testify today.  On behalf of more
than 6,000 members of the Laborers'
District Council I'm here in support of
the plans to redevelop 3900 Market
Street, a project that will create
thousands of new good-paying jobs for
our people at a time when they are most
needed.

        In support of this project, we
are asking Councilmembers to postpone
consideration of Bill No. 210778,
legislation that could have a chilling
effect on the new investment and
opportunity in the City of Philadelphia.
Such a move will be a devastating blow
to our members and their families.  This
legislation purports to address concerns
over affordable housing, something that
is a growing consideration in cities and
communities across the nation.  As a

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 131

Page 131

union that represents and is committed

to the interest of working-class people,

it is a concern we share.

          The support for redevelopment

of the University City Townhomes site

does not have to come at a cost of

eliminating affordable housing and

leaving these residents without safe and

affordable options.  Here's why:

Redevelopment of 3900 Market Street has

the potential to be a $1 billion project

because of the size and location.  This

site is likely to become a new life

science research center, a project that

could total $1 billion in development.

          A project of that size will

create as many as 6,500 construction

jobs over the next several years as well

as 3,800 permanent jobs.  These are jobs

that pay families sustainable wages, and

the redevelopment is also expected to

generate more than 25 million a year in

new state and City tax revenue.  It is a

project that could start quickly once

the land is sold.  The site is already

Page 132

Page 132

zoned CMX-4, which means that the

property is already zoned for

redevelopment.  If we as a City are

serious about lifting people out of

poverty with good jobs, this is an

opportunity that we must not squander.

        We share concerns about

ensuring residents are treated fairly,

and we applaud Councilmember Gauthier

for her commitment to provide affordable

housing to her community.  As always,

she is thoughtful and committed to doing

the right thing.  But it is clear that

the owners of 3900 Market Street are

willing to work with her in this effort.

        They have said publicly they

have no interest in merely selling the

ground and leaving the residents

stranded.  A commitment that we will

join Councilmember Gauthier in ensuring

they live up to.  They are already

working to make sure that no one is

losing their Section 8 benefit for the

future.  They are meeting residents

individually to help them find and

Page 133

Page 133

secure affordable housing.  They are
working with a not-for-profit developer
to transfer the Section 8 rental
authorities from University City
Townhomes to other locations in West
Philly, which will provide long-term
rental assistance and an additional 113
families.  And they have pledged to
cover all moving and relocation costs
for these residents.

          In response, many residents
have expressed interest in relocating
immediately even though University City
Townhomes will not close until next
July.  The owners are willing to work
with Councilmember Gauthier to create
new affordable housing options near the
site ensuring the residents will be
treated fairly and with dignity, and
that's the way it should be.

          So it's not one or the other.
Redevelopment of this site won't leave
the residents stranded.  And for that, I
applaud Councilmember Gauthier for
leading the fight to make sure the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 134

Page 134

redevelopment doesn't threaten

affordable housing in West Philadelphia.

But Philadelphia needs the opportunities

presented by this project.

            We have the potential to create

more than 10,000 jobs once the sale of

this property is completed.  That means

putting more people to work, which is

critically important in the fight

against poverty in our City.  We can do

both and we should.  Let's work together

to make it happen.  I urge Council to

support the redevelopment of this site.

And with all differences and respect to

our friend Councilmember Gauthier,

reject Bill No. 210778.  Thank you for

the opportunity to testify today.  Have

a good one.

            COUNCILMAN JOHNSON:  Thank you.

Will the Clerk please call the next

panelist.

            THE CLERK:  For 210778, we have

Brett Altman.

            MR. ALTMAN:  Good morning,

Chairperson Johnson, members of the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 135

Page 135

Committee and staff.  Thank you for the

opportunity to testify this morning

regarding City Council Bill No. 210778.

This legislation is before you today for

consideration.  In addition to these

remarks, I am submitting supplemental

written testimony for the record.

        My name is Brett Altman.  I am

a Principal of IBID Limited Partnership,

the owner of the property of 3900 Market

University City Townhomes.  This

proposed bill, if enacted, will

specifically impact the property.  I am

here today to make a simple and straight

forward request of this Committee.

Please give us more time to work to

select a buyer with a development plan

that has a low-income housing component.

        I along with my partners have

received a number of offers for this

property within the last 30 days.  These

are not final offers.  We are committed

to working with these interested

parties, Councilmember Gauthier and the

Administration to develop a plan for the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 136

Page 136

future of this property that will
include affordable housing at the
current site.

I believe with all these
parties working together we can develop
additional affordable housing in West
Philadelphia that will benefit more
people than currently served on the
site, but we simply need more time to
work with the parties that are
interested in purchasing and developing
the site.  I have been in communication
with Councilmember Gauthier since
December of 2019 regarding the future of
our property, but we only formally
solicited offers in August.  And as a
result, those offers were only submitted
recently.

We believe that we can develop
a plan that will allow for affordable
housing onsite.  If you vote this bill
out of Committee today, it will
automatically and drastically devalue
the land.  My fear is that such an
action will cause these potential buyers

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 137

Page 137

to not pursue the purchase any further.

That will cost all interested parties

valuable time.  As I stated to

Councilmember Gauthier last week in a

meeting, we are committed to working

toward a positive resolution that will

work for everyone.  Thank you for your

time.

            THE CLERK:  Next we have Barry

Grossbach.

            MR. GROSSBACH:  Yes.  Thank you

very much for the opportunity to speak

with the Committee.  I represent the

Spruce Hill Community Association and

I'm not authorized to speak on the bill

before you, but rather on the history of

the site which we were intimately

involved in.

            During the Rizzo

Administration, as Housing Director John

Gallery approached Spruce Hill with the

proposition of Section 8 housing

financed by HUD at one of two possible

sites.  They suggested the former PGH

site where the hospital came down on

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 138

Page 138

Civic Center Boulevard or 40th and

Market as a possibility.

We considered the Civic Center

a non-go.  We felt that it would be

warehousing people with no amenities, no

stores or anything else and they would

just be isolated off on an island.  We

looked at 40th and Market.  We felt that

that was a site to consider public

housing and we decided that we would

conduct community meetings to get a

sense of how people felt about the

proposed project.

Needless to say whenever you

talked about subsidized housing, there

was pushback within the neighborhood but

there was also a lot of support.  We had

some interesting meetings with over 100

residents attending.  And ultimately,

Spruce Hill came down in favor of the

development of the site.

One of the key factors in our

decision was the fact that Friday

Architects headed by Don and Arlene

Matzkin who were known architects of the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 139

Page 139

Powelton Village were the proposed

developers of the site, so we felt that

whatever was put up there would be of

sufficient quality that the residents

would benefit and the neighborhood would

as well.  So it was an interesting

experiment for us.

        It was a neighborhood that came

together in support of subsidized

housing at that particular site, and I

just felt that the Committee should have

some history in terms of how all of this

came about.  It's been a project that

has been sustained for 40 years.  We

didn't know how it would turn out, but

it has been a beneficial experiment and

a successful housing development as far

as we're concerned.  And I thank the

Committee for the opportunity just to

give a bit of a history lesson as a

former history professor at the

Community College of Philadelphia.

Thank you very much for your time.

        COUNCILMAN JOHNSON:  Thank you.

Brett, are there any other panelists on

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 140

Page 140

this particular bill?

  THE CLERK:  For 210778, there
are no other speakers for public
comment.

  COUNCILMAN JOHNSON:  The Chair
recognizes Councilman Allan Domb.

  COUNCILMAN DOMB:  Thank you,
Mr. Chair.

  I've been listening to the
testimony and while I'm not on the
Committee, I just wanted to explore the
idea that Mo Rushdy brought up because I
read it in the op-ed in the Inquirer
this week.  I don't think he's still on
the call or not, but I did have some
questions for him if he is on the call.
But if he's not, we can do it offline.

  I think this idea on the
affordable housing is something we
should really explore.  I think it's
creative and I think it could help solve
the situation.  And I just want to
mention I think there's 69 or 70 people
involved, to figure out a way to get
them affordable housing that they can

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 141

Page 141

actually own and build wealth would be a

great solution to this, and also to get

the jobs.  We want to come out of this

with a win-win for both.  So that's my

comments for today.

          Thank you, Mr. --

          MR. RUSHDY:  Councilman, I'm

available.

          COUNCILMAN DOMB:  Oh.  Mo, I

have a question for you.  Can you just

explain simply if it's an option, the 69

or 70 people that live at 39th and

Market to engage in your idea about

affordable housing and they could

actually wind up owning a home versus

renting?

          MR. RUSHDY:  Absolutely

Councilman.  Again, if we're talking

about 70 homes, if we're talking about

the 190606 bill that has passed

unanimously in January of 2020, then

we're talking about close to 139 lots of

which 51 percent would represent that 70

homes of where we can build for-sale

affordable housing on public land.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 142

Page 142

            And without using any NPI

money, we would have cost of housing

somewhere between $850 to $1,000 per

month.  But if NPI money is used to buy

down the AMI, then we can provide

housing as low as 50 percent and 40

percent and 60 percent AMI which is

basically these affordable housing for

70 homes with close to about $4.5

million of NPI money.

            And that would get you 70 homes

with backyards, single family homes, new

construction 9-foot ceilings, 1250

square feet, three-bedroom, two-bathroom

homes.  We have done this model before

for housing developments under the

leadership of Council President Clarke

on our fees that were in 2016 and 2018,

and we continue as the BIA in our

blueprint to have models that work.

They have been proven.  And using NPI,

many or all of the 70 residents could

have been housed easily on public land

on single family homes, new construction

homes.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 143

Page 143

          COUNCILMAN DOMB:  So just to
clarify, what you're saying is the 70 or
so people that live at 39th and Market
could wind up owning a home in a similar
payment versus renting one?

          MR. RUSHDY:  Absolutely, yes.

          COUNCILMAN DOMB:  Okay.  You
know, I remember from my days in the
business the old expression when you
rent, it's a house, but when you own,
it's a home.  So that's a great idea.
Hope we can take advantage of it.

          Thank you, Mr. Chair.

          COUNCILMAN JOHNSON:  Thank you
very much.

          Any other questions or comments
for this particular panel?

               (No response.)

          COUNCILMAN JOHNSON:  Next I'm
going to ask the Clerk to please call
the next panel.

          THE CLERK:  Commenting on Bill
210667 and 210668 we first have Sherry
Brown.

          MS. BROWN:  Good morning,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 144

Page 144

everyone.  My name is Sherry Brown and

I'm a long-time resident of Strawberry

Mansion.  I am in support of Bill Nos.

210667 and 210668 to exempt City Council

President Clarke, 5th District from the

Mixed-Income Housing Zoning Bonus and

the expansion of the Strawberry Mansion

Neighborhood Conservation Overlay.

          I remember one developer whose

attorney repeatedly reminded us during a

community meeting that they met the

required criteria by law to receive two

bonuses wherein they would get an

additional 34 units of which only 10 of

the total of 94 units were designated

affordable.  They may be well-versed

with the law, but where is their moral

compass, when they have two rental

buildings across the street from each

other at 29th and Diamond Street and

they plan on building an additional 94

rental units on 29th Street, 30-plus

rental units on Diamond Street while

demolishing what was once Most Precious

Blood Roman Catholic Church, Rectory and

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 145

Page 145

Parochial School which opened in 1908

that sits next to that, replacing that

with a beer garden.

　　　　We are talking about possibly

adding a total of 400-plus renters in a

one-block area which greatly increases

the density and limited parking that

currently exists.  A group of community

organizations and stakeholders of

Strawberry Mansion formed a coalition to

create the Strawberry Mansion

Neighborhood Conservation Overlay which

enforces a series of neighborhood-

specific building regulations on new

construction to retain the historic

character of the neighborhood which some

of these houses were built more than 100

years ago.

　　　　Currently we have over 200 PHA

rental units in Strawberry Mansion.  We

are not against development, but we

demand respect from these developers for

what we need, and that is for affordable

homeownership to build and sustain

Strawberry Mansion.  I urge Council

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 146

Page 146

President Clarke to connect us with an

organization that specializes in

web-based technology that uses video and

surveys to teach and engage the

residents of Strawberry Mansion about

our neighborhood's land use issues in

order to plan for equality and

preservation.

        Knowledge is power and we're

willing to work with you all, but we

will not continue to be disrespected by

these developers coming in and taking

over and destroying our community.

Knowledge is power as I said, and

by-right is not right and bonuses must

go.  Thank you and have a blessed day.

        COUNCILMAN JOHNSON:  Thank you.

Will the Clerk please call the next

person for public comment.

        THE CLERK:  For Bill 210667 and

210668, we have Melvin (inaudible).

            (No response.)

        COUNCILMAN JOHNSON:  Melvin,

are you there?

        COUNCIL TECH SUPPORT:  Hi,

Page 147

Page 147

Councilman.  Melvin just hung up really

quick, so we're going to try to get him

called back on the line.

          COUNCILMAN JOHNSON:  Will the

Clerk call the next person for public

comment, and then we'll get Melvin

after.

          THE CLERK:  Next for Bill Nos.

210667 and 210668, we have Bonita

Cummings.

          MS. CUMMINGS:  Good day,

Chairman Johnson and the Rules

Committee.  Can you hear me?

          COUNCILMAN JOHNSON:  Yes, we

can hear you.

          MS. CUMMINGS:  Great.

Philadelphia is not New York City.

Philadelphia is not a city of mostly

high-rise buildings and neighborhoods.

The movement by developers assisted by

bonus legislation to make Philadelphia a

city of high-rise apartment buildings

has unleashed the worst conduct in

developers, and today Philadelphia

neighborhoods are experiencing very

Page 148

aggressive tactics and attacks from

those developers.

            They are harassing elders,

inducing fear in long-time residents who

have managed clean and (inaudible) at

their expense many of the lots, many

residents and neighborhoods who boarded

up open vacant buildings and painted

them.  In the name of development,

developers have decimated the rare and

unique mural of Martin Luther King at

Ridge and Diamond and blocked or trapped

leaving only his arm as well as trapping

the mural arts image of John Cultrane

behind the new development at 2848 West

Diamond Street, which by the way is for

sale for $1 million-plus.

            Bonuses continue to perpetuate

one-sided wealth.  Developers pay a

price and become millionaires,

billionaires and even trillionaires

according to how many times they can

flip your district.  The idea of

affordable rental housing created by

bonuses that only create in a

Page 149

development project of, for example, 95

units at 10 percent bonus, that is only

9 or 10 moderate units.  That can be a

very slow process to the much-stated

housing needs and a lot of harassment to

communities for so little.

Bill Nos. 210667 and 210668 are

necessary at this time to further expand

neighborhood boundaries and preserve and

protect the inclusion, health, welfare

and safety of sensitive and vulnerable

communities.  These bills help restore

some balance and give time for amended

legislation to correct the harm and

neighborhoods to comprehensively plan.

In perspective, African-

Americans have not been sitting around

twiddling their thumbs as the unique

designs in housing and their communities

Strawberry Mansion and North Central met

with decay.  Residents of those

neighborhoods ask questions of

preservation, inquired about how to get

access to and repair for the King

properties, et cetera.  We thought we

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 150

Page 150

had a plan called Blight Elimination

with engaged neighborhood ambassadors.

However, the breakdown of that

neighborhood discussion and planning was

when the name was changed from Blight

Elimination to Neighborhood

Transportation Initiative, NTI.  Put NTI

in the single-handed change of 2012 of

The Philadelphia Zoning Code and we now

have a very destructive weapon.

     Constituents do not always want

to be on the defense from developers who

act as conduits representing so-called

wealthy or powerful investors.  We would

like to get a win-win, but there has to

be more transparency.  Communities need

more inclusion in the legislative

process, meaning times hearings are

held, where they are held, et cetera.

     I would like to get a better

understanding of what area we're talking

about, south of Spring Garden amendment

to Bill No. 210667.  We look forward to

your support of Bill Nos. 210667 and

210668.  And I do thank you for allowing

Page 151

me to have a voice today.

COUNCILMAN JOHNSON:  Thank you
very much.

Will the Clerk please call the
next individual for public comment.

THE CLERK:  For Bill No.
210638, we have Sue Patrone.

MS. PATRONE:  Hello.  Thank
you, Rules Committee Chair, Co-Chair and
Councilmembers.  Can you hear me?

COUNCILMAN JOHNSON:  Yes, we
can hear you.

MS. PATRONE:  Thank you.  Thank
you for this opportunity to testify.  My
name is Susan Patrone and I am a Past
President of Passyunk Square Civic
Association and Columbus Square Advisory
Council.  I'm testifying today to urge
you to put a pause button on Bill 210638
on Alterra's processed 155 apartments
and retail on our municipal complex
land.

While density is driving this
proposal, this proposed plan, the heart
of my testimony is safety.  According to

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 152

Page 152

Alterra's own traffic study, they claim

the entire complex will generate 856

"new daily trips," that translates into

cars, distributed among Reed, Morton and

12th Streets.  Absent are any

calculations related to delivery.

Rideshare, Uber, Lyft, food delivery

services, Gopuff, InstaCart, Caviar,

Postmates, Grubhub, not counting UPS,

FedEx and Amazon Prime trucks.  Our

rough calculations add 90 more vehicle

trucks with delivery cars to this

development which will impact on 12th

Street.

        Now, this proposed 12th Street

where many of these cars and trucks will

go will have ingress and egress on the

12th Street sidewalk.  On 10/14 on that

block -- by the way, our Councilperson

was gracious enough to come and visit

the site today and talk and our Civic

President as well.  On 10/14/21 at the

intersection of 12th and Morton from

8:25 a.m. to 9:00 a.m., I did a head

count of 480 pedestrians, meaning

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 153

Page 153

children and families, using the

sidewalks where all of the above are

proposed.

        Is it safer to plan for more

cars and trucks on sidewalks?  Would any

of us here want approximately 1,000 more

cars and trucks in our neighborhood?

Would any of us want to put more

vehicles across the street from a multi-

generational park playground?  Is it

feasible with the scale of this

processed development, is it feasible,

to align with Vision Zero in keeping our

children safe?  How much mitigation do

we need?  Could Alterra offer a plan

that makes a safe, even safer than

before this proposed development?

        I'd like to say I appreciate

the work my Councilperson and my Civic

Association has put into this.  COVID

has presented a lot of issues.  But

again, safety is primary.  That's the

primary focus.  So this proposed project

needs a much deeper look and a pause

button here in the Rules Committee.

Page 154

Page 154

Thank you for your time.

COUNCILMAN JOHNSON:  Thank you
very much.

Will the Clerk please call the
next person for public comment.

THE CLERK:  For Bill No.
210638, we have Sarah Anton.

MS. ANTON:  Hi.  Can you hear
me?  Hello?

THE CLERK:  Yes, we can hear
you.

MS. ANTON:  Okay.  Great.
Sorry.  Good afternoon.  My name is
Sarah Anton.  I'm a Board member and the
immediate past President of Passyunk
Square Civic Association.  We're the
Registered Community Organization for
the area addressed in Bill 210638
regarding the zoning and Master Plan
changes to 1100 Wharton Street, which is
commonly understood as the Municipal
Complex.

Since 2018, PSCA has worked
with Councilman Squilla, the Department
of Public Property and the Philadelphia

Page 155

Page 155

Industrial Development Corporation,

PIDC, to gather community feedback for

the proposed sale of 1100 Wharton.  In

November of 2018, PIDC attended our

general meeting to present about the

process for recruiting and reviewing

proposals for the site and to review the

community engagement process that led to

the development of the 2035 City Master

Plan, which includes a vision for this

area of our neighborhood.

        Following this meeting, we

opened up an online forum and provided

instructions to encourage neighbors to

submit feedback.  We also started a

dedicated mailing list for updates about

the process of reviewing development

proposals.  We collected a wide range of

neighbor comments with visions for this

area and submitted these to PIDC to be

included as an addendum to the RFP.

        In addition, concern about

public school issues were raised at this

point and a special neighbor committee

was formed to work with the School

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 156

Page 156

District to explore the possibility of

uses for the site to assist in

addressing this issue.  At this point,

PIDC proceeded with development proposal

recruitment and review.

As this process continued,

Councilmember Squilla arranged for the

unique opportunity for representatives

from our group to be part of the

selection committee in an effort to

maximize transparency and community

input.  This later expanded to a team

from PSCA, myself as President of the

group as well as our Vice-president,

Zoning Chair and Planning Committee

Chair.  This team was able to

participate in developer interviews for

the two finalist proposals that were

submitted in response to the City's

Request for Proposals.

In June 2019 with the

permission of PIDC, we were able to

share key facts about each of these

proposals with neighbors.  We

distributed flyers door-to-door to

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 157

Page 157

hundreds of homes within blocks of the

site, sent emails to thousands who are

neighbors, provided an online hub for

comments and provided an inperson update

to about 50 neighbors at our general

meeting at length.

        We invited neighbors to share

their opinions about proposals directly

with the Mayor, Councilman Squilla and

our Board.  While more than half of the

neighbors responded to this call for

comments of support of a mixed-use

proposal on this site as submitted, we

clearly heard that there is not a

consensus in the neighborhood about the

right amounts of density and parking in

this area.

        Almost universally however, we

heard concern about preserving green

space, a desire to preserve the Fleet

Management building and mitigating the

downsize of gentrification and the

opportunity for development of this site

to add units that will be affordable to

seniors, small business owners, civil

Page 158

Page 158

servants, educators, retail workers and

trades people that have historically

called Passyunk Square their home.

This feedback was provided to

the applicants, and ultimately the

applicant most responsible to these

concerns, Alterra Property, was

invited to present a full proposal to

the neighborhood in December 2019.  The

revised project featured additional

residential permit parking, support for

affordable housing and reduced density.

Again, we distributed information door-

to-door in blocks surrounding the

property about this meeting, posted the

development proposal online, encouraged

direct feedback to our Councilmember via

dedicated email address and provided

reminders in our monthly newsletter and

at our monthly general meeting to the

community on how to make their voices

heard concerning this project.

After a long hiatus due to the

pandemic, Councilmember Squilla arranged

for a meeting on July 2021 to present

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 159

Page 159

the updated project, taking into account

all neighbor comments collected online

and provided during a community meeting

in December 2019 and provided via

various channels and individual meetings

with constituents from December 2019

through June 2021.

        The Master Plan legislation

before you is responsive to community

feedback and represents a compromise of

a wide range of concerns and aspirations

for this site.  While as an

organization, PSCA is in non-opposition

to the Master Plan changes before you

today.  There are many details to be

worked out before approval of the sale

of this parcel and before our Board

would be comfortable to being in

non-opposition to the specific

development project with Alterra

Properties.

        Neighbors continue to have

concerns about the selection of a

commercial tenant, the scope and details

of green space, pedestrian safety and

Page 160

Page 160

other traffic concerns and concerns that

the design of the new building will be

generic and out of character with the

neighborhood.  We believe that the

unique and extensive level of community

engagement in this process has allowed

for continuing improvement to the

proposed project, and perhaps the

addition of some components like

affordable housing that might otherwise

have never been included in the site.

It is our hope that neighbors

can continue to work with Councilmember

Squilla and the development team to

address the outstanding issues and

concerns and find solutions to make this

project a contributing and appropriate

addition to this vibrant part of the

City.  Thank you.

COUNCILMAN JOHNSON:  Thank you

very much.

Will the Clerk please call on

anyone else who is here for public

comment -- Councilman Squilla, you would

like to be acknowledged?

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 161

                COUNCILMAN SQUILLA:  Yes.

Thank you, Councilmember.

                And I just want to thank the

people who are testifying and Sarah and

their input and really hard work during

this process.  It's been a long time.

And yes, we have more work to do.  We

will continue working with the community

and appreciate their efforts and looking

forward to having future meetings as

this moves forward.  Thank you.

                COUNCILMAN JOHNSON:  You're

welcome.

                Will the Clerk please call

anyone else who has a public comment.

                THE CLERK:  Mr. Chair, there is

no one else in attendance for public

comment.

                COUNCILMAN JOHNSON:  Is there

anyone else whose name has not been

called that would like to testify?

                    (No response.)

                COUNCILMAN JOHNSON:  Hearing

none, at this time I'm going to ask for

all panelists and those who have signed

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 162

Page 162

up for public comment to please

disconnect as we conclude this hearing

and go into a public meeting.

This officially concludes the

public hearing of the Committee.  We

will now go into a public meeting to

consider the action to be taken on the

bills before this Committee today.

Will the Clerk please call the

roll so we can convene the public

meeting.

THE CLERK:  Councilmember Mark

Squilla.

COUNCILMAN SQUILLA:  Good

afternoon, Mr. Chair and colleagues.

Present.

THE CLERK:  Councilmember Cindy

Bass.

COUNCILWOMAN BASS:  Good

afternoon, Mr. Chair and colleagues.  I

am present as well.

THE CLERK:  Councilmember David

Oh.

COUNCILMAN OH:  Good afternoon.

I am present.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 163

Page 163

          THE CLERK:  Councilmember Brian

O'Neill.

          COUNCILMAN O'NEILL:  Present.

          THE CLERK:  Councilmember

Katherine Gilmore Richardson.

          COUNCILWOMAN GILMORE

RICHARDSON:  Good afternoon, Mr. Chair

and colleagues.  I'm present.

          THE CLERK:  And that is it,

Mr. Chair.

          COUNCILMAN JOHNSON:  We have a

quorum and we will now go into our

public meeting.

          The Chair recognizes Councilman

Mark Squilla for a motion on Bill No.

210638.

          COUNCILMAN SQUILLA:  (Muted).

          COUNCILMAN JOHNSON:  You're on

mute right now, Councilman Squilla.

          COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.  I was reading to myself.

          COUNCILMAN JOHNSON:  It's cool.

          COUNCILMAN SQUILLA:  I move

that Bill No. 210638 be reported from

this Committee with a favorable

Page 164

Page 164

recommendation and further move that the

rules of Council be suspended as to

permit the first reading of this bill at

the next session of Council.

   COUNCILMAN JOHNSON:  Can I get

a second from someone?

   COUNCILWOMAN BASS:  Second.

   COUNCILMAN JOHNSON:  The Chair

notes for the record that Councilwoman

Cindy Bass seconds the motion.

   It has been moved and properly

seconded that Bill No. 210638 be

reported out of this Committee with a

favorable recommendation and further

move that the rules of Council be

suspended to permit first reading of

this bill at the next session of

Council.

   All those in favor of the

motion will signify by saying aye.

    (Aye.)

   COUNCILMAN JOHNSON:  Those

opposed?

    (No response.)

   COUNCILMAN JOHNSON:  The ayes

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 165

Page 165

have it and the motion carries.

     The Chair recognizes Councilman Squilla for a motion on Bill No. 210637.

     COUNCILMAN SQUILLA:  Thank you, Mr. Chair.

     I move that Bill No. 210637 be reported from this Committee with a favorable recommendation and further move that the rules of Council be suspended to permit the first reading of this bill at the next session of Council.

     COUNCILMAN OH:  Second.

     COUNCILMAN JOHNSON:  The Chair notes for the record that Councilman David Oh seconds the motion.

     It has been moved and properly seconded that Bill No. 210637 be reported from this Committee with a favorable recommendation and further move that the rules of Council be suspended to permit first reading of this bill at the next session of Council.

     All those in favor of the

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 166

Page 166

motion will signify by saying aye.

        (Aye.)

        COUNCILMAN JOHNSON:  Those
opposed?

        (No response.)

        COUNCILMAN JOHNSON:  The ayes
have it and the motion carries.

        The Chair recognizes
Councilmember Mark Squilla for a motion
on Bill No. 210686.

        COUNCILMAN SQUILLA:  687.

        COUNCILMAN JOHNSON:  Oh, I'm
sorry.  Let me back up for a second.

        The Chair recognizes Councilman
Mark Squilla for a motion on Bill No.
210687.

        COUNCILMAN SQUILLA:  Thank you,
Mr. Chair.

        I move that Bill No. 210687 be
reported from Committee with a favorable
recommendation and further move that the
rules of Council be suspended as to
permit the first reading of this bill at
the next session of Council.

        COUNCILWOMAN BASS:  Second.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 167

Page 167

COUNCILMAN JOHNSON:  The Chair notes for the record that Councilwoman Cindy Bass seconds the motion.

It has been moved and properly seconded that Bill No. 210687 be reported from this Committee with a favorable recommendation and further move that the rules of Council be suspended to permit first reading of this bill at the next session of Council.

All those in favor will signify by saying aye.

(Aye.)

COUNCILMAN JOHNSON:  Those opposed?

(No response.)

COUNCILMAN JOHNSON:  The ayes have it and the motion carries.

The Chair recognizes Councilman Mark Squilla for a motion on Bill No. 210549.

COUNCILMAN SQUILLA:  Thank you, Mr. Chair.

I move that Bill No. 210549 be

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 168

Page 168

reported from this Committee with a

favorable recommendation and further

move that the rules of Council be

suspended as to permit the first reading

of this bill at the next session of

Council.

COUNCILWOMAN GILMORE

RICHARDSON:  Second.

COUNCILMAN JOHNSON:  The Chair

notes Katherine Gilmore Richardson

seconds the motion.

It has been moved and properly

seconded that Bill No. 210549 be

reported from this Committee with a

favorable recommendation and further

move that the rules of Council be

suspended to permit first reading of

this bill at the next session of

Council.

All those in favor of the

motion will signify by saying aye.

(Aye.)

COUNCILMAN JOHNSON:  Those

opposed?

(No response.)

Page 169

Page 169

COUNCILMAN JOHNSON:  The ayes have it and the motion carries.

The Chair recognizes Councilman Mark Squilla for a motion on the amendment to Bill No. 210667.

COUNCILMAN SQUILLA:  Thank you, Mr. Chair.

I offer an amendment to Bill No. 210667.  A copy of the amendment has been circulated to all members of the Committee.  And I move that the amendment to Bill No. 210667 be approved.

COUNCILWOMAN BASS:  Second.

COUNCILMAN JOHNSON:  The Chair notes for the record that Councilwoman Cindy Bass seconds the motion.  It has been moved and properly seconded that the amendment to Bill No. 210667 be approved.

All those in favor of the motion will signify by saying aye.

(Aye.)

COUNCILMAN JOHNSON:  Those opposed?

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 170

Page 170

(No response.)

COUNCILMAN JOHNSON:  The ayes
have it and the motion carries.

The Chair recognizes Councilman
Mark Squilla for a motion on Bill No.
210667 as amended.

COUNCILMAN SQUILLA:  Thank you,
Mr. Chair.

I move that Bill No. 210667 as
amended be reported from this Committee
with a favorable recommendation and
further move that the rules of Council
be suspended as to permit the first
reading of this bill at the next session
of Council.

COUNCILMAN O'NEILL:  Second.

COUNCILMAN JONES:  The Chair
notes for the record that Councilman
Brian O'Neill seconds the motion.

It has been moved and properly
seconded that Bill No. 210667 as amended
be reported from this Committee with a
favorable recommendation and further
move that the rules of Council be
suspended to permit first reading of

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 171

Page 171

this bill at the next session of

Council.

          All those in favor of the

motion will signify by saying aye.

               (Aye.)

          COUNCILMAN JOHNSON:  Those

opposed?

               (No response.)

          COUNCILMAN JOHNSON:  The ayes

have it and the motion carries.

          The Chair recognizes Councilman

Mark Squilla for a motion on Bill No.

210668.

          COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.

          I move that Bill No. 210668 be

reported from this Committee with a

favorable recommendation and further

move that the rules of Council be

suspended as to permit the first reading

of this bill at the next session of

Council.

          COUNCILWOMAN BASS:  Second.

          COUNCILMAN JOHNSON:  The Chair

notes for the record that Councilwoman

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 172

Page 172

Cindy Bass seconds the motion.

          It has been moved and properly

seconded that Bill No. 210668 be

reported from this Committee with a

favorable recommendation and further

move that the rules of Council be

suspended to permit first reading at the

next session of Council.

          All those in favor of the

motion will signify by saying aye.

               (Aye.)

          COUNCILMAN JOHNSON:  Those

opposed?

               (No response.)

          COUNCILMAN JOHNSON:  The ayes

have it and the motion carries.

          The Chair recognizes Mark

Squilla for a motion on the amendment to

Bill No. 210742.

          COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.

          I offer an amendment to Bill

No. 210742.  A copy of the amendment has

been circulated to all members of the

Committee.  I move that the amendment to

Page 173

Page 173

this Bill No. 210742 be approved.

   COUNCILMAN OH:  Second.

   COUNCILMAN JOHNSON:  The Chair

notes for the record that Councilman

David Oh seconds the motion.  It has

been moved and properly seconded that

the amendment to Bill No. 210742 be

approved.

   All those in favor of the

motion will signify by saying aye.

    (Aye.)

   COUNCILMAN JOHNSON:  The ayes

have it and the motion carries.  Give me

one second.

   The Chair recognizes Mark

Squilla for a motion on Bill No. 210742

as amended.

   COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.

   I move that Bill No. 210742 as

amended be reported from this Committee

with a favorable recommendation and

further move that the rules of Council

be suspended as to permit the first

reading of this bill at the next session

Page 174

Page 174

of Council.

      COUNCILMAN O'NEILL:  Second.

      COUNCILMAN JOHNSON:  The Chair
notes for the record that Councilman
Brian O'Neill seconds the motion.

      It has been moved and properly
seconded that Bill No. 210742 as amended
be reported from this Committee with a
favorable recommendation and further
move that the rules of Council be
suspended to permit first reading of
this bill at the next session of
Council.

      All those in favor of the
motion will signify by saying aye.

        (Aye.)

      COUNCILMAN JOHNSON:  Those
opposed?

        (No response.)

      COUNCILMAN JOHNSON:  The ayes
have it and the motion carries.

      The Chair recognizes Councilman
Mark Squilla for a motion on the
amendment to Bill No. 210808.

      COUNCILMAN SQUILLA:  Thank you,

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 175

Page 175

Mr. Chair.

I offer an amendment to Bill
No. 210808.  A copy of the amendment has
been circulated to all members of the
Committee.  I move that the amendment of
Bill No. 210808 be approved.

COUNCILWOMAN BASS:  Second.

COUNCILMAN JOHNSON:  The Chair
notes for the record that Councilwoman
Cindy Bass seconds the motion.  It has
been moved and properly seconded that
the amendment to Bill No. 210808 be
approved.

All those in favor of the
motion will signify by saying aye.

(Aye.)

COUNCILMAN JOHNSON:  Those
opposed?

(No response.)

COUNCILMAN JOHNSON:  The ayes
have it and the motion carries.  And the
amendment to Bill 210808 has been
approved.

The Chair recognizes
Councilmember Mark Squilla for a

Committee on Rules 10-26-21 Meeting
October 26, 2021

motion --

    (Background interruption.)

    COUNCILMAN JOHNSON:  Can everybody mute their phone or your computer, your screen if you're not speaking.

    The Chair recognizes Councilmember Mark Squilla for a motion on Bill No. 210808 as amended.

    COUNCILMAN SQUILLA:  Thank you, Mr. Chair.

    I move that Bill No. 210808 as amended be reported from this Committee with a favorable recommendation and further move that the rules of Council be suspended as to permit the first reading of this bill at the next session of Council.

    COUNCILMAN O'NEILL:  Second.

    COUNCILMAN JOHNSON:  The Chair notes for the record that Councilman Brian O'Neill seconds the motion.

    It has been moved and properly seconded that Bill No. 210808 as amended be reported from this Committee with a

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 177

Page 177

favorable recommendation and further

move that the rules of Council be

suspended to permit first reading of

this bill at the next session of

Council.

      All those in favor of the

motion will signify by saying aye.

        (Aye.)

    COUNCILMAN JOHNSON:  Those

opposed?

        (No response.)

    COUNCILMAN JOHNSON:  The ayes

have it and the motion carries.

      The Chair recognizes

Councilmember Mark Squilla for a motion

on the amendment to Bill No. 210634.

    COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.

      I offer an amendment to Bill

No. 210634.  A copy of the amendment has

been circulated to all members of the

Committee.  I move that the amendment to

Bill No. 210634 be approved.

    COUNCILWOMAN BASS:  Second.

    COUNCILMAN JOHNSON:  The Chair

Page 178

Page 178

notes for the record that Councilwoman

Cindy Bass seconds the motion.  It has

been moved and properly seconded that

the amendment to Bill No. 210634 be

approved.

        All those in favor of the

motion will signify by saying aye.

              (Aye.)

        COUNCILMAN JOHNSON:  Those

opposed?

              (No response.)

        COUNCILMAN JOHNSON:  The ayes

have it.  The motion carriers.  The

amendment to Bill No. 210634 has been

approved.

        The Chair recognizes

Councilmember Mark Squilla for a motion

on Bill No. 210634 as amended.

        COUNCILMAN SQUILLA:  Thank you,

Mr. Chair.

        I move that Bill No. 210634 as

amended be reported from this Committee

with a favorable recommendation and

further move that the rules of Council

be suspended as to permit the first

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 179

Page 179

reading of this bill at the next session
of Council.

      COUNCILMAN O'NEILL:  Second.

      COUNCILMAN JOHNSON:  The Chair
notes for the record that Councilman
Brian O'Neill seconds the motion.

      It has been moved and properly
seconded that Bill No. 210634 as amended
be reported from this Committee with a
favorable recommendation and further
move that the rules of Council be
suspended to permit first reading of
this bill at the next session of
Council.

      All those in favor of the
motion will signify by saying aye.

      (Aye.)

      COUNCILMAN JOHNSON:  Those
opposed?

      (No response.)

      COUNCILMAN JOHNSON:  The ayes
have it and the motion carries.

      The Chair recognizes
Councilmember Mark Squilla for a motion
on the amendment to Bill No. 210778.

Page 180

Page 180

COUNCILMAN SQUILLA:  Thank you, Mr. Chair.

I offer an amendment to Bill No. 210778.  A copy of the amendment has been circulated to all members of the Committee.  I move that the amendment of Bill No. 210778 be approved.

COUNCILMAN O'NEILL:  Second.

COUNCILMAN JOHNSON:  The Chair notes for the record that Councilman Brian O'Neill seconds the motion.  It has been moved and properly seconded that the amendment to Bill No. 210778 be approved.

All those in favor of the motion will signify by saying aye.

(Aye.)

COUNCILMAN JOHNSON:  Those opposed?

(No response.)

COUNCILMAN JOHNSON:  The ayes have it and the motion carries.  And the amendment to Bill No. 210778 has been approved.

The Chair recognizes

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 181

Page 181

Councilmember Mark Squilla for a motion
on Bill No. 210778 as amended.

      COUNCILMAN SQUILLA:  Thank you,
Mr. Chair.

      I move that Bill No. 210778 as
amended be reported from this Committee
with a favorable recommendation and
further move that the rules of Council
be suspended as to permit the first
reading of this bill at the next session
of Council.

      COUNCILWOMAN BASS:  Second.

      COUNCILMAN JOHNSON:  The Chair
notes for the record that Councilmember
Cindy Bass seconds the motion.

      It has been moved and properly
seconded that Bill No. 210778 as amended
be reported from this Committee with a
favorable recommendation and further
move that the rules of Council be
suspended to permit the first reading of
this bill at the next session of
Council.

      All those in favor of the
motion will signify by saying aye.

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 182

Page 182

(Aye.)

COUNCILMAN JOHNSON:  Those
opposed?

(No response.)

COUNCILMAN JOHNSON:  The ayes
have it and the motion carries.

Brett, for the record are we
holding Bill No. 210741?

THE CLERK:  Yes.  The two bills
being held at this time are Bill Nos.
210741 and 210686.

COUNCILMAN JOHNSON:  Okay.  So
for the record, Bill No. 210741 is being
held.

And, Brett, the next bill is
also -- what's the second one you
mentioned?

THE CLERK:  210686.

COUNCILMAN JOHNSON:  And for
the record, Bill No. 210686 is also
being held at the request of their
sponsors.

This concludes the Rules
Hearing.  I want to thank all my
colleagues for their dedication and

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 183

Page 183

participation on this hearing.

       COUNCILMAN SQUILLA:  Thank you,
Mr. Chairman.  Great job.

       Thank you, Brett.  Have a great
day.

       COUNCILMAN JOHNSON:  Thank you.

       (Committee on Rules concluded
at 1:05 p.m.)

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 184

Page 184

C E R T I F I C A T I O N

I, hereby certify that the
proceedings and evidence noted are contained
fully and accurately in the stenographic notes
taken by me in the foregoing matter, and that
this is a correct transcript of the same.


_____
TANEHA CARROLL
Court Reporter - Notary Public



(The foregoing certification of
this transcript does not apply to any
reproduction of the same by any means,
unless under the direct control and/or
supervision of the certifying reporter.)

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 1

**A**

**a.m** 1:10
152:49,49
**abatement**
110:5
113:51
114:5
**ability** 35:13
53:33
56:15
**able** 16:49
19:37
21:31
32:39
35:23
38:33
53:27 79:5
85:35
92:25
103:27
108:5
113:41
128:31
156:33,45
**abomination**
71:5 73:45
**above-grou...**
31:45
**Absent**
152:11
**Absolutely**
141:35
143:13
**Academy**
99:33
**acceptable**
110:19
**access** 86:39
88:19
117:27
149:49
**accessible**
89:43
**accommod...**
52:3
**accompany...**
60:35
**accomplish...**
45:13
**account**
159:3
**accountable**
75:9

**accurately**
33:49
184:10
**achieve** 56:49
**achieved**
62:45
**achievements**
44:25
**acknowledge**
111:7
122:5
**acknowled...**
160:51
**acknowled...**
108:35
**act** 10:5 45:7
150:27
**action** 74:51
136:51
162:15
**actions**
125:23
**actively**
86:51
**activities**
43:3,31
**activity** 47:37
**adaptive** 27:9
28:23
**add** 33:39
90:5
102:15
118:5
152:23
157:49
**added** 28:11
57:43
**addendum**
155:43
**adding** 5:11
8:23 11:27
20:9 84:3
145:11
**addition**
25:19
51:19
82:13
135:11
155:45
160:19,37
**additional**
14:11
32:35
40:31

42:45
43:21,23,33
44:3 62:41
108:33
133:15
136:13
144:29,43
158:21
**Additionally**
9:39 25:37
**address**
21:37 22:5
54:19 85:3
120:5
126:39
128:19
129:35
130:45
158:37
160:31
**addressed**
34:37
154:37
**addresses**
24:51
120:17
**addressing**
15:25
156:7
**adequately**
75:35
**adhere** 56:27
**adjacent**
34:15
51:35
**adjust** 16:49
**adjusted**
98:19
**adjustment**
61:25
**adjusts** 60:43
**Administra...**
111:25
135:51
137:41
**administra...**
82:7
**advantage**
143:25
**adversely**
65:21
**Advisory**
151:35
**advocacy**

30:39
**Affairs**
116:21
117:31
**affect** 65:23
**afford** 89:35
102:49
103:11,27
107:13
**affordability**
16:23
38:27
58:43
59:21 85:5
86:29,49
90:5
123:41
127:19
**affordable**
8:25 11:47
14:7 38:3
38:11
51:15,43,49
52:5 84:7
84:25,35
86:33
87:13
88:13
89:21
101:43
102:5
107:43
108:21
112:21
113:43
114:5
119:9
120:45
121:13
123:3,11,21
124:5,23
125:29
126:33
127:15,41
128:11,19
128:23,39
129:9,37
130:47
131:15,19
132:21
133:3,35
134:5
136:5,13,41
140:39,51

141:29,51
142:17
144:33
145:47
148:49
157:49
158:25
160:21
**afforded** 14:9
**Afghan**
117:37
**aforementi...**
9:11
**African-**
149:33
**afternoon**
115:47
116:15
120:37
126:5
130:5
154:27
162:31,41
162:49
163:15
**aggressive**
148:3
**ago** 15:21
72:13
78:19
90:47
119:3
123:49
145:37
**agree** 35:13
92:27
109:15
**agreed** 33:21
33:29 34:7
70:5 94:41
121:21
**agreement**
34:9 37:9
94:41
127:11,27
**ahead** 21:51
26:15
64:45
99:27
106:33
114:3
**AHP** 84:5
**Aida** 83:27
85:29

91:15,17,23
109:9,11
123:49
**aims** 86:21
**air** 12:3
**alert** 110:47
**align** 153:27
**aligns** 32:5
**alive** 30:31
113:45
**Allan** 1:27
140:13
**Alliance**
26:35,43
27:27
28:49
120:51
126:23
**allow** 9:49
22:3 25:39
30:33
31:39
38:11
59:11
60:37
81:35
136:41
**allowable**
60:45
**allowances**
12:5
**allowed**
160:13
**allowing**
42:31
121:7
150:51
**allows** 19:43
19:51
36:43
55:39
**alterations**
127:5
**altered**
129:19
**Alternatively**
61:51
**alternatives**
125:31
**Alterra** 14:39
14:47
153:31
158:15
159:41

**Alterra's**
151:41
152:3
**Altman**
134:47,49
135:17
**Amazon**
152:21
**ambassadors**
150:5
**amend** 4:51
5:11,47 6:9
7:11,39 8:5
8:21,45
19:3 35:23
50:49
84:11
**amended**
19:9 33:19
149:27
170:13,21
170:43
173:35,43
174:15
176:19,27
176:49
178:37,45
179:17
181:5,13,35
**amending**
5:29,33
6:35,45
7:25,31
24:45
38:15
39:43
**amendment**
6:23 27:31
36:35
62:41
63:39
65:27
66:21
150:45
169:11,17
169:19,25
169:39
172:37,45
172:47,51
173:15
174:49
175:5,7,11
175:25,45
177:33,39

177:41,45
178:9,29
179:51
180:7,9,13
180:27,47
**amendments**
19:19
51:31
54:17 82:5
**amends**
11:17
24:41 25:7
26:49
36:23 67:9
67:23
81:21
83:51
**amenities**
138:11
**amenity-rich**
86:37
89:37
**Americans**
149:35
**AMI** 142:11
142:15
**AMIs** 123:39
**amount**
16:41
51:51
124:29
**amounts**
157:33
**analysis** 43:7
**and/or**
184:43
**Andre**
115:45
116:9,19
**Andrews**
83:29
92:43
105:31,39
105:41,51
106:11,17
106:19,29
106:37,39
**announced**
122:39
**announcem...**
2:13
**annual** 43:25
**answer** 12:35
15:31 17:3

Committee on Rules 10-26-21 Meeting
October 26, 2021

25:51
32:25,39
37:25
41:13 52:7
54:29
62:13
68:17
82:37
85:25
120:25
answers
75:49
Anthony
34:47
Anton 154:15
154:17,25
154:29
anymore
102:51
apartheid
94:39
apartment
70:23 73:5
107:15,25
116:23,31
116:43
119:49
147:45
apartments
73:41
77:37
89:13
151:41
apologies
26:27
apologize
75:17 81:9
app 117:27
apparently
122:51
appeal 75:31
78:3,7
79:29
90:31
appealed
90:21
appealing
79:23
appeals
72:27
applaud
132:19
133:49
applicability

60:49
applicant
158:13
applicants
51:3
123:31
158:11
applications
53:29,35
applies 27:17
29:31 53:7
61:9
apply 51:23
53:27 61:3
61:31
184:39
appreciate
33:3 35:9
35:13
116:13
153:37
161:19
appreciated
41:41
appreciating
56:3
approached
137:43
appropriate
160:35
appropriati...
56:3
approval
12:33
20:27
25:49
32:23
37:23
40:37
44:43,49
45:15
51:31
54:15
61:35
62:11
68:15
82:37
85:23
127:47
159:33
approvals
71:45
approve
20:19

53:35
approved
18:51
20:13,23
70:9 72:29
82:7
126:43
169:27,41
173:3,17
175:13,27
175:47
177:47
178:11,31
180:15,29
180:49
approving
5:17 6:21
11:33
approxima...
43:31
153:13
April 14:17
Arch 7:19
architects
34:51
138:49,51
area 5:7 6:3
6:15 7:3,5
7:17,35,45
8:11,51
9:11 18:35
19:29
20:41
22:33
25:23
36:29
40:15
46:27,33
47:9 55:29
58:45
59:23
67:15,43
69:31,33
82:15,17,19
84:15
88:41 92:9
92:19,21
99:49
103:9,11
107:7,11,43
108:23
145:13
150:43
154:37

155:23,41
157:35
area's 42:5
areas 5:5,51
6:13 7:15
7:43 8:9,49
36:27
38:23 41:7
48:15
67:13
81:25
argue 123:23
Arlene
138:49
arm 148:27
arranged
156:15
158:49
Articles 6:23
39:45
44:39
arts 148:29
as-of- 79:45
as-of-right
75:41
aside 88:13
asked 27:37
77:3
asking 71:41
72:47
107:23
130:31
aspirations
159:23
assessed
43:49
109:23
111:51
assessment
109:21,29
110:13,21
110:27,43
111:43
assessments
42:13
110:15
112:9
asset 13:47
assist 156:5
assistance
28:51
117:7
133:15
assisted

117:5
147:41
associated
119:25
Associates
57:25
association
13:39
14:25,51
15:9,25
16:39 34:7
63:35,43
69:17
116:23,33
116:33,45
119:49
120:43
137:29
151:35
153:41
154:33
assure
108:19
118:3
attach 18:45
33:27
38:17
attached
11:43
18:49 21:3
33:17
36:37
attacks 148:3
attempt
84:25
attempts
129:31
attend 101:5
attendance
2:45,47
3:33 14:31
161:35
attended
155:9
attending
138:39
attorney
144:21
attract 42:7
attractive
56:7
audit 110:11
August 15:15
136:33

authorities
40:49 45:7
133:9
authority
37:11
40:31
42:11
authorized
137:31
automatica...
136:47
available
9:47 32:37
45:17
124:19,35
128:43
141:17
Ave 41:43
42:19
Avenue 6:17
6:25 7:7,7
7:47,47,49
7:49,51 8:3
8:3,19
36:31
39:47 40:5
40:15,35,41
41:29,35,51
46:5,13
47:7 48:41
49:17,23
67:19
81:33
Avenue's
40:29
Avenues
67:21
average
107:23
avoid 118:13
aware 9:25
110:23
aye 164:41
164:43
166:3,5
167:27,29
168:43,45
169:45,47
171:9,11
172:21,23
173:21,23
174:31,33
175:31,33
177:15,17

178:15,17
179:33,35
180:33,35
181:51
182:3
ayes 164:51
166:13
167:37
169:3
170:5
171:19
172:31
173:25
174:41
175:41
177:25
178:25
179:43
180:43
182:11
─────────
        B
─────────
B 79:35
back 19:7,17
19:35,39,49
49:35
72:37
74:51 76:9
93:9
102:29
103:29
105:19
107:9
113:27,29
125:35
147:7
166:27
background
8:31,37
13:25
79:31
176:5
backyards
142:25
badly 122:15
Bala 47:11
balance
127:39
149:27
balanced
129:15
balancing
77:21
ban 118:41

band 89:51
banded 88:7
Bank 37:49
37:51
38:45
128:37
barn 73:47
Barry 137:19
base 25:35
84:47
based 14:13
75:33
110:37
basic 62:39
basically
19:13
70:21
142:17
Bass 1:19
3:27,29
162:37,39
164:15,21
166:51
167:7
169:29,35
171:47
172:3
175:15,21
177:49
178:5
181:25,31
beer 145:7
began 46:9
begging
95:35
beginning
2:13
begun 53:39
behalf 33:45
126:9
130:13
belief 48:47
believe 48:21
51:49
65:19
125:17
136:9,39
160:9
believes
116:45
Ben 62:43
65:39
beneficial
139:33

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| **benefit** 29:51 | 31:47 32:5 | 137:31 | 148:43 | 154:29 | 100:3 | **Brooks** |
| 132:47 | 32:19 36:5 | 140:3 | **bills** 1:37 | 157:21 | 149:19 | 117:23 |
| 136:15 | 36:15,23 | 141:41 | 4:47 37:45 | 159:35 | **boundary** | **brothers** |
| 139:11 | 37:19 | 143:45 | 149:25 | **boarded** | 40:23 | 117:37 |
| **Benjamin** | 38:15 | 144:7 | 162:17 | 148:15 | **bounded** 5:7 | **brought** |
| 7:35 64:7 | 39:23,25,43 | 146:41 | 182:19 | **body** 90:29 | 5:21 6:3,15 | 75:15 94:3 |
| **best** 41:3 | 45:27 | 147:17 | **biomedical** | **Bolling** 93:17 | 7:5,17,45 | 118:17 |
| 55:51 | 48:33 | 149:15 | 31:41 | 93:23,33,43 | 8:11,51 | 140:25 |
| 75:39 | 50:25,29,41 | 150:47,49 | **bisected** 64:5 | 111:11 | 36:29 | **Brown** |
| 123:7 | 50:49 | 151:13,39 | **bit** 15:3 35:39 | 112:17 | 67:15 | 104:49 |
| **better** 28:21 | 51:23,29 | 154:13,37 | 106:7,9 | 123:51 | 81:23 | 143:49,51 |
| 41:33 | 52:21,23,41 | 163:31,49 | 139:41 | **Bonita** | 84:15 | 144:3 |
| 55:49 | 52:49 | 164:7,25,35 | **Black** 87:19 | 147:19 | **Boylan** 60:17 | **Brumbelow** |
| 112:37 | 54:15 | 165:7,13,23 | 87:25,31,43 | **bonus** 51:7 | 63:21,31,33 | 10:43,51 |
| 128:51 | 60:11,13,25 | 165:37,47 | 88:45 | 51:11,35,43 | 64:25,51 | 11:5 18:47 |
| 150:41 | 60:33,35,43 | 166:21,31 | 89:27 | 61:19 | **Boyle** 99:25 | 20:21,33 |
| **beyond** 44:35 | 61:5,29 | 166:39,47 | 93:45 95:5 | 144:13 | 99:29,31 | 21:13 |
| **BIA** 118:21 | 62:3,7,31 | 167:11,21 | 95:7,25 | 147:43 | 102:31 | 24:13,25,29 |
| 121:29 | 63:13,21 | 167:43,51 | 96:31,33,37 | 149:5 | **Bracali** 34:47 | 31:19,21,23 |
| 125:13 | 66:39,41 | 168:11,27 | 96:49 97:7 | **bonuses** 6:41 | **breakdown** | 36:7,9,11 |
| 142:39 | 67:3,7,23 | 168:37 | 97:9 | 34:19 51:5 | 150:7 | 50:31,33,35 |
| **BIA's** 123:21 | 68:11,29 | 169:11,17 | 102:39 | 61:49 | **Brett** 4:27 | 52:25,33,35 |
| 128:35 | 80:45,47 | 169:25,39 | 103:17,25 | 62:37 | 9:17 10:19 | 60:15,19,21 |
| **big** 73:29 | 81:15,19,35 | 170:11,19 | 104:47,47 | 124:33,39 | 37:29 | 62:33 |
| 95:19 | 82:33,49 | 170:29,43 | 114:21 | 124:43,51 | 64:33 | 66:43,45,47 |
| 107:41 | 83:3,5,15 | 171:3,25,33 | 144:27 | 99:19 | 74:33 |
| **bigger** 75:49 | 83:23,43,51 | 171:43 | **blessed** | 146:31 | 134:47 | 75:11 |
| 96:41 | 84:23,45 | 172:7,39,45 | 146:33 | 148:37,51 | 135:17 | 80:49 81:3 |
| 104:15 | 85:19,23,37 | 173:3,13,15 | **Blight** 150:3 | **boom** 90:37 | 182:15,31 | 81:9 83:27 |
| **biggest** 70:19 | 86:19 | 173:41,51 | 150:11 | **Borbeck** 7:51 | 183:9 | 83:33,37 |
| **bike** 44:13 | 89:49 | 174:15,25 | **block** 36:47 | 67:19 | **Bryn** 48:23 | **bump** 34:21 |
| 46:15 | 90:21 92:3 | 174:49 | 38:7,9 | **borne** 101:15 | **Brian** 1:22 | **bunch** 30:17 |
| 47:33 | 92:29,29 | 175:5,13,25 | 87:49 | **bottom** 73:25 | 4:7 163:3 | 104:35 |
| 48:11 | 94:13 | 175:45 | 107:51 | 87:31 | 170:39 | **burned** 19:33 |
| **bill** 4:35,49 | 99:39,43 | 176:19,25 | 126:51,51 | 89:29 | 174:11 | **Burns** 10:43 |
| 4:51 5:29 | 101:49 | 176:35,49 | 152:39 | 93:47 95:5 | 176:45 | 10:51 11:5 |
| 5:47 6:9,21 | 103:51 | 177:9,33,39 | **blocked** | 95:9,25 | 179:13 | 18:47 |
| 6:35,45 | 107:37 | 177:47 | 148:25 | 96:49 97:7 | 180:23 | 20:21,33 |
| 7:11,25,39 | 108:19 | 178:9,29,37 | **blocks** 54:23 | 97:9 | **brief** 3:3 | 21:13 |
| 8:5,21 | 110:33,35 | 178:43 | 65:39 | 114:21 | 111:9 | 24:15,25,29 |
| 10:11,21,27 | 111:15,29 | 179:3,17,27 | 101:27 | **bottom-line** | 115:17,23 | 31:19,21,23 |
| 10:39 | 112:3 | 179:51 | 119:5 | 111:29 | **briefings** | 36:7,9,11 |
| 11:11,17,39 | 115:43 | 180:7,15,27 | 157:3 | **bought** 70:29 | 117:9 | 50:31,33,35 |
| 12:29 | 116:27 | 180:47 | 158:29 | 95:21 | **briefly** 13:23 | 52:25,33,35 |
| 13:19 | 120:33 | 181:5,11,21 | **Blood** 144:51 | **Boulevard** | **bring** 40:13 | 60:15,19,21 |
| 15:41 | 121:9,25 | 181:35,45 | **Bloomberg** | 8:15 46:37 | 120:11 | 62:33 |
| 22:23 | 122:31 | 182:17,21 | 113:7 | 61:43 | **bringing** | 66:43,45,47 |
| 24:17,35,41 | 124:37 | 182:27,31 | **blow** 130:41 | 81:29 | 66:13 | 74:33 |
| 25:5,7,17 | 125:19,51 | 182:41 | **blueprint** | 138:3 | **brings** 27:33 | 75:11 |
| 25:43,45 | 126:31,43 | **bill's** 121:33 | 123:23 | **boundaries** | **broached** | 80:51 81:3 |
| 26:45,47 | 130:33 | **billion** 88:51 | 142:41 | 54:21 55:5 | 48:35 | 81:11 |
| 27:11,21,33 | 134:33 | 96:27 | **board** 69:15 | 58:15 | **Broad** 63:49 | 83:27,33,37 |
| 28:17,19 | 135:7,25 | 131:23,31 | 78:37 80:9 | 63:43 | **brochure** | **business** |
| 31:17,29,37 | 136:43 | **billionaires** | 97:21 | 82:21 | 44:27 | 40:21,51 |

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 4

67:49
126:37
143:19
157:51
**businesses**
42:21
44:21 47:5
47:15,29
48:37
49:15
**button**
151:39
153:51
**buy** 38:33
94:23
142:9
**buyer** 135:35
**buyers**
136:51
**by-right**
71:17,29
73:7 77:13
78:25
146:31

——————
        **C**
——————
**C** 184:3,3
**calculations**
152:13,23
**call** 2:43
10:17,37
12:41
24:11 26:9
31:13
32:29
35:51
39:21
50:25
52:19 60:9
63:13
66:37
80:43
83:21,31
91:11
92:37
93:11
99:19
105:27
115:31,39
120:31
125:47
129:49
134:41
140:31,33

143:41
146:37
147:11
151:9
154:9
157:23
160:45
161:29
162:19
**called** 2:51
4:31 52:31
115:33
147:7
150:3
158:7
161:43
**calls** 127:13
**Cambria**
6:17 36:31
**camera** 8:43
79:37
**campus**
35:45
87:35 88:3
**capacity**
100:13
123:27
**capital** 40:7
42:35
43:11,37
46:29
**care** 77:25
86:43
89:41
**careful** 32:13
**carried** 37:7
40:7
**carriers**
178:27
**carries** 165:3
166:15
167:39
169:5
170:7
171:21
172:33
173:27
174:43
175:43
177:27
179:45
180:45
182:13
**CARROLL**

184:24
**cars** 152:9,25
152:33
153:11,15
**case** 28:13
48:21 69:3
79:49
**cases** 109:25
**cash** 99:49,51
**Catholic**
144:51
**cause** 96:5
98:47
136:51
**caveats** 60:47
61:3
**Caviar**
152:17
**CDC** 54:51
57:25
**ceilings**
142:27
**center** 7:29
8:13 47:11
51:35
81:27
87:39
94:31
100:19
101:31
131:29
138:3,7
**Central**
67:39
149:41
**century**
90:47
**certain** 5:5
5:25,35,43
5:51 6:13
6:41,43 7:9
7:15,23,31
7:37,43
8:49 9:11
11:23
24:47
34:11
36:27
48:15
67:13
**certainly**
29:29
**certainty**
122:21

129:17
**certification**
184:37
**certify** 184:6
**certifying**
184:45
**cetera** 118:33
149:51
150:39
**chain** 34:33
**Chair** 1:17
3:15,23,43
3:51 4:21
15:37,45
26:39
28:35
37:35,43
45:25,35,45
49:49
68:25,33
72:49
76:25
82:45 83:7
85:35,41
86:7,13
105:41
106:41
107:17
108:41,47
109:3
114:45
125:41
140:11,17
143:27
151:19
156:31,33
161:33
162:31,41
163:15,21
163:29,43
164:17
165:5,11,29
166:17,29
166:37
167:3,41,49
168:19
169:7,15,31
170:9,17,35
171:23,31
171:49
172:35,43
173:7,31,39
174:7,45
175:3,17,49

176:15,23
176:41
177:29,37
177:51
178:33,41
179:9,47
180:5,19,51
181:9,27
**Chairman**
3:31 32:51
35:21
39:33
41:27
54:45
57:21
63:33
66:23
93:25,41
110:51
115:3
121:3
126:25
147:25
183:7
**Chairperson**
99:41
115:49
116:15
134:51
**challenge**
78:35
79:29,43
**challenges**
117:13
118:17
120:5
**challenging**
18:5 79:47
**chance** 57:35
96:25
97:31,31,43
98:41
**change** 25:21
29:41,43
34:21
67:29
72:21,25
84:47 98:5
150:17
**changed**
17:29
88:37
150:11
**changes** 5:17

8:29 11:51
17:21
26:51
36:51 49:5
82:25
84:11
127:25
154:41
159:29
**changing** 5:3
5:49 6:11
7:13,41
8:47 36:25
67:11
84:13
**channels**
159:11
**Chapter** 5:35
11:23
24:47
126:11
**character**
67:35
68:45
145:33
160:7
**characteris...**
55:27
59:21
**Chase** 67:37
67:47
69:13,15,29
69:35
**chat** 9:47
10:5
**cheaper**
69:41
89:15
**check** 90:7
**children**
153:3,29
**chilling**
121:49
130:35
**choose**
128:21,31
**church** 27:39
144:51
**churches**
27:37
**Cindy** 1:19
3:25
162:35
164:21

167:7
169:35
172:3
175:21
178:5
181:31
**circle** 74:51
**circulated**
169:21
172:49
175:9
177:43
180:11
**cities** 130:49
**citizenry**
65:17
**city** 1:1 2:19
6:25 7:29
11:7,13
12:27
14:45 19:7
20:25,43
24:31,37
25:43
30:29
31:25,31
32:17
35:45
36:13,19
37:17
38:31,35
39:45 40:5
40:15,29,35
40:37,41
41:5,29,33
41:43,45,51
42:19
43:15,35,43
44:45 46:3
46:13 47:7
47:17
48:39,41
49:9,15,19
49:23
50:37,43
51:25,35
52:37,43
54:11
57:37
60:23,27
62:5 65:27
66:15,49
67:5 68:9
78:45,47

79:15 80:7
81:13,17
82:31,31
83:45
85:17
86:25,37
87:27,29,37
88:35,35
89:3,9
90:19,51
91:49
94:21,33
95:17 97:9
97:13
99:45
101:29,41
102:9
103:23,29
103:31,49
104:5
105:3
109:47
111:35
112:11
118:13,43
118:47
119:19
120:7
121:21,25
122:5,19
123:5,25
124:9
125:3,21
126:35
127:9
128:21
129:29
130:39
131:11,47
132:7
133:9,27
134:21
135:7,23
144:9
147:35,37
147:45
155:19
160:39
**City's** 13:29
64:19 65:9
123:23
156:39
**city-wide**
27:21 32:7

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Committee on Rules 10-26-21 Meeting
October 26, 2021

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 113:33 | 39:21,25 | 74:17 | 139:45 | 143:45 | 51:27,33 | 66:31 | 27:5 |
| **civic** 8:13 | 50:23,29 | 77:31 | **Columbus** | **comments** | 52:39 | 80:37 | **communicate** |
| 13:37 | 52:19,23 | **CMX-2** | 151:35 | 9:43 22:19 | 53:51 | 83:15,35 | 57:35 |
| 14:25,49 | 59:33 60:9 | 67:23,41 | **come** 19:7,15 | 28:39 31:3 | 54:11 | 86:17 | 97:41 |
| 15:9,25 | 60:13 | **CMX-4** 32:3 | 19:39,49 | 39:13 | 57:37 | 93:43 | **communica...** |
| 16:39 34:7 | 63:13,17 | 61:49 | 21:23 | 50:13 | 60:23 | 106:27 | 136:25 |
| 53:41 | 64:39 65:5 | 62:37 | 69:39 | 52:11 | 61:23 62:7 | 107:21 | **communities** |
| 65:11,15 | 66:37,41 | 84:47 | 71:19 | 59:51 | 62:29 | 108:37 | 56:5,9,11 |
| 81:27 | 80:43,47 | 132:3 | 74:49 | 62:19 63:5 | 66:51 | 112:21 | 56:19 58:3 |
| 138:3,7 | 83:21,25 | **CMX-5** | 75:47 | 66:29 | 68:11,39 | 113:31 | 58:39,51 |
| 151:33 | 85:29,41 | 60:49 61:7 | 87:17 | 80:35 | 69:5,13 | 115:11 | 59:7 87:27 |
| 152:43 | 91:11,15 | 62:3,37 | 88:21 | 83:13 | 70:11 | 116:17 | 90:41 |
| 153:39 | 92:37,41 | **Co-Chair** | 90:29 91:3 | 102:13 | 71:23,47 | 119:35,39 | 112:43 |
| 154:33 | 93:11,15 | 120:45 | 93:9 95:41 | 114:49 | 74:41 76:7 | 121:5 | 130:51 |
| **Civics** 54:5 | 99:23 | 151:19 | 97:33 | 115:9 | 76:41 | 126:27 | 149:13,25 |
| **civil** 157:51 | 105:27,31 | **coalition** | 98:29 | 128:41 | 77:17,45 | 127:37 | 149:39 |
| **claim** 152:3 | 115:31,39 | 145:21 | 100:47 | 141:11 | 78:11 | 135:3,31 | 150:33 |
| **clarifies** | 115:43 | **code** 5:31 | 103:27 | 143:33 | 79:49,51 | 136:45 | **community** |
| 25:21 | 120:31,33 | 6:37,47 | 107:21 | 155:39 | 80:3 81:13 | 137:27 | 12:19 14:5 |
| 29:13 | 125:41,47 | 7:27 8:23 | 113:39 | 157:9,25 | 82:9,31 | 139:23,39 | 14:11,45 |
| **clarify** 143:5 | 125:51 | 11:19 | 114:41 | 159:5 | 83:41 | 140:23 | 15:27 16:9 |
| **clarity** 74:37 | 129:49 | 15:19 | 131:13 | **Commerce** | 85:19 | 147:27 | 16:27,43,47 |
| **Clarke** 50:47 | 130:3 | 24:43 | 141:7 | 39:39 | 90:21,23 | 151:19 | 17:3,17,31 |
| 52:47 | 134:41,45 | 65:27 | 152:41 | **commercial** | 111:27 | 153:51 | 17:41,47 |
| 60:31 | 137:19 | 75:21,43 | **comes** 109:35 | 12:7 27:43 | **Commissio...** | 155:49 | 18:9 19:45 |
| 142:35 | 140:5 | 80:7,21 | 116:49 | 32:3 41:7 | 53:19 | 156:21,31 | 20:9 21:29 |
| 144:11 | 143:41,45 | 82:31 84:3 | **comfortable** | 42:13 | 61:37 | 162:11,17 | 21:51 33:5 |
| 146:3 | 146:37,41 | 150:19 | 159:37 | 60:49 | 68:37,49 | 163:51 | 33:13 |
| **class** 86:43 | 147:11,17 | **cohesive** | **coming** 47:43 | 61:11 | 70:51 | 164:27 | 38:13 |
| 87:19 | 151:9,13 | 58:29 | 64:31 | 67:25,27,51 | **commitment** | 165:15,39 | 44:19 |
| **clean** 61:51 | 154:9,13,21 | **collaborating** | 96:15 | 68:5 69:25 | 88:23 | 166:41 | 46:23 |
| 95:49 | 160:45 | 120:5 | 98:43 | 70:31,35 | 132:21,39 | 167:13 | 48:35,47 |
| 148:11 | 161:29,33 | **collaboration** | 112:33 | 71:33 | **committed** | 168:3,29 | 54:49 55:9 |
| **clear** 58:27 | 162:19,25 | 41:5 55:43 | 117:39 | 73:25,29,31 | 131:3 | 169:23 | 55:11,13,15 |
| 64:31 | 162:35,45 | 117:45 | 146:25 | 73:33 | 132:25 | 170:21,45 | 55:17,21,23 |
| 125:7 | 163:3,9,19 | **collaborative** | **commensur...** | 74:13 | 135:45 | 171:35 | 55:43,47 |
| 132:27 | 182:19,37 | 53:47 | 34:15 | 75:19 | 137:11 | 172:9,51 | 57:3,31,33 |
| **clearly** 56:41 | **clinical** | **collaborati...** | **comment** | 76:39 | **committee** | 173:43 | 57:41,47 |
| 93:37,39 | 101:37 | 121:17 | 23:37 99:9 | 84:49 | 1:3 4:23,29 | 174:17 | 58:11,31 |
| 157:29 | **close** 22:7 | **colleague** | 99:17 | 126:17 | 4:35 11:3 | 175:11 | 59:13 |
| **Clerk** 2:43 | 92:15 | 45:49 50:3 | 102:23,27 | 159:49 | 14:27,37 | 176:27,51 | 67:33 |
| 3:9,17,25 | 133:29 | **colleagues** | 102:29 | **Commission** | 21:19,25,25 | 177:45 | 68:41,51,51 |
| 3:37,45 4:7 | 141:45 | 3:31,43 4:3 | 115:21,31 | 11:9 12:27 | 22:21 24:7 | 178:45 | 69:21 70:3 |
| 4:15,45,49 | 142:19 | 72:9 78:31 | 140:9 | 17:51 | 24:27 | 179:19 | 70:29 71:7 |
| 8:33,45 | **closely** 38:21 | 86:15 | 146:39 | 20:15 | 26:37,41 | 180:13 | 71:13,51 |
| 10:17,25,37 | 46:15 | 162:31,41 | 147:13 | 21:15 | 28:39 31:5 | 181:13,37 | 72:35,39 |
| 10:41 | 117:3,23 | 163:17 | 151:11 | 24:33 | 33:31 | 183:15 | 74:25 |
| 12:41,43 | **closer** 27:35 | 182:51 | 154:11 | 25:45 | 35:21 | **committees** | 77:21,25,49 |
| 24:11,13 | **clued** 96:19 | **collected** | 160:49 | 29:49 | 39:15,35 | 2:19,31 | 78:7,35,43 |
| 26:9,13 | **CMX** 71:33 | 155:37 | 161:31,37 | 31:27 | 50:15 | 113:33 | 78:51 |
| 31:13,17 | 77:23 | 159:5 | 162:3 | 32:19 | 52:13 | 120:49 | 87:47 |
| 32:29,31,45 | **CMX-1** | **collectively** | **Commenting** | 36:15 | 54:45 | **commonly** | 93:47 |
| 35:51 36:5 | 67:27 68:3 | 126:37 | 115:43 | 37:19 | 57:21 60:3 | 154:43 | 94:21,45,49 |
| 37:33 | 71:41 | **College** | 120:33 | 50:39 | 62:21 63:7 | **commonse...** | 95:33,49 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 97:5,19,25 | 124:43 | 6:43 7:9,23 | 85:19 | 28:27 | 169:19 | 67:5 75:27 | 23:19,25,29 |
| 102:51 | 135:37 | 7:37 9:13 | 89:49 | 35:11 | 172:47 | 81:17 | 23:33,51 |
| 105:7 | **components** | **Condomini...** | 138:7 | 44:31 | 175:7 | 83:45 | 24:19 26:5 |
| 106:51 | 84:23 | 65:47 | **consistent** | 78:19 | 177:41 | 91:51 | 26:15,23,29 |
| 107:33 | 160:19 | **conduct** 45:9 | 12:23 38:9 | 119:29 | 180:9 | 97:13 | 28:31,35,41 |
| 112:23 | **comprehen...** | 138:23 | 56:29 | 156:13 | **cornerstones** | 110:11 | 28:43 30:7 |
| 117:25 | 56:31 | 147:47 | 77:15 | **continues** | 128:29 | 121:19 | 30:49,51 |
| 120:19 | 126:41 | **conducted** | **Consortium** | 123:5 | **corporate** | 122:33 | 31:9 32:27 |
| 122:3 | **comprehen...** | 40:45 | 82:3 | **continuing** | 66:13 | 124:27 | 32:43,45,49 |
| 123:33 | 149:31 | **conduits** | **constantly** | 9:35 30:31 | **Corporation** | 130:11,17 | 33:49 |
| 125:25 | **compromise** | 150:27 | 103:17 | 49:45 | 13:13 | 134:25 | 34:41 35:7 |
| 126:19,39 | 159:21 | **confidence** | **constituents** | 160:15 | 155:3 | 135:7 | 35:27 |
| 127:49 | **compromised** | 128:7 | 80:31 | **continuously** | **correct** 20:15 | 142:35 | 37:27,35,37 |
| 132:23 | 57:5 | **confines** | 150:23 | 118:7 | 21:11 | 144:9 | 37:41 39:9 |
| 137:29 | **computer** | 127:35 | 159:13 | **contract** | 29:27 | 145:51 | 39:11,19 |
| 138:23 | 176:11 | **connect** | **construct** | 84:37 | 53:25 74:5 | 146:51 | 41:15,37 |
| 139:45 | **concern** | 16:11 | 129:33 | 86:51 | 149:29 | 151:37 | 45:21,25,31 |
| 144:23 | 16:23 | 146:3 | **constructed** | 100:23 | 184:14 | 164:5,9,31 | 50:9,19 |
| 145:17 | 113:35 | **consensus** | 34:13 | **contractor** | **corrective** | 164:37 | 52:9,17 |
| 146:27 | 131:7 | 157:31 | 42:49 | 96:31 | 74:51 | 165:19,25 | 54:33 57:9 |
| 154:35 | 155:45 | **consent** | **construction** | **contrary** | **correspond...** | 165:43,49 | 59:25,43,49 |
| 155:5,17 | 157:39 | 127:3 | 31:39 | 118:11 | 112:9 | 166:45,49 | 60:7 62:17 |
| 156:23 | **concerned** | **consenting** | 43:45 | **contribute** | **corridor** | 167:17,23 | 62:25,51 |
| 158:43 | 71:31 | 9:37 | 51:15 89:3 | 25:13 | 39:39 | 168:7,13,33 | 63:11,25 |
| 159:7,19 | 74:19,21 | **consequence** | 124:47 | **contributing** | 40:21 | 168:39 | 64:21,27,43 |
| 160:11 | 139:37 | 126:47 | 131:35 | 160:35 | 42:25 | 170:25,31 | 66:25,35 |
| 161:17 | **concerning** | **consequences** | 142:27,49 | **contribution** | 43:19 | 170:49 | 68:21,25,31 |
| **community's** | 34:11 | 29:7 | 145:31 | 44:9 | 47:17 | 171:5,39,45 | 72:51 |
| 74:27 | 158:45 | **Conservati...** | **contact** | **contributions** | 48:15,17 | 172:13,17 | 73:11,17,21 |
| **community...** | **concerns** | 6:49 53:3 | 114:41 | 51:17 | 67:51 | 173:47 | 74:7,9,11 |
| 71:43 | 14:5 17:15 | 144:17 | **contained** | **control** | **cost** 107:23 | 174:3,21,27 | 74:29,35,49 |
| **companies** | 17:31,41,47 | 145:25 | 184:8 | 122:27 | 131:13 | 176:31,37 | 76:21,25,29 |
| 116:41 | 18:15 | **consider** | **contention** | 184:43 | 137:5 | 177:5,11 | 76:31 |
| **compass** | 21:33,35,37 | 55:21 | 65:51 | **controls** 7:33 | 142:5 | 178:49 | 79:13,13,25 |
| 144:37 | 22:5 23:41 | 127:39 | **context** 90:25 | **convene** | **costs** 119:21 | 179:5,23,29 | 79:33,41 |
| **compatible** | 118:35 | 138:19 | 99:43 | 162:21 | 119:23 | 181:17,23 | 80:15,19,25 |
| 68:43 72:3 | 130:45 | 162:15 | **continue** 20:5 | **conversation** | 124:47 | 181:41,47 | 80:27,41 |
| **compensati...** | 132:15 | **considerati...** | 22:5,11 | 114:33 | 133:19 | **Council's** | 82:41 83:9 |
| 43:27 | 158:15 | 28:29 | 23:43 | **conversatio...** | **Council** 1:1 | 45:15 | 83:19 |
| **completed** | 160:3,3,33 | 32:13 | 25:31 | 33:11 | 2:19,31 | **Councilman** | 85:39,45 |
| 42:41 43:7 | **conclude** | 41:11 | 30:23 | 53:41 | 3:23 11:13 | 1:17,18,21 | 86:5 91:7 |
| 134:15 | 162:5 | 125:37 | 46:27 54:3 | 71:21 | 19:7 20:25 | 1:22,27 2:5 | 91:27 |
| **completely** | **concluded** | 127:29 | 64:47 | **cool** 23:19 | 24:37 | 3:13,41 | 92:33,45,51 |
| 109:13 | 183:15 | 129:43 | 73:49 | 163:45 | 31:31 | 4:11,25 | 93:7,19,27 |
| **complex** | **concludes** | 130:33,49 | 91:43 | **cooperation** | 35:47 | 8:39 9:15 | 98:49 |
| 12:15 | 162:9 | 135:11 | 118:15 | 40:19 | 36:19 | 10:31,45 | 99:11,27 |
| 86:35 | 182:47 | **considerati...** | 119:51 | 65:41 | 40:37 | 12:39,51 | 102:17 |
| 151:43 | **concurrent** | 54:27 | 142:39 | **coordinated** | 45:13 | 15:33,39,43 | 103:41 |
| 152:5 | 34:33 | **considered** | 146:23 | 14:47 | 50:43,47 | 16:33 17:9 | 104:17,27 |
| 154:45 | **condition** | 12:29 | 148:37 | **coordinating** | 51:9 52:43 | 19:25 | 105:11,21 |
| **compliance** | 61:35 | 25:45 | 159:45 | 63:45 | 52:45 | 20:29,37 | 105:33,45 |
| 82:27 | **conditions** | 32:19 | 160:27 | **coordination** | 53:43 54:5 | 21:21 | 106:5,15,23 |
| **comply** 10:3 | 5:27,45 | 37:19 62:7 | 161:17 | 16:35,43 | 57:37 | 22:15,17,27 | 106:33 |
| **component** | | 68:11 | **continued** | **copy** 43:5 | 60:27,31 | 22:29,39 | 108:25,43 |
| | | 82:33 | | | | | |

108:47,51
109:11
111:3,5,13
111:17
114:27
115:5,15,25
115:51
120:29
124:17
125:39,45
129:45
134:39
139:49
140:11,13
140:15
141:15,19
141:37
143:3,15,29
143:39
146:35,47
147:3,9,29
151:5,23
154:5,49
157:19
160:41,49
161:3,25,39
161:47
162:29,49
163:7,23,29
163:35,37
163:39,41
163:45,47
164:11,17
164:45,51
165:5,9,27
165:29,31
166:7,13,23
166:25,29
166:35
167:3,31,37
167:41,47
168:19,47
169:3,7,13
169:31,49
170:5,9,15
170:33,35
170:37
171:13,19
171:23,29
171:49
172:25,31
172:41
173:5,7,9
173:25,37

174:5,7,9
174:35,41
174:45,51
175:17,35
175:41
176:7,21,39
176:41,43
177:19,25
177:35,51
178:19,25
178:39
179:7,9,11
179:37,43
180:3,17,19
180:21,37
180:43
181:7,27
182:5,11,25
182:39
183:5,13
**Councilma...**
123:13
124:41
**Councilme...**
3:9,17,25
3:37,45 4:7
4:17 11:15
24:39
28:45
31:33
36:21
45:49,51
50:3,45
52:45
60:29 67:7
81:19
83:47 91:9
116:13,29
117:23
132:19,41
133:33,49
134:31
135:49
136:27
137:9
156:15
158:35,49
160:27
161:5
162:25,35
162:45
163:3,9
166:19
175:51

176:17
177:31
178:35
179:49
181:3,29
**Councilme...**
99:43
130:31
151:21
**Councilme...**
121:31
**Councilper...**
16:11
152:39
153:39
**Councilwo...**
1:19,20,23
1:28 3:21
3:29,49
4:19 45:37
45:41 48:7
50:11
82:47,51
85:33,51
86:7,11
96:27
106:47
108:29,39
111:15
123:41
162:39
163:13
164:15,19
166:51
167:5
168:15
169:29,33
171:47,51
175:15,19
177:49
178:3
181:25
**Councilwo...**
94:13
count 152:51
**counting**
73:27
152:19
**country**
104:37,37
122:43
**County** 7:51
40:25
67:19

**couple** 71:37
77:7 83:29
**course** 34:23
**Court** 184:25
**cover** 53:3
133:19
**COVID**
153:41
**COVID-19**
118:19
119:31
**craft** 121:17
**create** 19:19
43:23 85:5
121:47
130:21
131:35
133:33
134:11
145:23
148:51
**created** 43:21
148:49
**creates** 55:13
55:29
**creating** 7:33
53:21
54:19
**creation**
90:15
**creative**
140:43
**crew** 115:19
**crime** 44:15
**crisis** 123:25
**criteria** 56:29
144:25
**critical** 40:17
**critically**
134:19
**cross-** 117:43
120:3
**cross-colla...**
117:15
**cross-colla...**
116:47
**Cultrane**
148:29
**cultural**
58:51
65:11
101:45
**culture** 55:11
55:13,35

57:3 59:19
**cumbersome**
78:39
**Cummings**
147:21,23
147:33
**curb-cut** 12:3
**current** 2:17
22:47
27:31
57:43
68:43
84:29,41
87:5
122:11
129:25
136:7
**currently**
2:11,21
22:41
86:25
117:29
128:15
136:17
145:17,39
**Curtis** 45:27
**cut** 88:47
**Cuthbert**
7:19
**Cynwyd**
47:11

_____
**D**
**D** 1:23
**daggone**
105:3
**daily** 2:35
152:7
**Dalfo** 10:43
12:43,47
13:5,7
16:33
**dangerous**
121:49
126:45
**Darby**
103:25
**date** 10:15
**David** 1:21
3:37
108:49
162:45
165:33
173:11

**day** 111:23
146:33
147:23
183:11
**days** 135:43
143:17
**dead-ends**
69:35
**deadline**
13:51 14:3
**dealing** 95:5
119:27
**decades**
44:23 66:5
88:43
**decay** 149:43
**December**
6:31 14:43
40:3
136:29
158:19
159:9,13
**decent** 105:3
**decided**
124:27
**decimated**
148:21
**decision**
138:47
**decisions**
58:3
100:25
**decrease**
124:29
**dedicated**
88:27
155:33
158:37
**dedication**
46:23
182:51
**deed-restri...**
51:13
**deemed**
67:33
**deeper**
153:49
**deeply** 86:33
127:43
**defend** 80:9
**defending**
78:45
79:19

**defends**
78:47
**defense**
150:25
**deficient**
53:17
**define** 55:27
**Del** 115:45,47
116:11,19
**delays** 53:37
**deliberate**
129:21
**deliberative**
53:47
**delivery**
152:13,15
152:25
**demand**
88:49
145:45
**demanded**
88:11
119:5
**demo** 29:23
**demoing**
29:21
**demolish**
29:45
**demolishing**
144:49
**demolition**
9:7 84:21
85:13
89:51
118:41
121:43
122:37
**demonstrat...**
125:27
**Denis** 39:27
39:35
**Dennis** 60:17
63:21,27,33
64:23,29,47
**dense** 18:21
19:39
70:25
**density** 18:25
51:5,21
73:19
77:51
145:15
151:47
157:33

158:25
**department**
39:41 59:3
84:31
117:31,33
154:49
**depending**
17:25
112:13
**description**
80:21
**deserve**
56:19
129:29
**deserves** 41:9
**design** 53:9
53:27
54:19
160:5
**designated**
5:41 25:5
25:13
144:31
**designation**
6:13 8:49
36:41
**designations**
5:3,51 7:15
7:43 36:27
67:13
**designs**
149:39
**desire** 125:15
157:41
**desperately**
38:13
117:47
**despite** 61:3
**destroy** 94:9
**destroying**
146:27
**destructive**
150:21
**details** 56:39
159:31,49
**devalue**
136:47
**devastating**
130:41
**develop**
30:33
40:11 75:7
113:41,43
135:51

136:11,39
**developed**
37:13
61:49 92:9
127:11
**developer**
14:31,41
17:25,45
19:35,47
21:33
70:19,21,39
71:15,15,17
71:29,49
75:3 76:47
77:11,23
78:23,49
79:19,45
133:5
144:19
156:35
**developers**
13:15,33
14:21
38:43
42:23
51:51
57:39 58:7
58:31
104:7
107:21
112:33
113:35,37
113:49
122:7,17
124:31
139:5
145:45
146:25
147:41,49
148:5,21,39
150:25
**developing**
136:23
**development**
11:51
12:11,13
13:11,51
14:11
17:21 23:7
32:11 37:7
38:11 39:5
42:7,33
44:33
55:31,45

56:13
58:21,23,33
59:11
64:13
65:21,35
66:3 67:31
82:29
84:33 85:5
90:37
92:11
121:51
123:33
125:23
126:17
127:13
128:19
129:13
131:31
135:35
138:43
139:35
145:43
148:19,31
149:3
152:27
153:25,35
155:3,19,35
156:9
157:47
158:33
159:41
160:29
**developme...**
84:27
**developme...**
49:3 55:37
56:5,21,27
57:5,43
58:37,45
59:17
142:33
**deviate** 19:13
**dialogue**
117:49
**Diamond**
144:41,47
148:25,33
**differences**
134:29
**different**
69:23
77:49
90:45
**difficult**

78:39
**digest** 34:31
**dignity**
133:39
**diligence**
80:31
**direct** 43:23
111:37
158:35
184:43
**direction**
30:25
121:27
**directly**
157:17
**Director** 11:5
24:29
31:23
36:11
39:37
50:35
52:35
60:21
66:47
81:11
83:37
116:21
137:41
**disconnect**
162:5
**discretion**
70:51 78:9
78:13
**discuss** 18:15
120:15
**discussing**
118:47
**discussion**
150:9
**dismantle**
55:35
**dispensers**
47:49
**displace**
112:45
**displaced**
87:9,45
88:15
93:45
**displacement**
118:9
**displacing**
96:7
**displayed** 3:5

**dispose**
123:29
**disrespected**
146:23
**distinct** 55:25
55:27
**distinctive**
56:5
**distributed**
152:9
156:51
158:27
**district** 5:15
5:19 6:27
6:31,39,41
7:29 8:27
11:31,35,43
12:9,25
16:7 25:15
36:39
38:23
39:47 40:7
40:17
41:31,35,39
41:43 42:9
42:15,19,33
43:45,47
44:7,11,17
44:33,37,51
45:49 46:5
46:9 48:41
49:17
50:51 51:9
51:47
64:17 65:7
65:23
67:39,49
69:31
73:13
82:27 84:9
88:37
118:29
121:29
123:13
124:41
128:45
130:9,17
144:11
148:47
156:3
**District's**
39:51 42:3
43:3
**Districts** 6:51

11:27
40:51
121:33
**diversity**
90:41
120:47
**doing** 18:11
21:49
22:51 29:9
29:17 30:3
30:5 77:19
93:21,39
112:33
116:9,11
132:25
**dollar** 114:19
**Domb** 1:27
140:13,15
141:19
143:3,15
**dominant**
97:49
**Don** 138:49
**door-** 158:27
**door-to-door**
156:51
**dormitories**
49:37
**double-cro...**
72:37
**downsize**
157:45
**downtown**
69:29
**Dozens** 89:11
**Dr** 93:51
**drafted** 13:31
**dramatic**
122:51
125:21
**dramatically**
88:39
**drastically**
136:47
**Drexel** 94:5
114:17
**Drive** 8:13,13
81:27,27
**driver** 101:11
**driving**
104:35
112:11
151:47
**due** 2:17

119:21
158:47
**duty** 65:15
**dwelling**
11:47
85:11
_____
**E**
**E** 184:3
**earlier** 15:5
100:15
**early** 87:29
**earn** 51:3
**earned** 51:43
**ease** 28:25
**easily** 89:41
142:47
**east** 8:13
81:27
88:45
**easy** 86:39
**economic**
42:51 43:7
101:45
127:41
**economy**
122:17
128:31
**Econsult** 43:9
**educational**
65:11
101:47
**educators**
158:3
**effect** 16:45
121:51
130:37
**effective**
125:31
**effectively**
126:49
**efficient**
128:15
**effort** 35:11
41:9
132:31
156:21
**efforts**
117:19,35
121:31
161:19
**egress** 152:35
**eight-** 44:11
**either** 62:35

108:7
**elders** 148:7
**elected**
117:51
120:13
**electronical...**
44:29
**elementary**
101:31
**eliminate**
124:39
**eliminating**
124:51
131:15
**Elimination**
150:3,13
**email** 158:37
**emails** 157:5
**emerge** 26:51
**emergency**
2:19 117:5
117:17
**employee**
43:27
**employees**
35:49
**employs**
44:11
**enables** 38:5
**enacted**
135:25
**encourage**
32:9 67:43
67:49
90:13
155:29
**encouraged**
158:33
**encourages**
27:21
**ends** 15:29
**Energy** 81:49
**enforces**
145:27
**engage** 40:13
141:27
146:9
**engaged** 16:7
150:5
**engagement**
12:19
23:47
155:17
160:13

**engages**
44:17
**enhance** 42:5
**enhancement**
55:31
**ensure** 48:29
48:37
53:25
**ensuring**
46:25
47:13
49:13
132:17,41
133:37
**entire** 18:35
152:5
**entitled** 5:31
5:37 6:39
6:49 7:29
8:25 11:21
11:25,29
24:43,49
84:5
**entity** 34:27
66:13 94:7
**envisioned**
28:3
**EOP** 20:51
33:23,33
34:23
35:17
38:17
**equality**
146:15
**equation**
70:29
104:13
**equitable**
47:21
48:43
49:19
**equity** 90:39
120:47
**Eradicating**
89:21
**erred** 80:3
**error** 75:23
75:33
**especially**
16:21
104:47,49
112:39
116:47
**essence** 79:27

establish 9:5
58:29
84:19
118:39
established
56:23
estate 13:9
90:11
102:47
104:11,31
104:41
108:9
120:49
121:51
125:9
126:17,21
127:49
estimated
88:51
et 118:33
149:51
150:39
evaluating
65:31
eventually
88:23
everybody
93:31,37
95:51
99:31
113:19
176:9
everybody's
113:11
eviction
100:33,35
evidence
184:8
evolving
18:29
exactly 19:43
example
27:41
75:15
109:25
125:21
129:11
149:3
examples
41:3
excited
108:17
exclude 54:21
98:31

exclusive
27:13
Excuse 79:33
exempt 144:9
existence
6:31 39:51
existing 7:3
25:25
29:33
31:45
60:39
81:51
exists 145:17
exit 23:13
expand
149:17
expanded
82:19
156:25
expanding
6:51 53:23
expands
52:49
expansion
25:29
32:11
49:37
53:15
81:37,43
144:15
expectation
9:33 56:49
expected
131:43
expenditures
43:25
expense
87:17
148:13
expensive
86:31
experiencing
147:51
experiment
139:15,33
experts 98:35
expiring
84:35
explain 18:41
89:7
141:23
explore
140:23,41
156:3

express 26:43
expressed
133:25
expression
143:19
extend 6:29
39:49
40:29 46:3
extended
14:3
extension
44:39
extensive
13:27 17:5
160:11
extent 16:35
_____
F
F 184:3
fabric 30:29
faced 129:29
faces 120:7
127:25
facilitate
36:51
facilities
48:19
facility 13:45
13:47
fact 138:47
factors 65:35
138:45
facts 156:47
fail 95:47
faint 105:47
106:25
fair 47:19
48:43
49:19
103:49
fairly 132:17
133:39
fairness
56:37
faith 65:43
fall 16:3
74:39
falls 63:41
familiar
87:23
families
58:11
86:23
89:25

102:3
107:9,47
130:43
131:41
133:17
153:3
family 37:3
54:51
57:25 59:7
98:29,31
142:25,49
far 16:29
17:33 85:7
94:45,51
139:35
far-reaching
127:45
Farms 46:51
fast-forward
88:31
favor 54:51
57:29
71:11,13
92:5
138:41
164:39
165:51
167:25
168:41
169:43
171:7
172:19
173:19
174:29
175:29
177:13
178:13
179:31
180:31
181:49
favorable
163:51
164:29
165:17,41
166:41
167:15
168:5,31
170:23,47
171:37
172:11
173:45
174:19
176:29
177:3

178:47
179:21
181:15,39
fear 136:49
148:9
feasible
153:23,25
feature 9:47
10:5 64:3
featured
158:21
features
12:21
FedEx
152:21
fee 51:41
feedback
155:5,31
158:9,35
159:21
feel 56:25
57:49
58:19
75:23
107:37
124:3
feelings
57:39
feels 61:37
68:41
71:51
106:51
107:35
fees 142:37
feet 60:47
62:47 68:7
70:45 73:7
73:7,9,19
73:43
75:45
82:13,15,17
101:35
142:29
felt 62:33
70:3 138:9
138:17,25
139:5,23
fewest 77:33
Fifth 6:39
fight 88:9
113:29
133:51
134:19
fighting

113:27
figure 75:45
122:21
140:49
Filing 78:35
filled 100:13
fills 69:45
final 35:15
135:45
finalist
156:37
finalize 20:25
finalized
21:39
finalizing
44:51
finally 49:27
financed
137:47
find 47:41
69:7 105:3
132:51
160:33
finding 91:47
fine 127:39
finished
91:35
fire 15:27
22:35,39
firehouse
23:9,27,31
firm 33:45
first 36:41
45:47 46:9
47:35
88:35
107:41
109:43
110:31
115:41
119:13,17
143:47
164:7,33
165:21,45
166:47
167:19
168:9,35
170:27,51
171:41
172:15
173:49
174:23
176:33
177:7

178:51
179:25
181:19,43
firsthand
118:27
fleet 13:45
22:47,47
23:5
157:41
flip 148:47
floating
98:39
flood 117:19
floor 25:23
68:5 82:17
floors 70:41
flow 58:47
flyer 18:9
flyers 156:51
focus 153:47
focusing
15:11
Foley 39:29
41:25,27
46:19
47:25
folks 22:7
46:45
48:11 95:9
100:11
101:3,11,21
folks' 101:23
follow 76:27
followed
38:39
following
2:11 55:41
117:21
155:25
follows 2:15
food 152:15
footage 12:7
82:3
footprint
63:47
for-sale
141:49
Force 27:3
28:5 30:17
forced
128:21
forces 56:51
90:9
foregoing

184:12,37
forever 87:15
forgot 22:49
81:7
formally
136:31
formed
145:21
155:51
former
137:49
139:43
forth 17:27
Forty 88:33
forum 155:27
forward
10:35 22:3
22:11
30:41
33:39
44:31
49:45
74:45
135:31
150:47
161:21,23
fostering
40:17
found 2:39
76:47
110:17
foundation
59:5
Founding
99:31
fountain
23:23
four 70:39
101:27
127:21
four-story
73:5 77:37
Fox 67:37,47
69:11,15,29
69:35
Franklin
7:35 62:43
64:7 65:39
freeze 110:35
frequently
22:35
Friday
138:47
friend 134:31

Committee on Rules 10-26-21 Meeting
October 26, 2021

front 69:43
118:29
frustrating
122:49
full 4:41
64:33
158:17
fully 28:19
42:11,47
128:35
184:10
functioning
128:17
fund 51:19
51:41
61:17
99:49,51
117:7
124:33
fundamental
56:37
funded 42:11
42:49
funding
42:35
funds 42:17
furniture
48:25
further 54:25
124:27
137:3
149:17
164:3,29
165:17,41
166:43
167:15
168:5,31
170:25,47
171:37
172:11
173:47
174:19
176:31
177:3
178:49
179:21
181:17,39
future 42:25
72:45 74:3
86:27
89:33
100:31
119:41
128:29

132:49
136:3,29
161:21

——————
G
Gallery
137:43
gang 96:11
garden 51:37
63:51
145:7
150:45
gather 155:5
Gauthier
1:28 4:17
4:19 81:19
82:47,51
83:49
85:33,51
86:9,11
106:49
108:31,39
116:29
123:41
124:17
132:19,41
133:33,49
134:31
135:49
136:27
137:9
Gauthier's
111:15
general 12:19
13:39
155:11
157:11
158:41
generally
5:21
generate
43:41
122:13
123:9
131:45
152:5
generated
43:13
110:3
generates
43:31
generating
43:51
generational

153:21
generations
88:21
generic 160:7
gentrificati...
112:25
157:45
gentrified
91:43
gentrifying
109:49
geographic
100:3
Gerald 79:35
93:15,21,29
93:43
102:31
111:7
123:51
getting 48:49
70:3 73:37
77:11,33
111:49
Gilmore 1:20
3:47,49
45:37,41
48:7
163:11,13
168:15,21
give 13:23
35:29,35
95:37
96:23
97:29,31,41
98:39
99:13,15
114:3
135:33
139:41
149:27
173:27
given 17:27
gives 19:21
57:33
giving 94:39
glad 92:3
Glenda 57:23
glitches
64:37
go 18:37
20:17
21:17
22:37
23:21

26:15
30:23
59:13
63:49
64:45
71:11 76:7
79:9 83:31
85:47,49
86:3 99:27
104:15
106:33
113:51
146:33
152:35
162:7,13
163:25
goal 30:43
71:23
goals 27:27
53:17
goes 71:13
going 10:33
20:3,17
22:37
23:37
29:51 30:3
35:39
38:19
70:43 72:7
72:25
75:11,17
79:5 81:5
91:51
95:11 96:3
96:13
97:11,37,39
98:11 99:5
103:7,21,31
103:35
108:29
109:39
110:29
112:39
113:19,21
114:15
124:15
143:41
147:5
161:49
good 2:5 3:13
3:23,29,35
3:41,43,51
4:3,11,19
10:51

12:47
16:45
23:21 24:3
24:25
26:37
33:41
39:31
41:25
55:39
57:19
61:39
63:31
65:43
74:23
83:33
86:11,43
93:23
99:29
105:39
106:39
109:33
115:47
116:11,13
120:37
126:5
130:5
132:11
134:37,49
143:51
147:23
154:27
162:29,39
162:49
163:15
good-paying
130:23
Gopuff
152:17
gotten 70:39
government
65:17
116:21
122:9
gracious
152:41
Graham
52:29
59:35
grandkids
99:37
105:9
granted
44:49 78:9
grants 97:23

grateful
90:17
grave 89:23
great 22:31
106:37
121:15
141:5
143:23
147:33
154:25
183:7,9
greater 26:35
51:21 68:7
126:9
greatest
51:51
102:7
greatly 58:5
145:13
green 11:47
157:39
159:51
grew 103:33
gross 82:15
Grossbach
137:21,23
Grossi 24:15
26:13,21,27
26:31,33
28:51
29:29
30:47
ground 68:5
132:37
grounds
91:35
group 14:41
14:47
16:27 33:5
33:13
57:25
128:49
145:17
156:19,29
growing
130:49
growth 44:23
44:31
127:41
128:27
129:15
Grubhub
152:19
grueling

21:45
Guardian
8:11 81:25
guess 96:3
113:25
guide 129:13
guiding
38:47
gun 35:43
guns 76:45
guys 20:15

——————
H
half 28:15
72:13
88:47
90:45
157:21
Hall 122:5,19
123:27
Hall's 125:21
halt 122:35
handed 79:45
handful
26:49
happen 72:45
73:51
96:13
109:45
122:45
134:25
happened
72:43
90:45
happening
47:29
104:5
111:39
112:41
113:13
happens
78:47
79:27
80:23
109:43,49
happy 12:35
15:31
25:51
32:23
34:33
37:23
41:11
47:51 52:5
54:29

62:13
68:17
82:37
85:25
114:37
120:25
harassing
148:7
harassment
149:11
hard 78:5
161:11
harm 149:29
Harrison
33:43
Hartel 8:3
67:21
Hasbrook
7:51 67:21
head 152:49
headed
138:49
headset
93:29
health 2:17
86:43
89:39
149:21
hear 9:19
12:49 13:3
22:5 23:35
33:15
64:33
93:37,37
101:23
104:19
105:13,49
106:21,27
108:15
115:27
124:3
147:27,31
151:21,25
154:17,21
heard 10:15
27:47
95:39
157:29,39
158:45
hearing 2:15
3:33 4:31
4:33 9:27
9:29 10:29
21:27

Committee on Rules 10-26-21 Meeting
October 26, 2021

22:27 31:9
33:35
34:39
35:25
39:19
40:45
45:11
50:23
52:17 60:7
64:35,41
66:35
80:41
83:19
103:35
114:37,47
115:15
161:47
162:5,11
182:49
183:3
**hearings** 2:25
2:31,39
150:37
**heart** 86:35
98:15
151:49
**height** 7:31
19:41
34:17 51:3
51:21
54:27
60:45
61:27
62:47
64:15
70:41
77:39
**Heights**
46:47 49:9
**held** 10:13,27
15:19
34:35
60:37
150:39,39
182:21,29
182:43
**Hello** 13:5
54:43
104:15,15
105:9
106:19
151:17
154:19
**help** 30:43

97:25
98:33,35,41
121:19
132:51
140:43
149:25
**helpful** 48:13
48:27
**helping** 78:33
**helps** 89:7
**hey** 10:19
64:21,27
75:3
**Hi** 31:21
50:33
91:23
146:51
154:17
**hiatus** 15:3
158:47
**high** 70:25
86:41
101:29
102:47
111:43,45
124:45
**high-rise**
114:15
147:39,45
**higher** 56:49
**highlight**
117:43
**highway** 78:3
**Hill** 137:29
137:43
138:41
**Hinchcliffe**
34:49
**hinder** 53:33
**hire** 96:33
**historic**
25:13,15,25
25:29
26:51
27:11,15,23
27:39
29:19,47
30:11,15,29
145:31
**historical**
97:19
**historically**
5:41 25:5
121:29

158:5
**history** 30:35
55:9 87:23
93:49
101:21
137:33
139:25,41
139:43
**hit** 15:3
**hodgepodge**
55:37
**hold** 10:21
33:23,31
35:15,19
55:19 75:7
105:51
**holding**
182:17
126:41
**holistically**
128:17
129:35
**home** 38:33
64:17 65:7
141:31
143:9,23
158:7
**Homeland**
117:33
**homeless**
104:9,39
**homelessness**
118:9
**Homeowne...**
69:17
**homeowne...**
145:49
**homes** 37:5
84:43
87:13,47
94:25
99:49
100:9
101:43
124:5,21
141:39,49
142:19,23
142:25,31
142:49,51
157:3
**hope** 44:27
92:21
98:13

101:49
129:41
143:25
160:25
hopefully
30:39 43:5
**horse** 73:47
**hospital**
35:49
137:51
hosted 14:17
117:7
hosts 101:35
**house** 91:39
107:13
109:31,37
123:17
143:21
housed
142:47
houses 69:45
94:27
145:35
housing 8:27
14:9 37:15
38:27 51:7
51:11,15,19
51:41
57:45
61:17,19
84:7,27,31
84:37
86:35
88:13,19,29
88:39
89:21,47
100:7
102:5
105:5
107:43
108:13,21
112:21,25
113:45
114:5,7
116:51
118:15
120:45
121:13
122:9,15
123:5,11,25
124:31
125:27,29
126:33
127:15,19

127:41
128:11,19
128:23,39
129:11,37
130:47
131:15
132:23
133:3,35
134:5
135:37
136:5,13,43
137:41,45
138:21,31
139:21,35
140:39,51
141:29,51
142:5,13,17
142:33
144:13
148:49
149:11,39
158:25
160:21
**How's** 93:39
**hub** 5:13
11:31
157:7
**HUD** 86:51
99:49
137:47
**huge** 69:33
**Human**
117:31
**hundreds**
93:49
157:3
**hung** 147:3
**Hurricane**
117:21
**husband**
107:11,45
_____
**I**
**I-76** 41:49
**i.e** 48:51
**IBID** 135:19
**Ida** 109:5
117:21
**idea** 90:33
140:25,37
141:27
143:23
148:47
identical

76:51
**identify**
24:21
**identities**
56:21
**identity** 55:7
**ignored**
70:37
**illegal** 110:3
110:37,41
110:43
111:41
**illustrated**
27:39
**image** 3:5
42:5
148:29
**imagine**
34:27
96:43
**immediate**
87:11
88:41
154:31
**immediately**
47:41
133:27
**immensely**
44:7 95:7
**Immigrant**
117:31
**impact** 42:51
58:3,23,47
135:27
152:27
**impacting**
116:49
**impacts**
56:33
**implement**
85:9
**implemented**
117:27
**implications**
127:45
**implied** 64:11
**importance**
90:25
**important**
20:7 30:9
30:13,27
33:25
37:47
38:25,35

40:15,19
42:25 58:7
65:9
126:35
134:19
**importantly**
56:37
58:49
65:45
**imposing**
125:5
**improper**
111:41
**improve** 42:3
46:29
**improvement**
40:51
42:37
160:15
**improveme...**
39:39 40:9
42:41,47
43:11,37
46:31
**inaudible**
12:45
27:45
104:9
146:43
148:11
**incentivizes**
27:25
28:21
29:17
**inception**
58:41
**include** 7:5
29:25
46:47 72:7
81:45
136:5
**included** 2:33
55:5 77:3
155:43
160:23
**includes**
42:27
82:11
89:49
155:21
**including**
129:25
**inclusion**
81:51

120:47
149:21
150:35
**inclusionary**
125:5
**inclusive**
90:15
**income** 51:7
103:7
106:45
**incompatible**
67:35
**incorporati...**
6:25 14:7
39:45
44:41
**increase**
43:29
51:17
110:9
**increased**
43:41,49
**increases**
123:27
145:13
**increasingly**
86:29
**indicate** 2:47
**indirect**
43:25
**individual**
32:33 37:5
63:19
151:11
159:11
**individually**
132:51
**individuals**
58:9
**inducing**
148:9
**Industrial**
155:3
**industry**
13:11
110:17,41
116:51
120:43
127:49
128:27
**information**
75:33
158:27
**informed**

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

65:33
infrastruct...
56:17
ingress
152:35
initially
76:35
Initiative
123:37
124:11
150:15
initiatives
46:27
injustice
89:23
inperson
18:11
157:9
input 16:51
58:39 69:3
156:25
161:11
inputted
16:21
inquired
149:47
Inquirer 2:35
140:27
inside 70:45
instability
118:15
InstaCart
152:17
institutional
32:11
81:41
institutions
65:13
86:45
95:19
instructions
2:27
155:29
integrity 57:3
Intelligencer
2:37
intended 28:5
intensify 56:9
intensive
16:41
intent 36:45
38:39
74:41
intention

27:51
53:51
interest
55:51
128:49
131:5
132:35
133:25
interested
135:47
136:23
137:5
interesting
138:37
139:13
interpret
80:5
interpretati...
71:11
interruption
8:31,37
176:5
intersection
152:47
intervention
87:11
interviews
14:19,31
156:35
intimately
137:35
introduce
29:5 30:21
introduced
11:13
13:21
24:37
31:31
36:17
50:43
52:41
60:27 67:5
81:17
83:45
106:47
116:29
introducing
18:33 21:9
45:51 50:5
128:47
introduction
27:45
investigate
47:41

investment
27:23
43:17
124:49
130:37
investments
43:39
investors
150:29
invited 9:23
157:15
158:17
involved
68:51
137:37
140:49
involvement
16:37
21:51
involving
129:23
irreplaceable
89:11
Isa 130:3,7
island 138:15
isolated
138:15
issue 64:41
75:47
126:35
129:9
156:7
issued 13:31
issues 65:49
69:49
106:13
129:35
146:13
153:43
155:47
160:31
issuing 75:25
_____
J
J 1:22
jail 98:37
Jamie 1:28
4:17 82:47
85:47 86:7
108:31
January
13:49
141:43
Jefferson

31:43 33:9
33:21,29,47
34:27,47
35:33,37,45
35:49
JFK 61:41
job 23:21
24:3 61:39
80:9 96:37
183:7
jobs 43:21,23
66:15
86:43
89:39
122:13
130:23
131:37,39
131:39
132:11
134:13
141:7
Joe 126:3,7
Joe's 49:35
John 137:41
148:29
Johnson 1:17
2:5 4:25
8:39 9:15
10:31,45
12:39,51
15:33
22:15,27
23:19,29,51
24:19 26:5
26:15,23,29
26:39
28:31,45
30:49 31:9
32:27,43
35:27
37:27,35
39:9,19,33
41:15,27
45:21,31
50:9,19
52:9,17
54:33 57:9
59:25,43,49
60:7 62:17
62:25,51
63:11,25,33
64:21,27,43
66:25,35
68:21

72:51
73:17 74:7
74:29,35
76:21,29
79:13,33
80:15,25,41
82:41 83:9
83:19
85:39,45
86:5 91:7
91:27
92:33,45,51
93:7,19,27
98:49
99:11,27
102:17
103:41
104:17,27
105:11,21
105:33,45
106:5,15,23
106:33
108:25,43
111:3
115:5,15,25
115:51
116:15
120:29
121:5
125:39,45
126:25
129:45
134:39,51
139:49
140:11
143:29,39
146:35,47
147:9,25,29
151:5,23
154:5
160:41
161:25,39
161:47
163:23,37
163:45
164:11,17
164:45,51
165:29
166:7,13,25
167:3,31,37
168:19,47
169:3,31,49
170:5
171:13,19

171:49
172:25,31
173:7,25
174:7,35,41
175:17,35
175:41
176:7,41
177:19,25
177:51
178:19,25
179:9,37,43
180:19,37
180:43
181:27
182:5,11,25
182:39
183:13
join 132:41
joins 55:43
Jones 41:37
45:27,51
50:5
170:35
July 15:7
25:47
82:35
84:45 87:9
100:19
133:31
158:51
June 11:13
24:37
81:17
156:43
159:15
justice 90:49
101:51
_____
K
Katherine
1:20 3:47
45:37
163:11
168:21
keep 23:5
29:19
30:29 38:7
95:11
123:39
keeping 45:5
51:33
67:41
113:43
153:27

KENYATTA
1:17
kept 18:29
key 46:25
77:31
124:43
138:45
156:47
KFC 48:51
kind 75:45
King 148:23
149:49
Klehr 33:43
91:51
94:21
know 15:51
19:43
21:43,45
34:45
35:37
38:51
46:41
47:47
48:19,45
70:27
72:41
77:15 78:5
80:29
87:37
101:21
103:15,29
104:23
111:17,21
113:47
114:7
116:5
118:21,25
123:47
139:31
143:17
knowing
19:47
29:15
Knowledge
146:19,29
known 41:33
81:47,49
118:41
138:51
knows 96:17
123:33
_____
L

L&I 23:11
80:3,11
laboratory
81:47
101:39
Laborers'
130:9,15
lack 53:31
58:41
lacks 128:15
land 5:5 6:3
6:15 7:17
7:45 8:9,51
31:47
32:15
36:29
37:49,51
38:45
67:13
81:25
82:15
84:13
89:19,31
95:15,15,21
95:23,23,27
95:29
96:47
119:43
123:29,31
124:9,19
127:47,51
128:37,37
129:25
131:51
136:49
141:51
142:47
146:13
151:45
landlord
118:3
119:13
landlords
116:37
117:9
118:11
landowners
127:31
language
54:21
63:47
69:47
76:35

129:3
largest 13:47
late 87:27
   94:43
law 2:9 33:43
   40:47
   110:7
   127:35
   144:25,35
lay 113:19
layer 25:35
Layouts
   56:31
lead 53:41
   100:27
   111:45
leadership
   99:33
   142:35
leading 35:35
   111:43
   133:51
learned
   77:43
leave 84:43
   133:45
leaving
   131:17
   132:37
   148:27
led 12:17
   155:17
left 70:27
   77:49
Legal 2:37
   117:25
legality
   111:23
legislation
   11:7 24:31
   29:5 30:15
   30:43
   31:25
   33:19,29
   36:11
   40:27 46:3
   49:51
   50:37
   52:35
   60:21
   66:49
   81:11,43
   83:39
   86:21

116:49
117:45
118:37
119:37
121:47
122:51
126:49
127:25
128:5,47
129:3,31
130:35,45
135:9
147:43
149:29
159:17
legislative
118:31
150:35
Lehigh 7:5
length 157:13
lesson 139:41
let's 71:11
88:31
90:43,47
98:3
114:11,21
114:25
134:23
letting 92:23
98:7
105:17
level 16:35
160:11
life 47:51
131:27
lifting 132:9
liked 113:23
limit 61:27
73:13
limited 77:39
135:19
145:15
limits 54:27
Linda 52:27
line 7:51
67:19
77:43
147:7
lines 47:35
list 155:33
listed 27:13
listen 123:51
listening
140:19

listing 27:25
literally
104:33
little 35:39
69:29
106:7,9
149:13
live 89:25,37
96:25
100:11,43
101:3,5
103:11
112:13
132:43
141:25
143:7
lived 46:11
living 38:31
59:3,9
Loading 5:37
24:49
loans 97:23
local 25:15
29:35
44:21
locally 25:3
25:11
117:3
located 5:5
6:3,15 7:17
7:45 8:9,51
25:23
36:29
64:45
67:15
81:25
87:51
100:21
101:33
102:3
location 1:8
65:29
131:25
locations
133:11
Locust 6:5
31:51
Logan 61:45
63:35
long 15:51
21:45 79:3
102:33
106:51
122:25

158:47
161:13
long- 108:3
long-term
133:13
long-time
144:5
148:9
longer 17:13
longstanding
125:25
look 29:9
44:29
49:45
56:25
58:25
75:43 76:5
76:9,15
104:3
125:9
150:47
153:49
looked 17:33
138:17
looking 22:9
102:35
161:19
lose 56:21
87:13
losing 100:17
132:47
loss 79:11
lot 17:15 18:3
18:3 21:47
23:45,47
30:19 39:3
46:17
60:39 66:7
69:45,47
72:31
73:19
91:41
104:3
109:51
122:41
138:35
149:11
153:43
lots 36:43
37:3,5
67:31
141:45
148:13
low 124:7

142:13
low-dense
38:7
low-income
88:27
135:37
lower 6:29
39:49
41:33,47
42:29
44:45,47
48:49 49:7
61:43
123:39
lowered 25:9
lowering
124:33
LSNA 63:37
65:19,25,43
66:19
Ludlow 9:3
84:17
Luther
148:23
Lyft 152:15

_____
M
_____
mailing
155:33
maintain
56:13
127:17
maintained
108:21
maintaining
65:13
119:23
major 70:35
making 5:15
8:29 71:45
84:9
124:23
manage
127:33
managed
13:13,43
148:11
management
13:45
116:41
117:17
157:43
managers
116:35

mandates
125:5
mandatory
90:3
Mansion
52:51
54:49 55:3
55:7 57:27
144:7,15
145:21,23
145:41,51
146:11
149:41
Mansion/N...
7:3
Mantua 95:3
map 33:17
34:23
36:35,41
mapped
81:41
mapping
35:17
maps 5:3,49
6:11 7:13
7:41 8:47
36:25 61:5
67:11
84:13
Maria 1:23
3:17
marijuana
47:49
Mark 1:18
3:9 15:39
28:37
32:45
37:37
162:25
163:31
166:19,31
167:43
169:9
170:11
171:25
172:35
173:31
174:47
175:51
176:17
177:31
178:35
179:49
181:3

market 9:5
33:45 38:3
63:49
84:17
89:17,47
90:9,11
126:51
130:19
131:21
132:29
135:21
138:5,17
141:27
143:7
marketed
37:13
marketing
40:11
46:33
Martin
148:23
massing 7:33
Master 5:19
8:7 11:35
11:41,43
12:21
18:39,43
20:9,11,19
20:27
81:21,37
82:23,25
154:39
155:19
159:17,29
materially
129:31
materials
53:27,31
matter 90:37
90:39,41
184:12
Matzkin
138:51
Mawr 48:23
maximize
87:3
156:23
maximizing
90:13
maximum
60:45 85:7
Mayor
157:19
mean 29:29

73:49
98:21
99:51
113:47
114:9
meaning
150:37
152:51
meaningful
66:7
means 29:11
70:43
110:13,19
132:3
134:15
184:41
meant 129:13
129:17
mechanism
128:17,45
mechanisms
129:33
medical
47:49
meet 62:37
74:23
75:21
meeting 2:21
9:25,35
12:31
13:39
14:45 15:9
15:17,23
25:47
32:21
37:21
51:27
54:13 62:9
68:13
72:11,17
82:35
85:21
132:49
137:11
144:23
155:11,25
157:13
158:31,41
158:51
159:7
162:7,13,23
163:27
meetings
18:11,13

34:5 69:9
71:7
138:23,37
159:11
161:21
**mega** 87:5
**Melvin**
146:43,47
147:3,13
**member**
14:25
93:45
120:49
126:21
154:29
**members**
2:45 3:23
4:21 9:41
9:49 11:3
14:29
22:21 24:7
24:27
26:41 31:5
39:15,33
48:33
50:15
52:11
55:47
57:47
59:51
62:19 63:7
66:31
69:15
80:37
83:15,35
91:49
106:25
108:35
112:23
115:11
116:17
118:29
130:15,43
134:51
169:21
172:49
175:9
177:43
180:11
**membership**
118:25
119:19
126:31
**mention**

22:49
140:47
**mentioned**
34:3 72:23
76:37
100:15
124:27
182:35
**merely**
132:35
**Merion** 6:29
39:49
41:33,49
42:29
44:45,47
48:49 49:7
**met** 75:19
127:21
144:23
149:41
**methodology**
110:13
**Michael**
34:49
**micro-** 129:7
**microphone**
8:35
**Microsoft** 1:8
2:23 9:49
**middle** 99:35
114:35
**million** 42:35
42:39,47
43:13,27,29
43:51 44:3
89:21
101:35
131:45
142:21
**million-plus**
148:35
**millionaires**
148:41
**minimum**
25:9,27,31
**miscellaneo...**
82:5
**mission** 77:19
**mistakes**
72:33
**mitigating**
157:43
**mitigation**
153:29

**mix** 114:9
**mixed** 103:7
106:45
**Mixed-** 32:3
51:5
**mixed-inco...**
51:11
61:19
124:23
144:13
**mixed-use**
32:3 60:51
67:25,27,31
67:43
74:13
84:49,51
157:25
**Mixed-Use-2**
5:19 11:33
**Mo** 120:35
120:39
140:25
141:19
**model** 142:31
**models**
142:41
**moderate**
149:7
**modified**
129:19
**money** 78:43
78:51 79:3
111:49
124:29
142:5,9,21
**monitor**
47:27
**monitoring**
47:3
**Montgomery**
40:25
**month** 70:13
107:15,27
142:9
**monthly**
69:41
107:27
158:39,41
**months** 91:3
**moral** 144:35
**moratorium**
9:7 84:21
85:13
121:43

**morning** 2:7
3:15,23,31
3:35,41,43
3:51 4:3,13
4:21 11:3
12:49
24:27
26:37
33:41
34:29
39:31
41:25
57:19
63:31
83:35
86:13
93:23
99:29
105:39
106:39,49
108:17
134:49
135:5
143:51
**Morton**
152:9,47
**motion**
163:31
164:21,41
165:3,7,33
166:3,15,19
166:31
167:7,39,43
168:23,43
169:5,9,35
169:45
170:7,11,39
171:9,21,25
172:3,21,33
172:37
173:11,21
173:27,33
174:11,31
174:43,47
175:21,31
175:43
176:3,17,45
177:15,27
177:31
178:5,15,27
178:35
179:13,33
179:45,49
180:23,33

180:45
181:3,31,51
182:13
**move** 10:33
22:3 23:45
30:41
33:39
45:33
74:45
130:41
163:47
164:3,31
165:13,19
165:43
166:39,43
167:17,51
168:7,33
169:23
170:19,25
170:49
171:33,39
172:13,51
173:41,47
174:21
175:11
176:25,31
177:5,45
178:43,49
179:23
180:13
181:11,17
181:41
**moved**
107:11,45
164:23
165:35
167:9
168:25
169:37
170:41
172:5
173:13
174:13
175:23
176:47
178:7
179:15
180:25
181:33
**movement**
147:41
**moves** 121:25
161:23
**moving** 96:7

133:19
**much-stated**
149:9
**multi-** 153:19
**multiple-st...**
60:41
**municipal**
5:13 11:31
12:13
40:29,49
42:9 45:5
151:43
154:43
**mural** 148:23
148:29
**Murphy**
39:27,31,37
**mute** 8:35,43
26:25
79:37
163:39
176:9
**muted** 26:21
85:39,43
125:39,43
163:35

_____ N _____

**N** 184:3
**NAIOP**
126:11,13
126:31
129:37
**name** 10:47
13:5 26:17
26:31
39:35
41:21
52:31
54:39,45
57:15,21
59:31
63:27
91:25
92:47
93:43
105:35,41
106:39
115:33,35
116:3,5,19
120:39
123:3
126:7
130:7

135:17
144:3
148:19
150:11
151:31
154:27
161:41
**names** 2:49
**nation**
130:51
**nature**
112:35
127:27
**navigate**
118:17
**navigated**
117:11
**NCO** 53:15
53:23,29
**near** 100:13
100:29
101:3,51
133:35
**nearby** 56:35
**nearest** 65:45
**necessary**
128:13
149:17
**need** 30:19
51:47
62:41
76:19
78:25
95:45,49
97:19
102:51
104:49
112:19
113:45
119:51
121:11
122:17
123:17
126:39
136:19
145:47
150:33
153:31
**needed**
122:15
130:27
**Needless**
138:29
**needs** 38:13

58:45
59:11
103:51
104:43
107:41
117:49
120:19
122:5
134:7
149:11
153:49
**neighbor**
75:29
155:39,49
159:5
**neighborho...**
6:49 19:23
51:37
52:51 53:7
53:45,49
54:9 55:25
55:35
59:19
61:45
63:35,41,47
64:5,9
65:19
67:37
68:45
69:11 72:3
86:39
87:33
88:21
89:37
91:43
92:15 94:7
94:17
95:43
96:51
97:45
100:43,49
103:7
106:45
109:45
110:7
112:13
113:23
123:37
124:11
138:33
139:11,17
144:17
145:25,33
149:19

Committee on Rules 10-26-21 Meeting
October 26, 2021

150:5,9,13
153:15
155:23
157:31
158:19
160:9
neighborho...
55:51
146:13
neighborho...
145:27
neighborho...
55:33
58:19,25
90:15 96:9
109:51
124:25,47
147:39,51
148:15
149:31,45
neighboring
56:35
neighbors
22:7 23:3
23:39
65:45
69:51 88:5
155:29
156:49
157:7,11,15
157:23
159:45
160:25
networking
44:19
never 160:23
never- 90:35
new 11:49
16:5 25:23
27:45
31:39
42:27,31
43:21,45
47:29
51:15
56:25 57:5
57:41
58:21,33
68:3
114:11
119:25
122:11,37
129:3
130:23,37

131:27,47
133:35
142:25,49
145:29
147:35
148:31
152:7
160:5
newer 48:51
newly 92:9
117:25
news 2:35
109:35
newsletter
158:39
nice 101:23
noise 79:31
non-go 138:9
non-opposi...
159:27,39
nonresiden...
54:23
Normally
16:11
north 22:45
23:9 57:29
61:45
100:23
103:33,47
149:41
Northeast
67:39
Nos 4:37
144:7
147:17
149:15
150:49
182:21
not-for-pro...
133:5
Notary
184:25
note 9:45
14:23
noted 184:8
notes 164:19
165:31
167:5
168:21
169:33
170:37
171:51
173:9
174:9

175:19
176:43
178:3
179:11
180:21
181:29
184:10
notice 100:33
100:35
102:35
noticeable
53:37
notices 2:33
notified
84:29,41
87:7
November
13:35,43
35:25
155:9
NPI 142:3,9
142:21,43
NTI 150:15
150:15
number
16:47
65:33
118:45,51
122:27
128:43
135:41
numbers
101:15
_____
O
O 184:3
o'clock 72:17
O'Neill 1:22
4:9,11 67:7
68:27,31
73:11,21
74:9,11
76:25,31
79:15,25,41
80:19,27
163:5,7
170:33,39
174:5,11
176:39,45
179:7,13
180:17,23
objectives
42:3
obligating

127:17
obligation
64:11
127:23
occupant
66:11
occupied
82:19
occur 40:41
occurred
33:51
110:5
October 1:9
12:31
13:35
14:35
32:21
37:21
51:29
54:13 62:9
67:5 68:13
85:21
odds 79:3
Odessa 52:27
54:47
off-site 25:41
offensiveness
58:35
offer 2:29
102:11
153:31
169:17
172:45
175:5
177:39
180:7
offers 135:41
135:45
136:33,35
office 60:41
61:9 75:27
101:37
109:29
117:17,29
officially
162:9
officials
117:51
120:13
offline
140:35
onsite 51:45
52:5 61:13
136:43
op-ed 140:27

109:11
111:5,13,17
114:27
141:19
162:47,49
165:27,33
166:25
173:5,11
Okay 10:31
23:51
26:29
45:31
59:49
62:51
63:25
76:21
80:25 86:5
93:7
105:51
106:37
143:15
154:25
182:25
old 48:25,51
49:37
143:19
oldest 69:31
once 18:49
45:11
89:31
115:33
131:49
134:13
144:49
once-in-a-g...
128:25
one-bedroom
107:15
one-block
145:13
one-sided
148:39
one-year
85:13
89:51
ones 98:35,37
online 155:27
157:7
158:33
159:5
onsite 51:45
52:5 61:13
136:43
op-ed 140:27

OPA 109:27
109:35
open 11:51
89:17
117:49
148:17
opened 88:35
145:3
155:27
opinion
110:39
opinions
157:17
opportunities
44:19
55:29
102:9
123:7
134:7
opportunity
42:31
86:17
99:17
101:45,47
101:47
108:15
116:25
120:9,23
130:11,39
132:13
134:35
135:5
137:25
139:39
151:29
156:17
157:47
opposed 75:5
164:47
166:9
167:33
168:49
169:51
171:15
172:27
174:37
175:37
177:21
178:21
179:39
180:39
182:7
opposition
68:37

opted 86:49
option 51:3
51:39
141:23
options 30:19
88:17
120:15
121:15
131:19
133:35
order 4:33
10:3 52:31
99:5
113:39
146:15
ordinance
13:21
18:33,45,51
20:11 21:9
organization
126:15
146:5
154:35
159:27
organizatio...
53:43
57:33
145:19
original
26:47
27:33
74:39
originally
87:51
ostracized
96:49
outliers
55:17
outraged
71:9
outside 25:29
100:47
outsiders
102:37
outskirts
103:21
outstanding
160:31
overall 49:23
Overbrook
46:49,49
overbuilding
96:23
overcoming

124:45
overcrowdi...
58:49
overdue
107:3,39
overempha...
59:3
overlay 5:13
6:39,51
7:29 8:27
11:25,31,45
50:51
51:25 53:3
53:7 54:3,7
55:3,29,39
56:7,25,39
56:47
57:31
58:13
59:15
62:43,49
73:15 84:7
106:47
144:17
145:25
overly 111:43
111:45
overrun
108:11
owned
119:45
owner 75:29
86:47
118:5
120:21
127:17,21
127:47
129:25
135:21
owner's
121:41
127:3
owners 40:43
42:15,21
45:9 84:29
119:47
132:29
133:31
157:51
ownership
95:31,45
97:23,47,49
owning
141:31

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 143:9 | 98:1 99:1 | 153:1 | 50:27 | 28:7,13 | 136:11,21 | 15:47 | 90:37 |
| **Oxford** 7:47 | 100:1 | 154:1 | 52:21 | 29:27,39 | 137:5 | 18:41 | 92:13 |
| 67:17 | 101:1 | 155:1 | 60:11 | 30:5 31:45 | **partners** | 24:13,29 | 95:25,47 |
| ———— | 102:1 | 156:1 | 63:15 | 58:47 | 125:33 | 31:19,23 | 96:7,23,33 |
| **P** | 103:1 | 157:1 | 66:39 | 60:39 | 135:39 | 36:7,9 | 96:37,45,49 |
| **p.m** 183:17 | 104:1 | 158:1 | 80:45 | 61:13 66:5 | **partnership** | 50:31,35 | 97:27,49 |
| **packed** 73:43 | 105:1 | 159:1 | 83:23 | 69:37,49 | 41:45 | 52:33 | 99:7,13 |
| **Page** 2:1 3:1 | 106:1 | 160:1 | 130:7 | 85:9,9 | 135:19 | 60:15,19 | 102:35,41 |
| 4:1 5:1 6:1 | 107:1 | 161:1 | 143:35,43 | 119:7 | **partnerships** | 66:43,47 | 103:9,19,27 |
| 7:1 8:1 9:1 | 108:1 | 162:1 | **panelist** | 145:15 | 40:11 | 74:31,37 | 104:9,39 |
| 10:1 11:1 | 109:1 | 163:1 | 12:41 | 157:33 | 120:3 | 80:49 81:9 | 107:13 |
| 12:1 13:1 | 110:1 | 164:1 | 41:19 | 158:23 | **parts** 111:35 | 83:27,37 | 109:19 |
| 14:1 15:1 | 111:1 | 165:1 | 54:37 | **Parkway** | 121:31 | **pause** 115:17 | 110:25,45 |
| 16:1 17:1 | 112:1 | 166:1 | 57:13 | 7:35 62:43 | **party** 78:41 | 151:39 | 111:39 |
| 18:1 19:1 | 113:1 | 167:1 | 59:29,33 | 64:7,13,17 | **pass** 92:29 | 153:49 | 112:11 |
| 20:1 21:1 | 114:1 | 168:1 | 91:13 | 65:7,23,41 | 119:37 | **pay** 51:39 | 113:15,27 |
| 22:1 23:1 | 115:1 | 169:1 | 92:39 | 65:41 | **passed** | 109:39 | 114:3,21 |
| 24:1 25:1 | 116:1 | 170:1 | 93:13 | **Parochial** | 141:41 | 110:29,45 | 121:15 |
| 26:1 27:1 | 117:1 | 171:1 | 99:21 | 145:3 | **passes** 119:27 | 124:31 | 130:25 |
| 28:1 29:1 | 118:1 | 172:1 | 105:29 | **part** 16:9,27 | **Passyunk** | 131:41 | 131:5 |
| 30:1 31:1 | 119:1 | 173:1 | 125:49 | 23:7 51:45 | 13:37 | 148:39 | 132:9 |
| 32:1 33:1 | 120:1 | 174:1 | 129:51 | 53:45 | 14:23,49 | **Payette** 34:49 | 134:17 |
| 34:1 35:1 | 121:1 | 175:1 | 134:43 | 86:31 88:3 | 15:7,23 | **payment** | 136:17 |
| 36:1 37:1 | 122:1 | 176:1 | **panelists** 24:9 | 95:29 | 16:17,39 | 61:15,33 | 138:11,25 |
| 38:1 39:1 | 123:1 | 177:1 | 31:11 | 125:15 | 19:31 | 143:11 | 140:47 |
| 40:1 41:1 | 124:1 | 178:1 | 85:49 | 129:39 | 112:51 | **PCPC** 53:39 | 141:25 |
| 42:1 43:1 | 125:1 | 179:1 | 120:31 | 156:19 | 151:33 | **pedestrian** | 143:7 |
| 44:1 45:1 | 126:1 | 180:1 | 139:51 | 160:37 | 154:31 | 159:51 | 158:5 |
| 46:1 47:1 | 127:1 | 181:1 | 161:51 | **participants** | 158:7 | **pedestrian-...** | 161:9 |
| 48:1 49:1 | 128:1 | 182:1 | **parcel** 31:47 | 9:31 | **path** 28:25 | 69:27 | **people's** |
| 50:1 51:1 | 129:1 | 183:1 | 61:27,33 | **participate** | 100:29 | **pedestrians** | 69:43 |
| 52:1 53:1 | 130:1 | 184:1 | 118:41 | 156:35 | 129:13 | 152:51 | **percent** |
| 54:1 55:1 | 131:1 | **paid** 79:17 | 119:43 | **participated** | **Patrick** 24:15 | **Penn** 94:5 | 25:33 |
| 56:1 57:1 | 132:1 | **painted** | 120:17 | 15:15 | 26:13,17,25 | 96:29 | 44:15 |
| 58:1 59:1 | 133:1 | 148:17 | 121:39 | **participation** | 26:31 | **pennies** | 87:43 |
| 60:1 61:1 | 134:1 | **Palmer** 93:51 | 122:35 | 183:3 | 28:51 | 114:17 | 89:15 |
| 62:1 63:1 | 135:1 | **Pam** 83:27 | 159:35 | **particular** | 29:15 | **Pennsylvania** | 100:9,37,41 |
| 64:1 65:1 | 136:1 | 92:41,45,51 | **parcels** | 15:41 | 30:37 | 8:9 40:47 | 101:9 |
| 66:1 67:1 | 137:1 | 93:9 | 123:15 | 22:23 39:5 | **patrol** 44:13 | 42:9 81:23 | 124:21 |
| 68:1 69:1 | 138:1 | 105:31,33 | 128:43 | 69:3,11 | 46:15 | 82:23 88:7 | 125:3 |
| 70:1 71:1 | 139:1 | 105:41,47 | **park** 69:43 | 118:37 | 47:33 | 116:23,31 | 141:47 |
| 72:1 73:1 | 140:1 | 106:35,39 | 69:45 | 139:21 | 48:11 | 116:37,43 | 142:13,15 |
| 74:1 75:1 | 141:1 | **pandemic** | 106:43 | 140:3 | **Patrone** | 119:47 | 142:15 |
| 76:1 77:1 | 142:1 | 15:5 | 107:19 | 143:35 | 151:15,17 | **people** 18:13 | 149:5 |
| 78:1 79:1 | 143:1 | 118:19 | 153:21 | **particulara...** | 151:27,31 | 18:17,19,23 | **permanent** |
| 80:1 81:1 | 144:1 | 119:31 | **Parker** 50:47 | 127:51 | **Patterson** | 18:25 | 131:39 |
| 82:1 83:1 | 145:1 | 158:49 | 52:45 | **particularly** | 33:9,37,41 | 21:35 29:9 | **permission** |
| 84:1 85:1 | 146:1 | **panel** 10:39 | 60:31 | 27:37 | 33:43 | 38:29 | 29:47 |
| 86:1 87:1 | 147:1 | 24:11 | **parking** 5:37 | 46:35,43 | 34:43 35:9 | 69:39 71:9 | 156:45 |
| 88:1 89:1 | 148:1 | 26:11,11 | 5:39 18:27 | 47:7,17 | 35:31 | 71:43 | **permit** 29:37 |
| 90:1 91:1 | 149:1 | 31:15 | 24:49,51 | 48:15 | **Paul** 11:5 | 72:15 | 53:31 |
| 92:1 93:1 | 150:1 | 32:33 36:3 | 25:9,27,33 | 70:35 | 28:49 | 74:13,17 | 71:17 |
| 94:1 95:1 | 151:1 | 37:31,33 | 25:39 27:7 | **parties** | 52:25 | 88:15 | 75:25,33,41 |
| 96:1 97:1 | 152:1 | 39:23 | 27:49 28:3 | 135:49 | **Paula** 10:41 | 89:35 | 77:13 78:7 |

78:37
79:23,29,43
158:23
164:7,33
165:21,45
166:47
167:19
168:9,35
170:27,51
171:41
172:15
173:49
174:23
176:33
177:7
178:51
179:25
181:19,43
**permitted**
72:23
78:19
**permitting**
126:29
**perpetuate**
148:37
**person** 29:19
44:13
146:39
147:11
154:11
**personal**
120:21
**perspective**
149:33
**pertaining**
5:39
**perverse** 90:9
**PGH** 137:49
**PHA** 145:39
**PHDC** 117:5
**Philadelphia**
1:1 4:51
5:13,31,49
6:11,27,37
6:47 7:13
7:27,41
8:23,47
11:7,19,29
12:27
13:11
24:31,43
25:43
26:37
27:15,25

31:25 32:7
32:17
35:33
36:13,25
37:17
39:49
40:23
41:31,47
42:29
43:15,19
44:47
47:19
50:37
52:37
55:23
57:29 62:5
66:49 67:9
68:9 83:39
84:3,11
85:17
86:31
87:31
103:23
109:27
111:37
116:39
117:41
119:21
120:43
121:13
122:39
125:11
126:11,19
126:21
128:13,37
130:39
134:5,7
136:15
139:45
147:35,37
147:43,49
150:19
154:51
**Philadelphi...**
90:35
118:7
124:45
128:29
**Philadelphi...**
87:19,41
**Philly** 88:25
90:47
103:33,47
104:45

133:13
**PHLCounc...**
2:41
**phone** 79:35
176:9
**PIDC** 12:17
13:13,13,29
13:43
14:17,45
15:13
16:31
17:49
21:43
155:5,9,41
156:9,45
**piece** 89:17
118:37
**pits** 128:49
**place** 28:15
30:15
33:33
35:43
38:49
56:11
59:15
89:33
112:49
113:5
114:19
**places** 27:17
60:47
84:51
90:39
101:41
103:31
**plan** 5:19 8:7
11:35,41,45
12:13,21,25
18:39,43,49
18:51 19:9
19:19 20:9
20:11,19,27
21:39
27:45
34:23
38:17
40:39,43
45:3,7
56:31
67:41 72:7
75:13
81:21,37
82:23,27
84:37

135:35,51
136:41
144:43
146:15
149:31
150:3
151:49
153:9,31
154:39
155:21
159:17,29
**planning**
5:33 11:9
11:21
12:27
14:29
15:13
17:35,51
20:13,45
21:7,15,43
24:33,45
25:43
31:27
32:17
36:13
37:17
50:39
51:27
52:37
54:11
55:21
57:37
60:23
61:23,35
62:5,29
66:51 68:9
68:35,39,49
69:5,13
70:11,51
71:21,47
74:41 76:7
76:41
77:17,45
78:11
79:47,51
80:3,11
81:13 82:9
82:31
83:41
85:17
90:19
111:27
150:9
156:31

**plans** 130:19
**play** 90:9
**playground**
153:21
**please** 2:43
2:47,51
4:45 8:33
8:41 10:9
10:17,37,47
10:49
12:41
24:11,19,23
31:13
32:45
35:51
39:21
41:19
50:25
52:19
54:37
57:13 60:9
63:13,27
66:37
79:37
80:43
83:21
91:11,17,27
92:29
95:39,41
105:27,37
110:23,47
115:33,39
115:51
116:5
120:31
123:51
125:33,35
125:47
129:49
134:41
135:33
143:41
146:37
151:9
154:9
160:45
161:29
162:3,19
**pledged**
133:17
**plenty** 76:33
**plus** 73:35
**point** 17:11
18:29

20:49
155:49
156:7
**points** 23:13
**police** 23:11
**policies**
121:19
**policy** 32:13
75:5
125:27
**popular**
28:19
**populate**
101:13
**population**
88:45
101:9
**populations**
100:47
**portion** 20:23
**ports** 93:51
**position**
72:39
**positive**
53:15
137:13
**possibility**
76:39
138:5
156:3
**possible** 2:25
77:35 86:3
122:33
124:9,25
137:47
**possibly**
145:9
**Post** 100:21
**post-traum...**
35:41
**posted**
158:31
**Postmates**
152:19
**postpone**
130:31
**potential**
27:19
69:27
131:23
134:11
136:51
**potentially**
100:17

125:3
**poverty**
132:11
134:21
**Powel** 100:5
100:33,45
101:7
**Powelton**
106:51
107:33
114:13
139:3
**Powelton/S...**
106:41
107:19
**power** 112:27
112:31
146:19,29
**powerful**
150:29
**PowerPoint**
98:17
**practically**
118:27
**practice**
55:41
**pray** 98:3
**precedence**
55:19
**precedent**
119:41
121:49
126:45
127:29
**Precious**
144:49
**predictabili...**
55:47
**present** 1:15
1:25 2:49
3:15 4:15
4:23,31
45:7
155:11
158:17,51
162:33,43
162:51
163:7,17
**presentations**
14:33
**presented**
13:37
134:9
153:43

**preservation**
8:27 26:35
26:43 27:3
28:49
30:27 84:7
123:37
124:11
146:17
149:47
**preserve**
30:11
55:33
84:25
102:5
128:11
149:19
157:41
**preserving**
36:45
157:39
**President**
41:29
50:47
52:47
57:23
60:31
63:37
126:13
142:35
144:11
146:3
151:33
152:45
154:31
156:27
**Presidential**
46:37
**prestige**
66:15
**pretty** 109:31
**prevent**
67:29
77:11
**prevented**
74:3
**previous**
19:31
81:43
128:41
**previously**
16:31
44:49
81:39
101:25

**price** 108:7
148:41
**prices** 88:39
**pricing** 124:7
**pride** 55:15
**primarily**
54:23
**primary**
153:45,47
**Prime** 152:21
**principal**
99:33,35
101:19
135:19
**prior** 2:37
9:39
**priority**
104:49
**privacy** 9:33
**private** 38:43
43:17,39
99:47,49
114:33
122:7
127:31
**private-**
119:51
**privately**
119:45
**privately-o...**
121:39
**privilege**
94:15 96:5
98:45
**pro-formas**
52:3
**probable**
108:3
**probably**
27:47
33:35
73:33
107:39
**problem**
61:25
69:37
129:5
**proceed**
34:35
115:35
**proceeded**
156:9
**proceedings**
184:8

**process** 12:17
13:15,27,41
15:11,51
16:11,15,19
16:25,29
17:19,23,23
17:37 18:7
18:39,43
19:17
20:17,31,39
21:31,45
22:51
38:47
53:45
65:31
118:31
129:23
149:9
150:37
155:13,17
155:35
156:13
160:13
161:13
**processed**
151:41
153:25
**processes**
18:37
**producing**
122:9
**production**
51:13
**productive**
28:27
**professor**
139:43
**proficiency**
56:51
**profit** 90:13
**profits** 87:3
**program**
117:11,15
**prohibit** 6:41
**prohibiting**
127:3
**prohibits**
68:3
**project** 14:9
14:23
16:45
17:45
18:21,27

19:31,33
20:51
22:13,33,45
23:41
32:39
37:47
63:39,45
65:33
74:45
76:51
78:21,25
119:7
122:23,37
123:47
130:21,29
131:23,29
131:33,49
134:9
138:27
139:27
149:3
153:47
158:21,45
159:3,41
160:17,35
**projections**
122:29
**projects**
27:21 28:5
35:3 38:3
42:37
67:33
72:21
74:37
76:35,49
118:33
119:15,47
120:23
127:33
132:5
134:15
135:21,27
135:43
136:3,31
154:51
158:15,31
**proposal**
33:7 82:11
119:3
151:49
156:9
157:27
158:17,33
**proposals**

178:7
179:15
180:25
181:33
**properties**
5:43 9:9
25:3,11
27:11,13,23
28:25
29:31
43:51
51:25
53:13
56:33,35
67:25,47
72:31
123:19
129:23
149:51
159:43
**property**
13:17
14:41,47
20:43,45
21:3,7,11
21:19,23
29:45
40:43
42:13,21
43:41 44:5
45:9 70:17
75:29
86:47
109:29
116:35,39
118:5
119:15,47
120:23
127:33
132:5
134:15
135:21,27
135:43
136:3,31
154:51
158:15,31
**proposal**
33:7 82:11
119:3
151:49
156:9
157:27
158:17,33
**proposals**

13:33
14:21
17:27 70:9
155:15,37
156:37,41
156:49
157:17
**proposed**
11:39
12:21
13:49
19:15
25:17,41
27:41
36:35,49
37:51
40:27
61:39
65:27
66:11,19
74:43
81:45
123:3
128:35
135:25
138:27
139:3
151:49
152:31
153:7,35,47
155:7
160:17
**proposes**
84:45
121:41
**proposition**
137:45
**prosperity**
121:23
**protect** 86:23
107:43
149:21
**protection**
20:7 55:49
58:17
**proud** 30:33
44:9 99:35
**prove** 96:35
**proven**
142:43
**provide**
14:13
58:17
74:51 90:7

99:41
121:7
126:29
132:21
133:13
142:11
**provided**
25:39
42:17
75:35
155:27
157:7,9
158:9,37
159:7,9
**provides**
58:13
**providing**
125:31
**provision**
25:37
26:47 27:5
**provisions**
5:35 11:23
24:47
60:51 61:5
61:29
**provisos**
34:11
**PSCA** 154:47
156:27
159:27
**public** 2:15
2:17,27,29
2:31 4:23
4:33 9:27
9:31 19:17
20:45 21:7
21:17,23,27
23:37 40:9
40:45 42:5
44:9 45:11
46:31
115:21,31
120:3
123:29
124:19
126:37
138:19
140:7
141:51
142:47
146:39
147:11
151:11

154:11,51
155:47
160:47
161:31,35
162:3,7,11
162:13,21
163:27
184:25
**publicly**
114:39
132:33
**publicly-o...**
123:15
**published**
2:35
85:13
139:9
**punish**
125:23
**punishing**
120:19
**purchase**
137:3
**purchasing**
136:23
**purports**
130:45
**purpose** 10:7
31:37
36:49 51:9
60:33 66:9
81:41
**pursuant**
37:7
**pursue** 137:3
**pursued**
27:29
**push** 103:17
**pushback**
138:33
**pushed**
102:41,45
**pushing**
95:13,13
**put** 8:41
34:31
47:21
48:31
49:11 66:7
71:25
79:35
85:13
94:25
113:3,5,9
114:7,11,21
127:29

139:7
150:15
151:39
153:17,41
**puts** 78:41
**putting**
112:47
134:17

_____
**Q**
**qualified**
123:29
**quality** 56:15
65:15
86:41
139:9
**quantities**
123:9
**question**
13:17 17:5
22:31
62:27 73:3
74:31
75:15
78:15 99:5
102:23
111:31
112:17
113:29
119:33
141:21
**questions**
9:41 12:35
15:27,31
17:17,39
22:19 24:5
25:51
28:37 31:3
32:25,35
34:51
37:25
39:13
41:13
45:19
50:13 52:7
52:11
54:29
59:51
62:13,19
63:5 66:29
68:17
80:35
82:39
83:13

85:25
102:13
115:9
120:27
129:27
140:33
143:33
149:45
quick 15:49
16:17
74:31
147:5
quickly
123:29
131:49
Quinones-S...
1:23 3:19
3:21
quite 13:27
22:33
91:49
quorum 4:29
163:25
quoting
78:23

R
R 184:3
raise 102:45
raised 87:31
155:47
raises 118:35
Ralston
91:39
ramifications
119:29
range 155:37
159:23
rare 148:21
rate 38:3
100:7
118:9,9
ratio 85:9
RCO 15:17
18:9 57:27
63:45
69:17 97:3
106:43
re-authoriz...
40:35
reach 30:43
121:35
123:39
reaction

76:13,15
read 4:45
140:27
readily 27:29
reading
163:43
164:7,33
165:21,45
166:47
167:19
168:9,35
170:29,51
171:41
172:15
173:51
174:23
176:35
177:7
179:3,25
181:21,43
real 13:9,23
15:49
16:17
38:19
90:11 98:5
102:47
104:11,31
104:41
108:7
120:49
121:51
125:7
126:17,21
127:49
realize 95:47
realizing
29:3
really 16:39
23:3 38:25
77:41 98:7
103:51
140:41
147:3
161:11
reason 49:49
62:29
65:25
102:43
113:17
reasonable
9:33
reasons
66:19
rebuilt 22:43

receive 29:51
33:23
90:19
144:25
received
34:29 43:5
44:29
135:41
recess 115:23
recognize
15:37
32:45
37:37
90:23
97:13
121:9
recognized
9:51 56:15
86:19 94:3
97:17,21
recognizes
28:35
45:25,35
68:25
82:45 86:7
108:47
140:13
163:29
165:5
166:17,29
167:41
169:7
170:9
171:23
172:35
173:31
174:45
175:49
176:15
177:29
178:33
179:47
180:51
recognizing
9:41
recommen...
14:39 32:9
114:31
164:3,29
165:17,41
166:43
167:15
168:5,31
170:23,47

171:37
172:11
173:45
174:19
176:29
177:3
178:47
179:21
181:15,39
recommen...
12:23
recommen...
12:33
25:49
32:23
37:23
51:29
54:15
62:11
67:41
68:15
82:35
85:23
recommen...
62:31
recommends
51:33
79:51
reconsideri...
92:23
record 9:45
10:11,47
24:21
26:17
41:21 47:3
47:23
48:31
49:13
54:39
57:15
59:31
63:29
92:47
105:35
115:35
116:3,7
124:15
135:15
164:19
165:31
167:5
169:33
170:37
171:51

173:9
174:9
175:19
176:43
178:3
179:11
180:21
181:29
182:15,27
182:41
recorded
9:29,37
recourse
74:43
recruiting
155:13
recruitment
156:11
Rectory
144:51
redevelop
130:19
redevelop...
15:11
36:51 37:9
37:11
60:37
67:29,45
131:9,21,43
132:7
133:45
134:3,27
reduce 28:15
44:15
reduced
158:25
reduces 27:7
reducing
119:7
relied 80:11
22:43
23:15
152:9
refer 128:39
refine 54:7
reflect 10:11
59:17
reflects 33:51
refuge
117:39
regarding
4:35 13:41
15:27,41
40:47

57:39
135:7
136:29
154:39
regardless
61:17
Register
27:15,27
29:35
registered
115:21
154:35
regular 73:7
regularly
47:27
regulation
119:25
regulations
7:31 25:21
53:21
58:13
82:29 85:3
145:29
regulatory
56:41
reintroduced
110:35
reiterate
17:11
reject 134:33
related 5:15
8:29 13:17
84:9
152:13
relates 35:41
relations
58:5
relationships
58:29
relief 28:3
30:5
relies 127:51
relieves 27:7
relocating
133:25
relocation
117:19
133:19
remain 28:13
remaining
53:5
remains
82:27

remap 11:39
20:39
remapped
19:37
remapping
17:35
18:33
19:29 38:5
61:51
remaps 31:47
remark 111:9
remarks
15:41
45:27
68:27
82:47 83:3
83:5
108:33
135:13
remember
98:45
143:17
144:19
reminded
144:21
reminders
158:39
remote 1:8
2:15,25
remotely
2:21
removed
89:29
removes
25:19
removing
50:51
51:39
renderence
35:5
rendering
127:7
renewal
87:25
88:15
renewed
28:27
renewing
84:35
renovations
43:47
rent 107:13
143:21
rental 107:27

117:7
133:7,15
144:37,45
144:47
145:41
148:49
renters
117:27
145:11
renting
141:33
143:11
rents 89:13
repair 149:49
repeat
123:19
repeatedly
144:21
replace 31:43
replacing
145:5
replicated
89:47
reported
163:49
164:27
165:15,39
166:41
167:13
168:3,29
170:21,45
171:35
172:9
173:43
174:17
176:27,51
178:45
179:19
181:13,37
reporter
184:25,45
represent
54:47
80:33
100:37
101:7
116:39
137:27
141:47
representat...
32:37
156:17
representing
26:33 33:9

72:39
80:31
116:35
130:9
150:27
**represents**
16:41
99:47
100:39
126:15
131:3
159:21
**reproduction**
184:41
**request** 10:13
13:31,33
90:29
135:31
156:41
182:43
**requests** 14:7
**require** 51:43
61:33
**required**
15:19
44:43
144:25
**requirement**
25:9,27,33
28:9
**requirements**
5:39 12:3
16:51
24:51 27:9
27:49
28:13
29:23,27,39
53:19,23
62:39 90:5
**requires** 2:11
11:45
**research**
31:41
87:35 88:3
131:29
**resettling**
117:35
**reside** 86:25
**residences**
127:15
**resident**
107:5
144:5
**residential**

5:17 11:33
11:49
27:43
31:51
36:37 49:3
53:11
61:13
71:39
77:29
84:51 90:3
101:37
158:23
**residentiall...**
53:11
**residents**
42:23
57:35,41
58:7 87:5
88:25
89:29
90:51
104:45,47
108:5
119:5
120:13,17
121:21
122:11
123:11
131:17
132:17,37
132:49
133:21,23
133:37,47
138:39
139:9
142:45
146:11
148:9,15
149:43
**residing**
58:11
**resolution**
129:9
137:13
**resolve** 65:49
**resolved**
123:25
**resources**
32:15
89:41
117:33
**respect** 9:9
114:45
134:29

145:45
**respected**
121:29
**respond**
109:5
**responded**
157:23
**responding**
3:3
**response** 14:5
14:13
22:25 31:7
39:17
45:29
50:17
52:15
59:41,47
60:5 62:23
63:9 66:33
80:39
83:17
92:49 93:5
115:13
133:23
143:37
146:45
156:39
161:45
164:49
166:11
167:35
168:51
170:3
171:17
172:29
174:39
175:39
177:23
178:23
179:41
180:41
182:9
**responses**
13:51
**responsibili...**
55:19
68:47
**responsible**
158:13
**responsive**
159:19
**rest** 121:5
126:27
**restaurant**

74:15,19,21
**restaurants**
44:21 68:5
**restore**
149:25
**restrictions**
12:5 64:15
**restrictive**
29:25
**result** 53:35
87:45
136:35
**resulting**
43:17,39
**retail** 101:35
151:43
158:3
**retailer** 61:11
**retain** 39:25
145:31
**return** 40:37
45:13
88:17
**returned**
95:27,29
**reuse** 27:9
28:23
**revenue**
43:15,33,43
122:13
131:47
**review** 53:33
75:25 77:5
155:15
156:11
**reviewed**
76:43
**reviewing**
155:13,35
**revise** 11:23
**revised** 54:21
158:21
**rezone**
118:39
121:31
122:33
**rezoning**
118:33
119:41
121:37
**RFP** 12:15
13:41
16:21,51
17:29

20:47,49
23:3
155:43
**RFPs** 16:31
**Richardson**
1:20 3:47
3:51 45:39
45:43 48:9
163:11,15
168:17,21
**richest**
104:37
**Rideshare**
152:15
**Ridge** 148:25
**riding** 102:29
**right** 10:35
18:19
19:25 23:9
29:39
46:11
57:49
69:33
72:43
75:31
79:47
80:13,27
91:47
92:17
96:17
97:51
106:29
107:51
108:43
114:25,43
127:33
132:27
146:31
157:33
163:39
**rights** 102:7
67:17
118:7
119:21,23
**risk** 79:9
**Ritchie** 126:3
126:5,7
**River** 8:17
81:31
**Rizzo** 137:39
**RMX-2**
11:35,41
12:7

**RMX-3**
31:51
84:49
**robust**
100:45
129:21
**roll** 2:45
162:21
**roll-outs**
117:7
**Roman**
144:51
**Ron** 33:9
35:31
**Ronald** 33:43
**roofs** 11:49
**room** 52:3
73:27
**rooms** 70:45
**rooted** 55:9
**rough** 152:23
**roughly**
28:15
87:43
**route** 75:37
**RSA-5** 36:39
**RSA-6** 36:39
36:43
**rule** 127:35
**rules** 1:3 4:35
11:3 24:27
33:35
34:37
35:23
39:35
83:35
86:15
93:41
116:17
147:25
151:19
153:51
164:5,31
165:19,43
166:45
167:17
168:7,33
170:25,49
171:39
172:13
173:47
174:21
176:31
177:5

178:49
179:23
181:17,41
182:47
183:15
**run** 79:9
**running**
113:11
**rush** 75:51
**Rushdy**
120:35,37
120:39
140:25
141:15,35
143:13

———————
**S**
**sacrificed**
90:33
**safe** 48:5
92:21
105:9
131:17
153:29,33
**safeguard**
64:11
**safer** 153:9
153:33
**safety** 40:9
42:5,39
44:11
46:31
149:23
151:51
153:45
159:51
**sale** 20:47
21:3,5
112:15
124:5
134:13
148:35
155:7
159:33
**sales** 111:47
**Sarah** 154:15
154:29
161:9
**saved** 103:5
**saw** 17:23
**saying** 77:51
78:3 79:15
94:43
109:15

143:5
164:41
166:3
167:27
168:43
169:45
171:9
172:21
173:21
174:31
175:31
177:15
178:15
179:33
180:33
181:51
**says** 68:41
109:35
**scale** 61:41
61:43,47
153:23
**schedule** 4:43
**school** 43:43
99:35
100:3,5,33
100:39,43
101:13,29
145:3
155:47,51
**schools** 86:41
94:33
101:3,5,13
**Schuykill**
81:31
**Schuylkill**
8:17 63:49
**science** 81:49
87:33,39
94:31
99:33
131:29
**scope** 159:49
**scrapped**
118:51
**screen** 3:5
176:11
**seat** 16:13
**second** 10:19
40:33
87:15
99:15
105:47
106:3
164:13,15

165:27
166:27,51
168:17
169:29
170:33
171:47
173:5,29
174:5
175:15
176:39
177:49
179:7
180:17
181:25
182:33
**seconded**
164:25
165:37
167:11
168:27
169:37
170:43
172:7
173:13
174:15
175:23
176:49
178:7
179:17
180:25
181:35
**seconds**
164:21
165:33
167:7
168:23
169:35
170:39
172:3
173:11
174:11
175:21
176:45
178:5
179:13
180:23
181:31
**section** 6:47
7:27 8:25
11:27 54:7
57:27 84:5
127:19
132:47
133:7

137:45
**sector** 43:17
43:39
**secure** 133:3
**secured**
42:33
**security**
19:21
117:35
**Sedgley** 7:7
**see** 30:9,25
35:5 38:21
57:51
72:33
76:17
102:37
103:39,41
104:23,25
104:27
124:17,49
**seeing** 44:31
**seek** 117:39
**seeking** 34:19
44:37 87:3
121:17
**seeks** 124:37
**seemingly**
90:35
**seen** 75:13
98:25
107:9
121:35
**select** 14:39
135:35
**selected**
12:15
**selecting**
17:25
**selection**
13:15
14:27,37
16:9,15,19
16:29
156:21
159:47
**sell** 20:43
21:11
96:47
119:15
120:21
127:33
**selling** 84:39
132:35
**send** 98:13,17

**sending**
125:7
**Senior** 13:7
39:37
**seniors**
157:51
**sense** 55:15
56:11
103:13
138:25
**sensible**
28:17
**sensitive**
149:23
**sent** 157:5
**September**
31:33
36:19
50:45
52:43
60:29
83:47
**series** 14:19
34:3
145:27
**serious** 34:25
56:33
104:3
132:9
**seriously**
64:9
**servants**
158:3
**serve** 120:41
126:13
**served** 44:13
128:51
136:17
**Service** 8:13
81:27
**services** 6:27
13:9 39:47
40:9 41:31
42:17 45:3
46:5,7
48:41
49:17
61:13
117:25
152:17
**session** 164:9
164:35
165:23,47
166:49

167:21
168:11,37
170:29
171:3,43
172:17
173:51
174:25
176:35
177:9
179:3,27
181:21,45
**set** 49:15
53:21
88:11
115:19
119:39
126:45
**setting** 47:5
48:39
**settle** 47:15
**Shahid** 130:3
130:5,7
**shape** 42:7,23
**share** 114:23
114:25
121:21
131:7
132:15
156:47
157:15
**shared** 40:41
**Shelmire**
7:47 67:17
**sheriff's**
111:47
112:15
**Sherry**
143:47
144:3
**shooting**
113:15
**shopping**
47:11
**short** 48:23
**short-listed**
14:19
**shortfalls**
125:25
**shout-out**
35:31,35
**shoved** 70:41
**show** 93:31
**side** 22:45
34:9 43:19

47:19
48:39,49
49:7,9,19
70:33,49
71:3,27
73:27
76:37 77:3
78:13,17
**sides** 18:19
42:29
**sidewalk**
152:37
**sidewalks**
153:5,11
**siege** 58:21
**sight** 88:49
**sign** 110:31
**signal** 125:7
**signed** 33:33
115:29
161:51
**significant**
12:17 64:3
101:11
123:9
**signify** 9:51
164:41
166:3
167:25
168:43
169:45
171:9
172:21
173:21
174:31
175:31
177:15
178:15
179:33
180:33
181:51
**similar** 143:9
**simple**
135:29
**simply** 27:33
123:27
136:19
141:23
**sincere**
125:13
**sincerely**
129:37
**single** 37:3
66:13

119:43
121:39
142:25,49
**single-family**
36:37
124:5
**single-hand...**
150:17
**sir** 79:39
93:33,35
**sisters** 117:37
**sit** 72:37
97:33
**site** 5:21
11:37,41,51
12:15
13:29
14:43
15:13
49:39
84:27,39
85:15 87:5
88:25
89:23,51
90:27,33
101:5,25,33
121:43
127:5
131:11,27
131:51
133:37,45
134:27
136:7,19,25
137:35,51
138:19,43
139:5,21
152:43
155:15
156:5
157:5,27,47
159:25
160:23
**sites** 88:11
96:39
100:7
137:49
**sits** 145:5
**sitting** 89:17
112:29
149:35
**situated**
40:21
**situation**
77:39

95:39
140:45
**situations**
74:47
**six** 101:17
**six-story**
81:45
**size** 12:3
131:25,33
**SLA** 100:45
**SLAM**
100:31
101:19
**slated** 87:51
99:7,13
**slow** 149:9
**small** 22:31
27:17
157:51
**smaller** 36:43
76:49,51
78:21
**smart** 55:31
**SMH** 11:29
11:45
**Smith** 83:27
85:31
91:15,17,23
91:23,31
92:35 99:3
102:21,25
103:45
104:21,31
105:15,23
109:5,9
123:49
124:25
**Smith's** 99:37
**so-called**
150:27
**sold** 38:11
69:19,21
107:29
131:51
**solicited**
136:33
**solicitor**
78:47
79:17
**solicitor's**
80:7
**Solly** 7:49
67:17
**solution** 69:7

125:15
129:39
141:5
**solutions**
76:19
125:17
126:41
160:33
**solve** 112:37
129:3
140:43
**somebody**
72:27
112:45
**somewhat**
14:3
**soon** 87:9
125:11
**sorry** 34:43
81:5
103:39
104:21
109:13
154:27
166:27
**sort** 17:29
19:33
29:39,41
**sound** 97:51
**south** 5:11
11:29
12:25
35:31
51:37
150:45
**space** 101:39
157:41
159:51
**spaces** 68:7
85:11
**speak** 3:7
52:29
85:35 99:7
99:13
105:17
118:23
137:25,31
**speakers**
140:7
**speakers'**
128:41
**speaking**
8:41
176:13

Committee on Rules 10-26-21 Meeting
October 26, 2021

**special** 6:25
39:47
41:29 46:5
46:7 48:41
49:17
81:41
155:49
**specializes**
146:5
**specific** 54:19
61:31
65:29
145:29
159:39
**specifically**
64:15
135:27
**specified**
82:29
**speculation**
104:11,33
104:41
**spend** 78:49
78:51
**spent** 88:51
**spills** 69:39
**spirit** 27:35
75:21
116:45
**spoke** 123:43
**sponsor**
10:13
**sponsors**
182:45
**sponsorship**
68:27
**spot** 126:49
127:45
128:9
**Spring** 51:37
63:51
150:45
**Spruce**
137:29,43
138:41
**squander**
123:7
132:13
**square** 12:7
13:37
14:25,49
15:9,23
16:17,39
19:31 33:7

61:45
63:35 68:7
73:43 82:3
82:13,15,17
101:35
142:29
151:33,35
154:33
158:7
**squeeze**
71:49
77:35
**squeezed**
73:41
**Squilla** 1:18
3:11,13
11:15
15:39,43
17:9 19:25
20:29,37
21:21
22:17,29,39
23:25,33
24:39
26:39
28:37,41,43
30:7,51
31:35
32:47,49
33:49
34:41 35:7
36:21
37:39,41
39:11
154:49
156:15
157:19
158:49
160:29,49
161:3
162:27,29
163:31,35
163:39,41
163:47
165:7,9
166:19,23
166:31,35
167:43,47
169:9,13
170:11,15
171:25,29
172:37,41
173:33,37
174:47,51

175:51
176:17,21
177:31,35
178:35,39
179:49
180:3
181:3,7
183:5
St 49:35
**stabilized**
94:45,49
**staff** 35:47
53:25,39,43
54:3 61:23
61:37 82:9
135:3
**staff's** 53:33
**stakeholders**
40:13
55:45
117:51
120:11
145:19
**stand** 35:47
**standard**
56:29
110:17,21
110:41
**standards**
53:9,29
56:43,51
58:15
61:31 85:7
**standing**
29:33
72:19
**start** 30:25
102:35
108:33
114:33
131:49
**started**
155:31
**starting**
41:35
46:35
**state** 2:9
10:47
26:17
41:21 45:5
54:39
57:15
59:29
63:27

92:45
105:35
115:33
116:3,5
131:47
**stated** 56:41
137:7
**statement**
114:29
**statewide**
116:33
**station** 15:29
22:35,41
23:11
69:33
**status** 61:3
**stay** 102:49
108:7
**stayed** 72:15
**steadfast**
46:21
49:31
**Steinke** 28:49
**stellar** 46:35
**stenographic**
184:10
**step** 40:33
125:35
**steps** 107:41
**sticking**
76:43
**stock** 57:45
**stolen** 95:21
95:23
**stone** 112:29
**stop** 75:51
96:19,23
97:27,35,37
98:23,27,43
104:3
112:31
114:43
**store** 48:25
**storefront**
69:25
70:31
71:31
**storefronts**
70:13
71:25
73:35,39
77:29,31,33
**stores** 138:13
**stories** 34:17

70:47
71:37
**straight**
62:35
135:29
**straighten**
112:7
**stranded**
132:39
133:47
**Strawberry**
7:3 52:51
54:49 55:3
55:7 57:27
144:5,15
145:21,23
145:41,51
146:11
149:41
**street** 5:7,9,9
5:9,21,23
5:23,25 6:5
6:5,5,7,17
6:19,19 7:7
7:19,19,21
7:21 8:15
8:15,17,19
9:3,3,3,5
22:43
23:15,17
31:49
33:45
36:31,33,33
41:51
46:39
47:13
49:25
51:39
70:49 71:3
73:27,31,37
76:37,45
77:3 78:13
78:17
81:29,29,31
81:33,39
84:15,17,17
84:19
88:45
91:37
94:27 95:3
100:23
126:51
130:21
131:21

132:29
144:39,41
144:45,47
148:33
152:29,31
152:37
153:19
154:41
**streets** 31:51
70:33
98:39
152:11
**streetscape**
42:39
**strengthen**
67:47
**stress** 35:41
119:51
**stretches**
41:49
**strong** 56:11
67:51
122:17
**strongly**
107:35
**structure**
29:19
31:45
58:51
**structures**
30:13
**student**
108:11
**students** 88:7
100:31,35
100:37,41
101:7
**study** 152:3
**stuff** 103:35
104:35
**subject** 63:39
**submit** 65:3
155:31
**submitted**
136:35
155:41
156:39
157:27
**submitting**
135:13
**subsidized**
138:31
139:19
**substantial**

43:3
**substantially**
28:11
**suburbs**
69:41
**succeed** 79:7
**successful**
47:33,47
139:35
**Suddenly**
122:39
**Sue** 151:15
**sufficient**
122:27
139:9
**suggested**
54:17
137:49
**suggesting**
17:35
**suggestion**
114:29
**suggestions**
114:51
**summarize**
43:9
**summer** 34:5
67:17
**Sunshine**
10:3
**supermarket**
49:39
**supervision**
184:45
**supplemental**
135:13
**support**
13:19
26:45
28:21
33:13
39:43 41:9
41:39
47:31
49:31
72:11
74:27
78:31
90:19
94:11
99:39
106:45
108:19

111:15
112:3
119:41,45
121:41
125:29
128:3,35
130:17,29
131:9
134:27
138:35
139:19
144:7
146:51
150:49
157:25
158:23
**supported**
19:45
123:35
124:13
**supporting**
48:33
49:51
107:37
111:19
128:23,25
**supports**
53:51
55:49
65:25
66:19
**supposed**
75:7
**sure** 33:27
38:37
47:31 48:3
68:49
87:21
90:49
91:49
93:35
103:3,5
104:45
132:45
133:51
**surface** 60:39
66:5
**surrounding**
158:29
**surveys**
146:9
**Susan** 151:31
**suspended**
164:5,33

Committee on Rules 10-26-21 Meeting
October 26, 2021

165:21,45
166:45
167:19
168:9,35
170:27,51
171:41
172:15
173:49
174:23
176:33
177:7
178:51
179:25
181:19,43
**sustain**
145:49
**sustainable**
131:41
**sustained**
139:29
**swayed** 90:31
**system** 128:7

**T**
**T** 184:3,3
**tactic** 94:35
**tactics** 55:33
94:39
148:3
**take** 2:45
17:13
29:11 66:3
76:3,9
77:27
103:37,51
112:45
114:29
115:17
125:33
143:25
**taken** 162:15
184:12
**takes** 38:49
64:9
**talk** 94:15
97:33,39
98:9
114:37
124:15,19
152:43
**talked** 138:31
**talking** 95:51
96:45

100:51
101:25
113:11
141:37,39
141:45
145:9
150:43
**TANEHA**
184:24
**target** 121:37
**targeted**
111:41
128:3
**Task** 27:3
28:5 30:17
**Tate** 52:27,27
54:43,47
57:19,23
**tax** 43:13,33
43:41
102:47
110:5,43
122:13
131:47
**taxes** 44:5
102:47
108:9
109:17,41
110:29,37
110:45
111:45
112:9
**taxpayers**
79:17,21
**teach** 146:9
**team** 12:11
14:29
35:33,37
156:25,33
160:29
**Teams** 1:8
2:23 9:49
**TECH**
146:51
**technical**
106:13
115:19
**technology**
81:49
87:35
146:7
**tell** 74:25
**telling** 47:37
**temporary**

9:7 84:19
**ten** 85:11
**tenant**
159:49
**tenants** 84:43
117:9
**tends** 92:19
**term** 6:29
39:51
40:29
101:51
108:5
127:25
**terms** 5:25,43
6:43 7:9,23
7:37 9:13
34:17
47:29
56:15
107:35
109:15
139:25
**Terrence**
39:29
41:27
46:19,43
49:27
**testifier**
26:11
32:29
37:29
**testify** 9:25
11:11
24:35
31:29
36:15
39:41
50:41
52:39
60:25
63:19 67:3
81:15
83:43
105:29
106:43
116:27
120:25
130:13
134:35
135:5
151:29
161:43
**testifying**
13:19

24:15
118:21
151:37
161:9
**testimony**
2:29 9:21
10:49
15:29,49
23:35
24:23
41:23
45:23
50:21
59:39
63:29
64:35,49
65:3 66:27
91:21,29
96:35
101:23
102:11,19
105:25
110:49
115:29,37
121:7
126:29
129:47
135:15
140:21
151:51
**text** 25:17
**thank** 4:3,25
8:43 9:15
10:33
15:33,43,45
15:47
17:49
21:41 22:9
22:15
23:47 24:9
26:5 28:29
28:31,43,47
30:49
31:11
32:49 35:7
35:27
37:27,41
38:45,49
39:9 41:9
41:15,37
45:15,21,43
45:43,47
46:21

47:25
49:29,41
50:3,5,9,19
54:33 57:7
59:23,25,27
63:3 66:21
66:25
68:21,33
72:49,51
74:7,9,29
76:23
79:37
80:27
82:41 83:5
86:13 91:3
91:7 92:33
93:39,41
98:7,47
102:17
105:17,23
108:13,23
108:25,41
108:51
110:47,51
111:5
114:47,49
115:3,5,25
116:25
120:23
121:3
125:37,45
126:25
129:41,45
130:11
134:33,39
135:3
137:15,23
139:37,47
139:49
140:15
141:13
143:27,29
146:33,35
150:51
151:5,17,27
151:27
154:3,5
160:39,41
161:5,7,23
163:41
165:9
166:35
167:47
169:13

170:15
171:29
172:41
173:37
174:51
176:21
177:35
178:39
180:3
181:7
182:49
183:5,9,13
**thanks** 39:7
**theirs** 96:47
**thing** 48:45
72:33
80:13
104:43
105:5
111:39
122:19
132:27
**things** 17:13
98:11
103:15
109:17,43
111:47
112:35,39
114:39
**think** 16:43
16:45
17:19 20:5
21:49
22:31
29:13 30:9
38:25
46:33
77:41,47
92:7 96:13
96:15
103:49
109:5
111:33
112:7,19,35
127:43
140:29,37
140:41,43
140:47
**thinking**
49:21
95:11
98:15
**Thomas**
10:43

12:43 13:3
13:7 31:41
33:47
**thorough**
129:21
**thought**
58:41 81:5
149:51
**thoughtful**
76:3,9
129:15
132:25
**thoughtfully**
76:17
**thousands**
87:41
89:27
130:23
157:5
**threat** 112:15
**threaten**
134:3
**three** 14:29
34:3 55:51
70:7,47
72:21
108:3
**three-bedr...**
89:11
142:29
**three-story**
73:23
75:47
**thumbs**
149:37
**ticket** 69:43
**time** 9:45
12:37
14:13
17:43 18:5
20:35 22:3
26:3 29:3
32:25
37:25
46:11
48:23 52:7
54:31
62:15
68:19
76:13,15,33
82:39
85:27
87:15
100:13

102:33
114:41
130:25
135:33
136:19
137:7,17
139:47
149:17,27
154:3
161:13,49
182:21
**timeline**
13:25
44:27
**times** 16:49
18:7 69:23
79:11
148:45
150:37
**Timothy**
99:25,31
**tired** 95:9
**Title** 5:11,29
6:35 8:21
11:17
24:41
83:51
**titles** 4:47
**to-door**
158:29
**today** 4:43
9:23 10:29
26:33
33:15,25
38:51
87:37
88:33
89:19,49
90:43
92:31
99:39
100:27
106:13
114:43
116:27
117:47
118:23,47
119:35
120:25
121:9
126:9
129:29
130:13
134:35

135:9,29
136:45
141:11
147:49
151:3,37
152:43
159:31
162:17
today's 3:33
89:47
90:11
told 77:9
Tom 15:47
15:49
Tonetta
52:29
59:35,43
tool 128:11
129:7
topic 48:37
total 82:13
101:9
118:45
131:31
144:31
145:11
totally 77:47
tour 13:45
townhomes
86:27,33
87:7,49
88:35 89:9
99:45
118:43,49
127:9
131:11
133:11,29
135:23
townhouses
107:29
Township
41:47
44:45
trades 158:5
traffic 58:47
152:3
160:3
train 69:33
transcript
184:14,39
transfer
94:19
133:7
transit 89:39

transitioning
61:41
translates
152:7
transparency
150:33
156:23
transportat...
86:41
150:15
trapped
148:25
trapping
148:27
Treasurer
120:41
treated
132:17
133:39
tremendous
69:49
Trenton 6:17
36:31
tribe 93:47
trigger 25:27
27:47
29:37
trillionaires
148:43
tripled 88:41
trips 152:7
trouble 46:43
troublesho...
117:13
trucks 152:21
152:25,33
153:11,15
truly 58:43
116:45
Trust 51:19
51:41
61:17
124:33
truth 94:47
try 30:11
38:9 74:49
147:5
trying 69:7
93:27,29
94:23,37
96:47
98:27
103:37,45
105:19

Tuesday 1:9
Tulip 6:17
36:31
turn 77:49
106:7
139:31
turned 76:39
tweak 28:17
twiddling
149:37
two 44:23
47:47
55:45 71:7
76:35,49
85:9 88:43
137:47
144:25,37
156:37
182:19
two-and-a-...
65:37
two-bathro...
142:29
two-story
36:47 38:7
two-thirds
53:5
type 122:23
types 47:5
_____
U
U.S 84:29
Uber 152:15
ultimately
112:5
138:39
158:11
unanimously
72:19
141:43
uncertainty
122:41
unconstitut...
56:43
undermines
128:5
understand
2:9 68:35
68:39
74:15
76:11
91:45
95:17
96:39

98:41
109:19,31
110:27
understand...
58:43 72:5
150:43
understands
126:33
understood
80:17
154:43
underutilized
67:45
unethically
59:13
unfortunat...
110:25
119:11
125:19
unimagina...
69:37
unintended
29:7
126:47
union 131:3
unique 41:45
53:49
55:11
65:13
148:23
149:37
156:17
160:11
units 11:47
37:11
51:45,49
52:5 70:23
70:43
71:39
85:11
100:17,19
116:43
118:45,51
119:7,9
144:29,31
144:45,47
145:41
149:5,7
157:49
universally
157:37
universe
27:19
University

8:7,19
31:43
33:47
81:23,33
82:21
86:25,37
87:37 88:5
88:33 89:3
89:9 94:31
94:33
96:29 97:9
99:45
101:29
118:43,47
127:9
131:11
133:9,27
135:23
unleashed
147:47
unmute
59:37
91:19
unnecessary
62:3
unsalable
127:7
update 157:9
updated
40:39
159:3
updates 82:5
155:33
upheld 56:39
Upper
103:23
UPS 152:19
urban 84:31
87:23
88:15
urge 127:37
134:25
145:51
151:37
urgent
121:11
use 9:47
28:27
29:41 32:5
71:3 78:13
85:3 94:37
128:3,9,37
146:13
uses 5:41

24:51
61:15
146:7
156:5
_____
V
vacancy
100:5
vacant 37:3
47:39
48:17
54:25
91:39
148:17
Vagelos
81:47
vague 56:45
Valle 151:45
115:47
116:11,19
valuable
137:7
value 43:49
109:23
110:9
valued 89:19
variables
122:27
variance
78:27
variances
107:23
118:31
various
159:11
VDO 50:51
vehicle
152:23
vehicles
153:19
versus
141:31
143:11
viable 120:15
vibrancy
40:13
vibrant
160:37
Vice-Chair
1:18 26:39
Vice-presid...
13:7
156:29
victims

117:19
video 146:7
view 2:29
viewed 44:25
viewers 9:31
Village 54:47
100:21
139:3
violence
35:43 96:3
96:15,21
97:29,35
98:23,29
112:41
113:13
virtual 18:13
vision 32:7
49:23
153:27
155:21
visions
155:39
visit 114:41
152:41
vitality 66:15
VLEST
81:51
voice 97:3
151:3
voices 158:43
volume 106:7
vote 21:17
34:35
72:19
136:43
voting 111:21
111:27
vulnerable
149:23
_____
W
wages 131:41
waiting 33:17
123:45
Walden
65:47
walk 65:47
101:11
walkable
67:51
walks 69:9
Walnut 6:5
8:17 31:49
81:31,39

101:31
want 10:21
17:49 19:3
19:11,27
21:41 24:7
28:47
31:11
33:25
35:29
38:37,45,49
46:21
47:31
48:29
49:41
58:27,33
64:29
85:47
92:13
94:11,13
95:27,29
96:33,37
97:13,27
98:23
100:11
102:21,25
102:37
107:25
109:19
111:7
113:43
114:31
118:23
121:3
122:5,11
123:35
140:45
141:7
150:23
153:13,17
161:7
182:49
wanted 17:11
23:5 33:15
34:45 35:3
45:47
47:21
49:11,29
62:27
93:35 98:9
99:9 109:3
109:13
111:13
113:25
140:23

Committee on Rules 10-26-21 Meeting
October 26, 2021

Page 25

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **wanting** | 101:25 | 107:17,33 | 136:21 | 61:29 | **zones** 126:49 | 124:51 | **122,615** |
| 120:21 | 114:35 | 133:11 | 137:15 | 64:51 | **zoning** 4:51 | 144:29 | 82:15 |
| **wants** 118:5 | 117:29 | 134:5 | 142:41 | 135:15 | 5:3,33,49 | 149:5,7 | **123** 123:1 |
| 122:35 | 118:45 | 136:13 | 146:21 | **wrong** 72:43 | 5:51 6:11 | **10-year** | **124** 124:1 |
| 129:39 | 139:37 | 148:31 | 153:39 | 110:33 | 6:13 7:13 | 110:3 | **125** 125:1 |
| **war** 96:11 | 141:37,39 | **Wharton** 5:9 | 155:51 | 121:27 | 7:15,41,43 | 113:51 | **1250** 142:27 |
| **warehousing** | 141:45 | 5:23 | 160:27 | **Wynnefield** | 8:47,49 | 114:5 | **126** 126:1 |
| 138:11 | 146:19 | 154:41 | 161:11,15 | 46:9,45,47 | 11:19,21,25 | **10,000** | **127** 127:1 |
| **Wash** 34:5 | 147:5 | 155:7 | **worked** 33:5 | 46:49 47:9 | 15:19 | 134:13 | **128** 128:1 |
| **Washington** | 150:43 | **White** 94:15 | 46:13 | _____ | 17:37 | **10/14** 152:37 | **129** 129:1 |
| 33:7 | 154:33 | 96:3 98:45 | 65:41 | **X** | 19:51 | **10/14/21** | **12th** 5:9,23 |
| **wasn't** 18:23 | **we've** 16:37 | **wide** 73:29 | 117:3,21 | _____ | 24:45 25:7 | 152:45 | 22:41 |
| 18:27 | 17:7 19:27 | 155:37 | 154:47 | **Y** | 25:35 | **10:00** 1:10 | 152:11,27 |
| 75:19 | 91:41 | 159:23 | 159:33 | _____ | 26:49 | **100** 72:15 | 152:31,37 |
| 104:7 | **wealth** 141:3 | **wigs** 95:19 | **workers** | **y'all** 35:37 | 29:41 | 89:19 | 152:47 |
| **watch** 38:19 | 148:39 | **William** 6:19 | 158:3 | 97:15,17,31 | 34:23 | 100:1 | **13** 13:1 37:3 |
| 109:21 | **wealthy** | 36:33 | **workforce** | 98:7,13,17 | 36:25,27,35 | 119:9 | 42:37 |
| **watched** | 150:29 | **willing** 76:7 | 37:15 | 98:19,25,41 | 36:41 | 138:37 | 73:35 |
| 91:41 | **weapon** | 125:33 | 38:27 | **Yeadon** | 42:27 49:5 | 145:35 | **130** 130:1 |
| **water** 23:21 | 150:21 | 132:31 | **working** | 103:25 | 53:9 60:51 | **100,000** | **131** 131:1 |
| 23:23 | **web-based** | 133:31 | 22:11 | **yeah** 29:43 | 61:5,9,49 | 109:33 | **132** 132:1 |
| **way** 46:39 | 146:7 | 146:21 | 38:29,31,45 | 102:27 | 62:49 | **100.5** 43:51 | **133** 133:1 |
| 77:51 | **week** 15:21 | **win-win** | 39:5 48:3 | 104:17 | 67:11,11,27 | **101** 101:1 | **134** 134:1 |
| 78:21,33 | 72:13 | 141:9 | 54:5 69:5 | 111:51 | 67:41 68:3 | **102** 102:1 | **135** 135:1 |
| 87:33 94:5 | 78:19 | 150:31 | 87:19 | 114:27 | 68:43 70:5 | **103** 103:1 | **136** 136:1 |
| 95:3 97:37 | 90:17 | **wind** 141:31 | 117:29 | **year** 15:5,17 | 71:29 | **104** 104:1 | **137** 137:1 |
| 98:27 | 137:9 | 143:9 | 118:13 | 42:51 | 75:31,43 | **105** 105:1 | **138** 138:1 |
| 100:29 | 140:29 | **wish** 9:51 | 129:33 | 43:29 44:3 | 78:7,37,37 | **106** 106:1 | **139** 139:1 |
| 110:15 | **weeks** 77:7 | **wishes** 26:43 | 132:45 | 123:49 | 79:43 80:7 | **107** 107:1 | 141:45 |
| 112:37 | 119:3 | **witness** | 133:5 | 131:45 | 80:9 84:11 | **108** 108:1 | **14** 5:11,31 |
| 129:17 | **weigh** 21:29 | 115:41 | 135:47 | **years** 27:29 | 84:13,47 | **109** 109:1 | 8:23 11:17 |
| 133:41 | **welcome** | **witnesses** | 136:11 | 40:31 | 107:19 | **10th** 6:7 | 13:43 14:1 |
| 140:49 | 57:11 | 9:21,43 | 137:11 | 41:41 | 125:5 | **11** 11:1 34:17 | 24:41 |
| 148:33 | 83:11 | **word** 25:19 | 161:17 | 42:43 | 127:45 | 72:17 | 42:35 |
| 152:39 | 98:51 | **words** 3:3 | **working-cl...** | 44:17,35,41 | 128:9 | **110** 110:1 | 83:51 |
| **ways** 113:41 | 105:23 | **work** 17:37 | 89:35 | 46:17 | 129:7,11 | **1100** 154:41 | **14-500** 11:25 |
| **we'll** 77:27 | 108:45 | 17:43 18:3 | 90:51 | 49:33 | 144:13 | 155:7 | **14-502** 7:27 |
| 93:9 | 111:5 | 20:45 | 131:5 | 77:47 | 150:19 | **111** 111:1 | **14-504** 6:47 |
| 147:13 | 120:9 | 21:31,47 | **works** 18:43 | 87:17 | 154:39 | **112** 112:1 | **14-529** 6:37 |
| **we're** 10:33 | 161:27 | 23:43,45 | 21:7 42:19 | 88:33 89:5 | 156:31 | **113** 113:1 | **14-531** 11:29 |
| 18:31 20:3 | **welfare** | 30:21 | **world** 86:43 | 91:3,33 | | 133:15 | **14-532** 8:25 |
| 29:9 33:15 | 149:21 | 35:11 39:3 | 104:39 | 93:49 | _____ | **114** 114:1 | 84:5 |
| 34:25,33 | **well-versed** | 42:27 48:9 | **worried** | 94:25 | **0** | **115** 115:1 | **14-800** 5:35 |
| 38:19 | 144:33 | 49:43,45 | 101:17 | 101:17 | _____ | **116** 116:1 | 24:47 |
| 47:49 48:3 | **went** 96:27 | 103:9 | 71:47 | 107:7 | **1** | **117** 117:1 | **14-acre** |
| 63:47 | **weren't** | 104:51 | **worst** 147:47 | 127:21 | **1** 71:35 77:25 | **118** 118:1 | 101:33 |
| 73:37 | 94:43 | 118:27 | **worth** 109:33 | 131:37 | 131:23,31 | **119** 119:1 | **140** 140:1 |
| 75:51 76:5 | **West** 33:7 | 122:29 | 109:37 | 139:29 | 148:35 | **11th** 5:7,21 | **1400** 107:27 |
| 77:33 | 34:5 49:25 | 125:17,35 | **worthwhile** | 145:37 | **1,000** 142:7 | 22:43 | **141** 141:1 |
| 91:47 92:9 | 86:31 | 129:41 | 41:7 | **York** 147:35 | 153:13 | 23:15 | **142** 142:1 |
| 94:49 | 88:25 | 132:31 | **wouldn't** | _____ | **1.41** 44:3 | **12** 12:1 | **143** 143:1 |
| 96:45 | 90:47 | 133:31 | 70:39 | **Z** | **1:05** 183:17 | **120** 120:1 | **144** 144:1 |
| 97:37,45,47 | 105:43 | 134:17,23 | 71:27,39 | **Zero** 153:27 | **10** 10:1 14:17 | **121** 121:1 | **145** 145:1 |
| 98:33 | 106:41,49 | 135:33 | 104:7 | **zoned** 132:3 | 42:43 89:5 | **122** 122:1 | **146** 146:1 |
| | | | **written** 56:27 | 132:5 | 100:9 | | |

# EXHIBIT 7

# Bill No. 210778, as amended Oct. 26, 2021

PROPOSED AMENDMENTS TO BILL NO. 210778

Amendment no. 1. Make the deletions and additions set forth below

**AN ORDINANCE**

To amend Title 14 of The Philadelphia Code by adding Section 14-532, entitled the "/AHP, Affordable Housing Preservation Overlay District" and making other related changes; to amend the Philadelphia Zoning Maps by changing the zoning designations of certain areas of land located within an area bounded by 39th Street, Ludlow Street, 40th Street, and Market Street; and to establish a temporary demolition moratorium with respect to properties within the aforementioned area; all under certain terms and conditions.

Whereas, Urban Renewal, the federal program used to remediate "blighted areas", began in Philadelphia in January 9, 1948, when eight "blighted" areas in Philadelphia, including two in West Philadelphia, were certified for remediation by the Philadelphia Planning Commission; and

Whereas, in 1959, the West Philadelphia Corporation, a non-profit community development organization, was formed by a coalition of higher education and medical institutions to spearhead the development of the University City Science Center in the area of West Philadelphia that would become known as Redevelopment Area Unit 3; and

Whereas, in 1963, the Philadelphia Planning Commission certified the area known as Redevelopment Area Unit 3 for remediation, consisting roughly of the land bounded by 34th to 40th streets, and north of Chestnut to Lancaster and Powelton avenues ("Unit 3"). According to census data, as of 1960, 4,603 people lived in Unit 3, and it consisted largely of the neighborhood known as the Black Bottom. A 1963 memorandum from the West Philadelphia Corporation noted that Unit 3 contained 3,432 people making up 987 families, 444 of which were white and 543 of which were non-white; and

Whereas, in 1965 the Philadelphia Redevelopment Authority ("PRA") determined that its property acquisitions in Unit 3 would displace an estimated 107 white families and 463 non-white families. Over 75% of the non-white families were tenants. Over 70% of the black families living in Unit 3 at this time were eligible for federally subsidized public housing; and

Whereas, by 1968, the RDA's use of eminent domain on behalf of developers, including, but not limited to, the Science Center, the School District of Philadelphia and Presbyterian-University Medical Center, displaced 2,653 people in Unit 3, roughly 78% of whom were Black. According to Census data, the population of Unit 3 plummeted from 4,603 individuals in 1960 to 654 people in 1970; and

Whereas, in February of 1969, Penn students, supported by local Black activists and others, led a sit-in at the University of Pennsylvania to protest Urban Renewal in Unit 3, calling for affordable housing in Unit 3 and a University fund for low-income housing. This action led to the formation of the Quadripartite Commission (the "Commission"), consisting of community members and University of Pennsylvania ("Penn") students, faculty and trustees; and

Whereas, the initial agreement forming the Commission noted that Penn would provide equitably-priced replacement housing units if future Penn development displaced residents, and that Penn would help create a ten-million-dollar community fund. Ultimately, the Commission floundered, but its genesis reflected the demands of community members and other stakeholders for affordable housing in Unit 3; and

1

Whereas, a 1964 Urban Renewal Land Use Map for Unit 3 showed plans for Presbyterian University City Medical Center on a 2.8 acre parcel of land bounded by 40th Street, 39th Street, Market Street and Ludlow Street (the "Site"). But ultimately, the Site was developed as affordable housing and the plans were changed to allow for the construction of the University City Townhomes, a 70-unit townhome style affordable housing development subsidized heavily by the U.S. Department of Housing and Urban Development ("HUD"), and consisting of approximately 19 two bedroom and 51 three bedroom units ("UCT"), that were built on the Site in the early 1980s; and

Whereas, in July, 1980, I.B.I.D. Associates ("IBID"), the current owner of the Site, entered into a Redevelopment Agreement with the RDA with respect to the site, and purchased it from the RDA for $70,000 in 1982. IBID built UCT in 1983, and in connection therewith entered into a long-term contract with HUD in order to provide Section 8 affordable, family-style rental homes on the Site; and

Whereas, as of 2019, the population of Unit 3 was approximately 1292 people, including 476 who identify as white, 252 who identify as African American, and 456 people who identify as Asian. About 98% of residents are over the age of 18. Approximately 68% of households have an income less than $50,000; and

Whereas, on July 8, 2021, IBID delivered its notice pursuant to Section 1, Title 7, of the Philadelphia Code, of its intent to allow its Section 8 Contract with HUD to expire on July 8, 2022; and now, therefore,

THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:

SECTION 1.

The Council of the City of Philadelphia hereby makes the following legislative findings:

1. As affordable housing in the City diminishes, this Council has adopted inclusionary zoning more often to support the maintenance and creation of affordable housing in the City.

2. The Site is located in an amenity rich area with access to transit, healthcare, quality schools, parks and jobs.

3. The nearby 40th Street SEPTA Market-Frankford Line station provides easy access to jobs throughout Center City and West Philadelphia.

4. Elderly residents are able to take advantage to the proximity of the University of Pennsylvania health system located at different locations within a 9-block radius.

5. The Site is four blocks from Saunders Park and a short walk from the greenery on Penn's campus.

6. The elementary and middle school catchment for the Site includes two top schools in the School District of Philadelphia, the brand new Science Leadership Academy Middle School ("SLAMS") and the Samuel Powel Elementary School. Approximately 7%, or 23 students in the SLAMS student body live in UCT, which represents half the school's total catchment population.

7. The area is home to other residential housing uses, including but not limited to the University Square Apartments, a senior community directly across Market Street from the Site, residential

units across Ludlow Street from the Site, and Center Post Village, an 84-unit housing complex just one-half block north of the Site that predominantly houses seniors and families, reinforcing that the area is attractive for seniors seeking easy access to transit, medical services, and the amenities discussed above.

8.  The Ronald McDonald House, which provides housing for families traveling for medical care, also neighbors the Site across Ludlow Street, reinforcing the area as attractive for those seeking easy access to medical services in the area.

9.  Zoning the Site as RMX-3 will allow the site to retain a residential use consistent with those certain surrounding residential uses abutting the property.

10.  Imposing an affordable housing overlay as described below is consistent with the planning of stakeholders dating back to the 1960s and mandated by the ongoing needs of the community.

11.  While other properties in the vicinity of the Site are zoned CMX-4 many are residential in nature or used for mixed residential and commercial use, and rezoning this Site as RMX-3 with the affordable housing overlay set forth below will best support and encourage growth of the residential community in this amenity rich area, encourage further development of residential housing in this area of the City, further Council's commitment to maintaining and creating new affordable housing across the City, and is consistent with the long standing planning of the community and various stakeholders like the RDA that identified this Site specifically for affordable housing purposes.

12.  Although families may be provided federal housing vouchers to relocate by the expiration of the Contract, given the high rate of voucher discrimination in Philadelphia and the unavailability of affordable housing in amenity rich areas, it is highly unlikely that families will be able to relocate to an area with similar access to transit, healthcare, quality schools, parks and jobs.

13.  Data from the immediate area documents this affordable housing crisis.  The Census tract that contains the Site saw the median gross rent double between 2000 and 2018.  The Census tract to the north saw a similar increase, while median gross rent quadrupled in the Census tract immediately to the east of the Site in that same time period.  Furthermore, in that same time period, the black population decreased in every Census tract in University City east of 52nd Street except the ones that contain low-income housing sites, sometimes by more than 50%.  This reinforces that those who need access to affordable housing most are finding it less and less in this section of the City.

14.  A study published by Temple University Beasley School of Law and Community Legal Services warns that over 9,000 Philadelphia families are at risk of losing their affordable housing through similar "opt outs" of Section 8 project-based housing, which disproportionately affects Philadelphians who are low-income and African-American. More than half of these properties are owned by for-profit companies, with almost 6,000 units in total, and many are in gentrifying census tracts with rapidly escalating property values. The study concludes that if project-based housing is lost, the populations that already face the highest housing burdens would further disproportionately face increased burdens within the private market.

SECTION 2.  Title 14 of The Philadelphia Code is hereby amended to read as follows:

TITLE 14.  ZONING AND PLANNING.

\* \* \*

CHAPTER 14-500.  OVERLAY ZONING DISTRICTS

\* \* \*

§ 14-532.  /AHP, Affordable Housing Preservation Overlay District.

(1)  Applicability.  The Affordable Housing Preservation Overlay District shall apply to lots located in the area bounded by Market Street, 39th Street, Ludlow Street and 40th Street.

(2)  Use Regulations.  The following standards shall apply in addition to those of the applicable base zoning district:

   (a)  At least 40% of all dwelling units (rounded up, if fractional), or seventy units, whichever is greater, shall be provided and maintained as affordable on the same site as all other dwelling units.

   (b) Any development that has received or will receive government financial assistance conditioned upon the provision of 51% or more units meeting affordability standards of a government program shall not be required to meet the requirements of subsections (a) above.

   (c) All uses other than residential uses or required off-street parking must be located on the ground floor of a building.

(3)  Development Standards

   (a)  The maximum floor area ratio for lots zoned RMX-3 within the Affordable Housing Preservation Overlay shall be 750% of the lot area.

   (b) Lots within the Affordable Housing Preservation Overlay shall not be eligible for any floor area ratio bonuses pursuant to the provisions of Section 14-702 (Floor Area, Height, and Dwelling Unit Density Bonuses).

(4) Affordability

 Affordable dwelling and sleeping units required shall be provided under the following standards.  For the purposes of this section, a household shall consist of every person who lives or intends to live in the unit, regardless of age, dependency status, or relationship. The imputed household size for determining unit affordability and occupancy requirements of this section shall be equal to 1.5 people per each bedroom in the unit,

4

except for studios, efficiencies, and sleeping units for which the imputed household size is 1 person.

    (a)   Affordable rental units shall:

        (.1)   Have total monthly costs (including rent and utility costs) that do not exceed thirty percent (30%) of gross monthly income for households earning up to twenty percent (20%) of the Area Median Income (AMI), adjusted for household size, as reported by the U.S. Department of Housing and Urban Development (HUD) for the Philadelphia Metropolitan Statistical Area;

        (.2)   Be occupied by households earning up to twenty percent (20%) of the Area Median Income (AMI), adjusted by household size, as reported by HUD for the Philadelphia Metropolitan Statistical Area at the time of the household's initial occupancy of the unit; and

        (.3)   At no time be occupied by households earning greater than forty percent (40%) of the Area Median Income (AMI), adjusted by household size, as reported by HUD for the Philadelphia Metropolitan Statistical Area; provided that, in the event the income of a tenant is found by the Department of Planning and Development to exceed the maximum income provided for by this subsection (iii), a tenant shall nonetheless be deemed in compliance with this subsection (iii) until the first expiration of a lease occurring after the tenant's income first exceeded the maximum permitted by this subsection (iii). The Department of Planning and Development may waive this requirement upon a showing of exceptional circumstances.

    (b) The standards of §14-702(7)(b)(.2) through (.5) shall apply.

    (c) Applicants shall be encouraged to partner with community development corporations and other community-based organizations in developing and executing plans for marketing units and evaluating the qualifications of potential occupants.

    (d) Compliance check, remedies, and regulations of § 14-702(7)(d) through (g) shall apply.

    (e) The affordability standards set forth in this section (4) shall supersede the affordability standards of any other overlay set forth in this Chapter 14-500 with provisions that otherwise apply to lots within the area of the Affordable Housing Overlay.

(5)  Interpretation

Where any other overlay district provisions conflict with those of this /AHP Affordable Housing Preservation Overlay District, the stricter provision shall govern.

\* \* \*

SECTION 3. Pursuant to Section 14-106 of The Philadelphia Code, the Philadelphia Zoning Maps are hereby amended by changing the zoning designations of certain areas of land within an area bounded by Market Street, 39th Street, Ludlow Street, and 40th Street from the existing zoning designations indicated on Map "A" set forth below to the zoning designations indicated on Map "B" set forth below.

SECTION 4.   No zoning permit shall issue for a complete demolition of any building within the area bounded by Market Street, 39th Street, Ludlow Street, and 40th Street, except if:

    (a)  Such demolition is necessary to abate an imminently dangerous condition as determined by the Department of Licenses and Inspections;

    (b)  Such demolition is necessary to abate an unsafe condition impacting the right of way or any adjacent property as determined by the Department of Licenses and Inspections; or

    (c)  12 months have passed since the date of enactment of this Bill of Council.

SECTION 5.  This Ordinance shall take effect immediately following its enactment.

## Amendment no. 2.

Add the attached document "Map A Existing Zoning" to the Bill as Exhibit A.

Add the attached document "Map B Proposed Zoning" to the Bill as Exhibit B.

# Map A Existing Zoning



7

CMX-4, Commercial Mixed-Use

# Map B Proposed Zoning



## Zoning Districts

RMX-3, Residential Mixed-Use

# EXHIBIT 8

# Bill No. 210778-A, as amended Nov. 4, 2021



# City of Philadelphia

City Council
Chief Clerk's Office
402 City Hall
Philadelphia, PA  19107



**BILL NO. 210778-A**
**(As Amended on Floor 11/4/2021)**

_____

**Introduced September 30, 2021**

_____

**Councilmember Gauthier**

_____

**Referred to the**
**Committee on Rules**

_____

## AN ORDINANCE

To amend Title 14 of The Philadelphia Code by adding Section 14-532, entitled the "/AHP, Affordable Housing Preservation Overlay District" and making other related changes; to amend the Philadelphia Zoning Maps by changing the zoning designations of certain areas of land located within an area bounded by 39th Street, Ludlow Street, 40th Street, and Market Street; and to establish a temporary demolition moratorium with respect to properties within the aforementioned area; all under certain terms and conditions.

Whereas, Urban Renewal, the federal program used to remediate "blighted areas", began in Philadelphia in January 9, 1948, when eight "blighted" areas in Philadelphia, including two in West Philadelphia, were certified for remediation by the Philadelphia Planning Commission; and

Whereas, in 1959, the West Philadelphia Corporation, a non-profit community development organization, was formed by a coalition of higher education and medical institutions to spearhead the development of the University City Science Center in the area of West Philadelphia that would become known as Redevelopment Area Unit 3; and

Whereas, in 1963, the Philadelphia Planning Commission certified the area known as Redevelopment Area Unit 3 for remediation, consisting roughly of the land bounded by 34th to 40th streets, and north of Chestnut to Lancaster and Powelton avenues ("Unit 3"). According to census data, as of 1960, 4,603 people lived in Unit 3, and it consisted largely of the neighborhood known as the Black Bottom. A 1963 memorandum from the West Philadelphia Corporation noted that Unit 3 contained 3,432 people making up 987 families, 444 of which were white and 543 of which were non-white; and

Whereas, in 1965 the Philadelphia Redevelopment Authority ("PRA") determined that its property acquisitions in Unit 3 would displace an estimated 107 white families and 463 non-

# City of Philadelphia

*BILL NO. 210778-A, as amended continued*

white families.  Over 75% of the non-white families were tenants. Over 70% of the black families living in Unit 3 at this time were eligible for federally subsidized public housing; and

Whereas, by 1968, the RDA's use of eminent domain on behalf of developers, including, but not limited to, the Science Center, the School District of Philadelphia and Presbyterian-University Medical Center, displaced 2,653 people in Unit 3, roughly 78% of whom were Black.  According to Census data, the population of Unit 3 plummeted from 4,603 individuals in 1960 to 654 people in 1970; and

Whereas, in February of 1969, Penn students, supported by local Black activists and others, led a sit-in at the University of Pennsylvania to protest Urban Renewal in Unit 3, calling for affordable housing in Unit 3 and a University fund for low-income housing.  This action led to the formation of the Quadripartite Commission (the "Commission"), consisting of community members and University of Pennsylvania ("Penn") students, faculty and trustees; and

Whereas, the initial agreement forming the Commission noted that Penn would provide equitably-priced replacement housing units if future Penn development displaced residents, and that Penn would help create a ten-million-dollar community fund.  Ultimately, the Commission floundered, but its genesis reflected the demands of community members and other stakeholders for affordable housing in Unit 3; and

Whereas, a 1964 Urban Renewal Land Use Map for Unit 3 showed plans for Presbyterian University City Medical Center on a 2.8 acre parcel of land bounded by 40th Street, 39th Street, Market Street and Ludlow Street (the "Site").  But ultimately, the Site was developed as affordable housing and the plans were changed to allow for the construction of the University City Townhomes, a 70-unit townhome style affordable housing development subsidized heavily by the U.S. Department of Housing and Urban Development ("HUD"), and consisting of approximately 19 two bedroom and 51 three bedroom units ("UCT"), that were built on the Site in the early 1980s; and

Whereas, in July, 1980, I.B.I.D. Associates ("IBID"), the current owner of the Site, entered into a Redevelopment Agreement with the RDA with respect to the site, and purchased it from the RDA for $70,000 in 1982.  IBID built UCT in 1983, and in connection therewith entered into a long-term contract with HUD in order to provide Section 8 affordable, family-style rental homes on the Site; and

Whereas, as of 2019, the population of Unit 3 was approximately 1292 people, including 476 who identify as white, 252 who identify as African American, and 456 people who identify as Asian.  About 98% of residents are over the age of 18.  Approximately 68% of households have an income less than $50,000; and

Whereas, on July 8, 2021, IBID delivered its notice pursuant to Section 1, Title 7, of the Philadelphia Code, of its intent to allow its Section 8 Contract with HUD to expire on July 8, 2022; and now, therefore,

# City of Philadelphia

*BILL NO. 210778-A, as amended continued*

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1.

The Council of the City of Philadelphia hereby makes the following legislative findings:

1.  As affordable housing in the City diminishes, this Council has adopted inclusionary zoning more often to support the maintenance and creation of affordable housing in the City.

2.  The area identified below as within the Affordable Housing Preservation Overlay is located in an amenity rich area with access to transit, healthcare, quality schools, parks and jobs.

3.  The nearby 40th Street SEPTA Market-Frankford Line station provides easy access to jobs throughout Center City and West Philadelphia.

4.  Elderly residents are able to take advantage to the proximity of the University of Pennsylvania health system located at different locations within a 9-block radius.

5.  The proposed Affordable Housing Preservation Overlay District is blocks from Saunders Park and a short walk from the greenery on Penn's campus.

6.  The elementary and middle school catchment for the Site includes two top schools in the School District of Philadelphia, the brand new Science Leadership Academy Middle School ("SLAMS") and the Samuel Powel Elementary School. Approximately 6%, or 22 students in the SLAMS student body live in the University City Townhomes which represents half the school's total catchment population. Approximately 15%, or 34 students in the Powel student body live in the University City Townhomes.

7.  The area is home to other residential housing uses, including units across Ludlow Street from the University City Townhomes, and Center Post Village, an 84-unit housing complex just north of Filbert Street that predominantly houses seniors and families, reinforcing that the area is attractive for seniors seeking easy access to transit, medical services, and the amenities discussed above.

8.  The Ronald McDonald House, which provides housing for families traveling for medical care, also neighbors the Site across Ludlow Street, reinforcing the area as attractive for those seeking easy access to medical services in the area.

9.  Zoning as provided in proposed Section 14-532 will allow the area to retain a residential use consistent with those certain surrounding residential uses abutting the Affordable Housing Preservation Overlay District.

# City of Philadelphia

10.  Imposing an affordable housing overlay as described below is consistent with the planning of stakeholders dating back to the 1960s and mandated by the ongoing needs of the community.

11.  While other properties in the vicinity of the Affordable Housing Preservation Overlay District are zoned CMX-4 many such properties are residential in nature or used for mixed residential and commercial use, and other properties are zoned for lower density residential uses. Rezoning the Affordable Housing Preservation Overlay District as set forth below will best support and encourage growth of the residential community in this amenity rich area, encourage further development of residential housing in this area of the City, further Council's commitment to maintaining and creating new affordable housing across the City, and is consistent with the long standing planning of the community and various stakeholders like the RDA that identified areas within in the Affordable Housing Preservation Overlay District specifically for affordable housing purposes. This overlay further serves to transition from the less dense residential uses north of Filbert Street to the denser mixed commercial and residential uses south of Filbert Street.

12.  The Executive Director of the Philadelphia City Planning Commission, Eleanor Sharpe, along with planning directors from across the country, published a Commitment to Change Statement, which notes that planners played an integral role in the displacement of communities of color over the course of modern American history, including through Urban Renewal.

13.  The American Planning Association's Housing Policy Guide Statement 2B supports the preservation of existing affordable housing in gentrifying, amenity rich areas, such as the area designated as the Affordable Housing Preservation Overlay District.

14.  Philadelphia's 2035 Comprehensive Plan notes that "the location of new housing, particularly housing supported by government funding, should be prioritized based on adjacency to existing community assets and strengths: commercial corridors, transit stations, and stable residential blocks."

15.  The University Southwest District Plan calls for mixed-use development in this area. Instituting the overlay set forth below achieves the District Plan's intent and does so in a way that creates space for equity, community cohesion, and cultural and housing preservation.

16.  Zoning the area designated as the Affordable Preservation Overlay District in the manner described in proposed Section 14-532 ensures that mixed-use development can take place at the scale of what is envisioned in the District Plan. Making residential mandatory for uses above one story provides a check against the market forces at play today, that encourage maximizing profit over the creation of inclusive neighborhoods where people with very low incomes can have housing near amenities.

17.  Although families may be provided federal housing vouchers to relocate by the expiration of the availability of affordable housing at a given location in the Affordable Preservation Overlay District, given the high rate of voucher discrimination in Philadelphia and the unavailability of

# City of Philadelphia

*BILL NO. 210778-A, as amended continued*

affordable housing in amenity rich areas, it is highly unlikely that families will be able to relocate to an area with similar access to transit, healthcare, quality schools, parks and jobs.

18.   Data from the immediate area documents this affordable housing crisis.  The Census tract that contains the Affordable Preservation Overlay District saw the median gross rent double between 2000 and 2018.  The Census tract to the north saw a similar increase, while median gross rent quadrupled in the Census tract immediately to the east of the Affordable Preservation Overlay District in that same time period.  Furthermore, in that same time period, the black population decreased in every Census tract in University City east of 52nd Street except the ones that contain low-income housing sites, sometimes by more than 50%.  This reinforces that those who need access to affordable housing most are finding it less and less in this section of the City.

19.   A study published by Temple University Beasley School of Law and Community Legal Services warns that over 9,000 Philadelphia families are at risk of losing their affordable housing through similar "opt outs" of Section 8 project-based housing, which disproportionately affects Philadelphians who are low-income and African-American. More than half of these properties are owned by for-profit companies, with almost 6,000 units in total, and many are in gentrifying census tracts with rapidly escalating property values. The study concludes that if project-based housing is lost, the populations that already face the highest housing burdens would further disproportionately face increased burdens within the private market.

20.   As affordable housing in the City diminishes, maintaining existing affordable housing communities and encouraging the creation of additional affordable housing is a priority for the City's overall plan for equitable growth.  Inspired by the potential loss of the rich community and needed housing provided by the University City Townhomes, the significant prior history of the displacement of lower income communities in this area, and recent gentrification, the Affordable Preservation Overlay District creates a framework for zoning mixed use properties in high density, amenity rich areas, to encourage sustainable residential development for the areas identified below, and other areas throughout the City.

SECTION 2.  Title 14 of The Philadelphia Code is hereby amended to read as follows:

TITLE 14.  ZONING AND PLANNING.

\*   \*   \*

CHAPTER 14-500.  OVERLAY ZONING DISTRICTS

\*   \*   \*

*§ 14-532.  /AHP, Affordable Housing Preservation Overlay District.*

*(1)           Applicability.  The Affordable Housing Preservation Overlay District shall apply to*

# City of Philadelphia

*BILL NO. 210778-A, as amended continued*

*lots located in the area bounded by:*

>    *(a)  Market Street, 39th Street, Ludlow Street and 40th Street.*

>    *(b)  Market Street, 39th Street, Filbert Street and 40th Street.*

*(2)        Use Regulations.  The following standards shall apply in addition to those of the applicable base zoning district:*

>    *(a)  Uses other than residential uses or required off-street parking may only be located on the ground floor of a building.*

>    *(b)  At least 20% of all dwelling units (rounded up, if fractional) shall be provided and maintained as affordable on the same site as all other dwelling units.*

>    *(c)  Any development that has received or will receive government financial assistance conditioned upon the provision of 51% or more units meeting affordability standards of a government program shall not be required to meet the requirements of subsections (b) above.*

*(3)  Development Standards.*

>    *(a)  The maximum floor area ratio for lots zoned CMX-4 within the Affordable Housing Preservation Overlay shall be 750% of the lot area.*

*Lots within the Affordable Housing Preservation Overlay shall not be eligible for any floor area ratio bonuses pursuant to the provisions of Section 14-702 (Floor Area, Height, and Dwelling Unit Density Bonuses).*

*(4) Affordability*

*Affordable dwelling and sleeping units required shall be provided under the following standards. For the purposes of this section, a household shall consist of every person who lives or intends to live in the unit, regardless of age, dependency status, or relationship. The imputed household size for determining unit affordability and occupancy requirements of this section shall be equal to 1.5 people per each bedroom in the unit, except for studios, efficiencies, and sleeping units for which the imputed household size is 1 person.*

>    *(a)  Affordable rental units shall:*

>>        *(.1)  Have total monthly costs (including rent and utility costs) that do not exceed thirty percent (30%) of gross monthly income for households earning up to forty percent (40%) of the Area Median Income (AMI), adjusted for household size, as*

---

# City of Philadelphia

*reported by the U.S. Department of Housing and Urban Development (HUD) for the Philadelphia Metropolitan Statistical Area;*

*(.2)  Be occupied by households earning up to forty percent (40%) of the Area Median Income (AMI), adjusted by household size, as reported by HUD for the Philadelphia Metropolitan Statistical Area at the time of the household's initial occupancy of the unit; and*

*(.3)  At no time be occupied by households earning greater than eighty percent (80%) of the Area Median Income (AMI), adjusted by household size, as reported by HUD for the Philadelphia Metropolitan Statistical Area; provided that, in the event the income of a tenant is found by the Department of Planning and Development to exceed the maximum income provided for by this subsection (iii), a tenant shall nonetheless be deemed in compliance with this subsection (iii) until the first expiration of a lease occurring after the tenant's income first exceeded the maximum permitted by this subsection (iii). The Department of Planning and Development may waive this requirement upon a showing of exceptional circumstances.*

*(b) The standards of §14-702(7)(b)(.2) through (.5) shall apply.*

*(c) Applicants shall be encouraged to partner with community development corporations and other community-based organizations in developing and executing plans for marketing units and evaluating the qualifications of potential occupants.*

*(d) Compliance check, remedies, and regulations of § 14-702(7)(d) through (g) shall apply.*

*(e) The affordability standards set forth in this section (4) shall supersede the affordability standards of any other overlay set forth in this Chapter 14-500 with provisions that otherwise apply to lots within the area of the Affordable Housing Overlay.*

*(5)  Interpretation.*

*Where any other overlay district provisions conflict with those of this /AHP Affordable Housing Preservation Overlay District, the stricter provision shall govern.*

*(6)  Severability.*

*If any paragraph, subsection, clause, provision, or exception of this Section shall be declared by a court of competent jurisdiction to be invalid, such decision shall not affect the validity of this Section as a whole or any part thereof. It is the intention of City Council that the remainder of*

# City of Philadelphia

*BILL NO. 210778-A, as amended continued*

*this Section would have been adopted as if such invalid paragraph, subsection, clause, provision, or exception had not been enacted.*

\* \* \*

SECTION 3. No zoning permit shall issue for a complete demolition of any building within the area bounded by Market Street, 39th Street, Ludlow Street, and 40th Street, except if:

    (a)    Such demolition is necessary to abate an imminently dangerous condition as determined by the Department of Licenses and Inspections;

    (b)    Such demolition is necessary to abate an unsafe condition impacting the right of way or any adjacent property as determined by the Department of Licenses and Inspections; or

    (c)    12 months have passed since the date of enactment of this Bill of Council.

SECTION 4.  This Ordinance shall take effect immediately following its enactment.

# EXHIBIT 9

# Bill No. 210778-A, as amended
# Jan. 20, 2022



# City of Philadelphia

City Council
Chief Clerk's Office
402 City Hall
Philadelphia, PA  19107

**BILL NO. 210778-AA**
**(As Amended on Floor 1/20/2022)**

_____

**Introduced September 30, 2021**

_____

**Councilmember Gauthier**

_____

**Referred to the**
**Committee on Rules**

_____

## AN ORDINANCE

To amend Title 14 of The Philadelphia Code by adding Section 14-532, entitled the "/AHP, Affordable Housing Preservation Overlay District" and making other related changes; to amend the Philadelphia Zoning Maps by changing the zoning designations of certain areas of land located within an area bounded by 39th Street, Ludlow Street, 40th Street, and Market Street; and to establish a temporary demolition moratorium with respect to properties within the aforementioned area; all under certain terms and conditions.

Whereas, Urban Renewal, the federal program used to remediate "blighted areas", began in Philadelphia in January 9, 1948, when eight "blighted" areas in Philadelphia, including two in West Philadelphia, were certified for remediation by the Philadelphia Planning Commission; and

Whereas, in 1959, the West Philadelphia Corporation, a non-profit community development organization, was formed by a coalition of higher education and medical institutions to spearhead the development of the University City Science Center in the area of West Philadelphia that would become known as Redevelopment Area Unit 3; and

Whereas, in 1963, the Philadelphia Planning Commission certified the area known as Redevelopment Area Unit 3 for remediation, consisting roughly of the land bounded by 34th to 40th streets, and north of Chestnut to Lancaster and Powelton avenues ("Unit 3"). According to census data, as of 1960, 4,603 people lived in Unit 3, and it consisted largely of the neighborhood known as the Black Bottom. A 1963 memorandum from the West Philadelphia Corporation noted that Unit 3 contained 3,432 people making up 987 families, 444 of which were white and 543 of which were non-white; and

Whereas, in 1965 the Philadelphia Redevelopment Authority ("PRA") determined that its property acquisitions in Unit 3 would displace an estimated 107 white families and 463 non-

# City of Philadelphia

*BILL NO. 210778-AA, as amended continued*

white families.  Over 75% of the non-white families were tenants. Over 70% of the black families living in Unit 3 at this time were eligible for federally subsidized public housing; and

Whereas, by 1968, the RDA's use of eminent domain on behalf of developers, including, but not limited to, the Science Center, the School District of Philadelphia and Presbyterian-University Medical Center, displaced 2,653 people in Unit 3, roughly 78% of whom were Black.  According to Census data, the population of Unit 3 plummeted from 4,603 individuals in 1960 to 654 people in 1970; and

Whereas, in February of 1969, Penn students, supported by local Black activists and others, led a sit-in at the University of Pennsylvania to protest Urban Renewal in Unit 3, calling for affordable housing in Unit 3 and a University fund for low-income housing.  This action led to the formation of the Quadripartite Commission (the "Commission"), consisting of community members and University of Pennsylvania ("Penn") students, faculty and trustees; and

Whereas, the initial agreement forming the Commission noted that Penn would provide equitably-priced replacement housing units if future Penn development displaced residents, and that Penn would help create a ten-million-dollar community fund.  Ultimately, the Commission floundered, but its genesis reflected the demands of community members and other stakeholders for affordable housing in Unit 3; and

Whereas, a 1964 Urban Renewal Land Use Map for Unit 3 showed plans for Presbyterian University City Medical Center on a 2.8 acre parcel of land bounded by 40th Street, 39th Street, Market Street and Ludlow Street (the "Site").  But ultimately, the Site was developed as affordable housing and the plans were changed to allow for the construction of the University City Townhomes, a 70-unit townhome style affordable housing development subsidized heavily by the U.S. Department of Housing and Urban Development ("HUD"), and consisting of approximately 19 two bedroom and 51 three bedroom units ("UCT"), that were built on the Site in the early 1980s; and

Whereas, in July, 1980, I.B.I.D. Associates ("IBID"), the current owner of the Site, entered into a Redevelopment Agreement with the RDA with respect to the site, and purchased it from the RDA for $70,000 in 1982.  IBID built UCT in 1983, and in connection therewith entered into a long-term contract with HUD in order to provide Section 8 affordable, family-style rental homes on the Site; and

Whereas, as of 2019, the population of Unit 3 was approximately 1292 people, including 476 who identify as white, 252 who identify as African American, and 456 people who identify as Asian.  About 98% of residents are over the age of 18.  Approximately 68% of households have an income less than $50,000; and

Whereas, on July 8, 2021, IBID delivered its notice pursuant to Section 1, Title 7, of the Philadelphia Code, of its intent to allow its Section 8 Contract with HUD to expire on July 8, 2022; and

# City of Philadelphia

*BILL NO. 210778-AA, as amended continued*

Whereas, inspired by the potential loss of the rich community and needed housing provided by the University City Townhomes, the significant prior history of the displacement of lower income communities in this area, and the explosion of commercial development in University City over the past ten years, the Affordable Housing Preservation Overlay District creates a framework for zoning mixed use properties in high density, amenity rich areas, to encourage sustainable residential development for the areas identified below, and other areas throughout the City; and now, therefore,

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1.

The Council of the City of Philadelphia hereby makes the following legislative findings:

1.  As affordable housing in the City diminishes, this Council has adopted inclusionary zoning more often to support the maintenance and creation of affordable housing in the City, most recently adopting mandatory inclusionary zoning within the Mixed Income Neighborhoods Overlay District which requires approximately 20% of units in certain new residential developments be affordable.

2.  The area identified below as within the Affordable Housing Preservation Overlay District and the Mixed Income Neighborhoods Overlay District is located in an amenity rich area with access to transit, healthcare, quality schools, parks and jobs.

3.  The nearby 40th Street SEPTA Market-Frankford Line station provides easy access to jobs throughout Center City and West Philadelphia.

4.   Elderly residents are able to take advantage to the proximity of the University of Pennsylvania health system located at different locations within a 9-block radius.

5.  The proposed Affordable Housing Preservation Overlay District is blocks from Saunders Park and a short walk from the greenery on Penn's campus.

6.   The elementary and middle school catchment for the area includes two top schools in the School District of Philadelphia, the brand new Science Leadership Academy Middle School ("SLAMS") and the Samuel Powel Elementary School. Approximately 6%, or 22 students in the SLAMS student body live in the University City Townhomes which represents half the school's total catchment population. Approximately 15%, or 34 students in the Powel student body live in the University City Townhomes.

7.  The area is home to other residential housing uses, including units across Ludlow Street from the University City Townhomes, and Center Post Village, an 84-unit housing complex just north

---

# City of Philadelphia

of Filbert Street that predominantly houses seniors and families, reinforcing that the area is attractive for seniors seeking easy access to transit, medical services, and the amenities discussed above.

8.  The Ronald McDonald House, which provides housing for families traveling for medical care, also neighbors area within the Affordable Housing Preservation Overlay District across Ludlow Street, reinforcing the area as attractive for those seeking easy access to medical services in the area.

9.  Zoning as provided in the proposed overlay will allow the area to retain a residential use consistent with those certain surrounding residential uses abutting the Affordable Housing Preservation Overlay District.

10.  Imposing an affordable housing overlay as described below is consistent with the planning of stakeholders dating back to the 1960s and mandated by the ongoing needs of the community.

11.  While other properties in the vicinity of the Affordable Housing Preservation Overlay District are zoned CMX-4 many such properties are residential in nature or used for mixed residential and commercial use, and other properties are zoned for lower density residential uses. Rezoning the Affordable Housing Preservation Overlay District as set forth below will best support and encourage growth of the residential community in this amenity rich area, encourage further development of residential housing in this area of the City, further Council's commitment to maintaining and creating new affordable housing across the City, and is consistent with the long standing planning of the community and various stakeholders like the RDA that identified areas within in the Affordable Housing Preservation Overlay District specifically for affordable housing purposes. This overlay further serves to transition from the less dense residential uses north of Filbert Street to the denser mixed commercial and residential uses south of Filbert Street.

12.  The Executive Director of the Philadelphia City Planning Commission, Eleanor Sharpe, along with planning directors from across the country, published a Commitment to Change Statement, which notes that planners played an integral role in the displacement of communities of color over the course of modern American history, including through Urban Renewal.

13.  The American Planning Association's Housing Policy Guide Statement 2B supports the preservation of existing affordable housing in gentrifying, amenity rich areas, such as the area designated as the Affordable Housing Preservation Overlay District.

14.  Philadelphia's 2035 Comprehensive Plan notes that "the location of new housing, particularly housing supported by government funding, should be prioritized based on adjacency to existing community assets and strengths: commercial corridors, transit stations, and stable residential blocks."

# City of Philadelphia

15.   The University Southwest District Plan calls for mixed-use development in this area. Instituting the overlay set forth below achieves the District Plan's intent and does so in a way that creates space for equity, community cohesion, and cultural and housing preservation. The need for residential housing in this area has grown significantly in the nearly ten (10) years since the plan was developed.  While there is no longer a need for hotel rooms in this location, the need for stable long-term housing remains.  Zoning the area designated as the Affordable Housing Preservation Overlay District in the manner described in the proposed overlay ensures that mixed-use development can take place at the scale of what is envisioned in the District Plan, while assuring residential housing, including affordable housing, remains in this amenity rich area.

16.   There has been over $5 billion in development in University City over the past ten years, a disproportionate amount of which has been dedicated to office, life sciences, and academic uses. Reportedly, there is billions more dollars of construction in the pipeline. This commercial development tracks the recommendation of a 2017 Brookings Institute Report which calls for the City to make a University City-Center City Innovation District from 17th Street to 43rd Street from the Market Street corridor to Grays Ferry Avenue. As University City continues to position itself as an innovation district for companies in the life sciences and other technology sectors to thrive, owners of land zoned for commercial and residential development on key corridors within and adjacent to University City will be incentivized to build commercial developments for the knowledge economy, not residential developments, and particularly not to maintain affordable housing for people with low incomes.

17.   The Comprehensive Plan and the Zoning Code currently presuppose that the market will provide adequate housing in CMX zoning districts since over the past several decades residential development has been the most profitable type of development in the City.  However, this is no longer the reality in University City, particularly along amenity rich transit corridors.  Making residential development mandatory for uses above one story within the Mixed Income Neighborhoods Overlay District provides a check against the unique market forces at play in University City, which otherwise encourage maximizing growth and economic development over the creation of inclusive neighborhoods.

18.   In addition to this shift from residential housing development along this transit corridor, a study published by Temple University Beasley School of Law and Community Legal Services warns that over 9,000 Philadelphia families are at risk of losing their affordable housing through "opt outs" of Section 8 project-based housing, which disproportionately affects Philadelphians who are low-income and African-American. More than half of these properties are owned by for-profit companies, with almost 6,000 units in total, and many are in gentrifying census tracts with rapidly escalating property values. The study concludes that if project-based housing is lost, the populations that already face the highest housing burdens would further disproportionately face increased burdens within the private market.

19.   Although families may be provided federal housing vouchers to relocate by the expiration of the availability of affordable housing at a given location in the Affordable Housing Preservation

# City of Philadelphia

*BILL NO. 210778-AA, as amended continued*

Overlay District, given the high rate of voucher discrimination in Philadelphia and the unavailability of affordable housing in amenity rich areas, it is highly unlikely that families will be able to relocate to an area with similar access to transit, healthcare, quality schools, parks and jobs unless this Council acts to assure more dedicated affordable housing is developed in such areas.

20.  Data from the immediate area documents this affordable housing crisis.  The Census tract that contains the Affordable Housing Preservation Overlay District saw the median gross rent double between 2000 and 2018.  The Census tract to the north saw a similar increase, while median gross rent quadrupled in the Census tract immediately to the east of the Affordable Housing Preservation Overlay District in that same time period.  Furthermore, in that same time period, the black population decreased in every Census tract in University City east of 52nd Street except the ones that contain low-income housing sites, sometimes by more than 50%. This reinforces that those who need access to affordable housing most are finding it less and less in this section of the City.

21.  For these reasons, the Affordable Housing Preservation Overlay District proposed is an essential tool to retain and encourage growth of residential housing units and affordable housing units in amenity rich areas where market forces may otherwise displace such housing.

SECTION 2.  Title 14 of The Philadelphia Code is hereby amended to read as follows:

TITLE 14.  ZONING AND PLANNING.

\*   \*   \*

CHAPTER 14-500.  OVERLAY ZONING DISTRICTS

\*   \*   \*

*§ 14-534.  /AHP, Affordable Housing Preservation Overlay District.*

*(1)  Applicability.  The Affordable Housing Preservation Overlay District shall apply to lots located in the area bounded by Filbert Street, 39th Street, Ludlow Street and 40th Street.*

*(2)  Use Regulations.  Uses other than residential uses or required off-street parking may only be located on the ground floor of a building.*

*(3)  Applicability of /MIN, Mixed Income Neighborhoods Overlay District.*

*For any property located within both the Affordable Housing Preservation Overlay District, and the § 14-533 (/MIN, Mixed Income Neighborhoods Overlay District) as described in Bill No. 210633-A:*

# City of Philadelphia

*BILL NO. 210778-AA, as amended continued*

*(a)  Notwithstanding the effective date of Bill No. 210633-A, the provisions of §14-533 (/MIN, Mixed Income Neighborhoods Overlay District), §14-303(8)(a), §14-513(5)(b)(.2), §14-702(7)(a)(.1)(.a)(iii), §14-702(7)(a)(.2)(.a)(iii), and 14-702(7)(i), all as set forth in Bill No. 210633-A, shall be effective immediately; and*

*(b)  Notwithstanding §14-533(3)(b)(.1)-(.4) and §14-533(6)(c), all affordable dwelling units and sleeping units shall be provided and maintained on the same site as all other dwelling units.  No offsite options or payment in lieu of providing onsite affordable housing shall be permitted to satisfy the affordability requirements of §14-533(3)(a) or §14-533(3)(b)*

*(4)  Severability.*

*If any paragraph, subsection, clause, provision, or exception of this Section shall be declared by a court of competent jurisdiction to be invalid, such decision shall not affect the validity of this Section as a whole or any part thereof. It is the intention of City Council that the remainder of this Section would have been adopted as if such invalid paragraph, subsection, clause, provision, or exception had not been enacted.*

\*   \*   \*

SECTION 3. No zoning permit shall issue for a complete demolition of any building within the area bounded by Market Street, 39th Street, Ludlow Street, and 40th Street, except if:

(a)     Such demolition is necessary to abate an imminently dangerous condition as determined by the Department of Licenses and Inspections;

(b)     Such demolition is necessary to abate an unsafe condition impacting the right of way or any adjacent property as determined by the Department of Licenses and Inspections; or

(c)     12 months have passed since the date of enactment of this Bill of Council.

SECTION 4.  This Ordinance shall take effect immediately following its enactment.

# City of Philadelphia

*BILL NO. 210778-AA, as amended continued*